# United States Tax Court

161 T.C. No. 11

YA GLOBAL INVESTMENTS, LP f.k.a. CORNELL CAPITAL
PARTNERS, LP, YORKVILLE ADVISORS, GP LLC, TAX MATTERS
PARTNER AND YA GLOBAL INVESTMENTS, LP f.k.a. CORNELL
CAPITAL PARTNERS, LP, YORKVILLE ADVISORS, LLC, TAX
MATTERS PARTNER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

YA GLOBAL INVESTMENTS, LP, YORKVILLE ADVISORS GP, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 14546-15, 28751-15.          Filed November 15, 2023.

————————

PS, a partnership, provided funding to portfolio
companies in exchange for stock, convertible debentures,
promissory notes, and warrants. Because PS had no
employees, it hired YA to manage its assets. PS could
impose restrictions from time to time on the management
of its assets with appropriate notice to YA. As part of the
transactions in which PS acquired securities from portfolio
companies, those companies paid fees to both PS and YA.

For each of 2006, 2007, and 2008, PS filed Form
1065, U.S. Return of Partnership Income, but did not file
Form 8804, Annual Return for Partnership Withholding

**Served 11/15/23**

Tax (Section 1446). PS was advised by the accounting firm that prepared its returns that it was not engaged in a U.S. trade or business. PS later filed suit against the accounting firm for professional malpractice and negligence.

By execution of a series of Forms 872–P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, R and PS agreed to extend until March 31, 2015, for each of the years in issue, the period of limitation on the assessment of "any federal income tax attributable to the partnership items of the partnership . . . against any partner."

On March 6, 2015, R issued notices of final partnership administrative adjustment (FPAAs) for taxable years that included 2006 through 2008. The FPAAs reflected R's determination that PS was engaged in the conduct of a trade or business in the United States during those years, that all of PS's taxable income was effectively connected with that trade or business, and that PS was liable for withholding tax under I.R.C. § 1446 on the portion of PS's effectively connected taxable income allocable to its foreign partners. R also determined that PS was a "dealer in securities" subject to the mark-to-market accounting rules provided in I.R.C. § 475.

*Held*: Because Ps (PS's tax matters partners) accept that the activities of an agent can be attributed to the agent's principal for the purpose of determining whether the principal is engaged in the conduct of a U.S. trade or business, and because Ps have not established that the relationship between PS and YA was other than agency, YA's activities can be attributed to PS. PS's ability to give interim instructions to YA regarding the management of PS's account demonstrates a relationship of agent and principal rather than service provider and recipient.

*Held, further*, Ps have not established that, during 2006, 2007, and 2008, PS was not engaged in a U.S. trade or business, as defined by I.R.C. § 864(b), *Commissioner v. Groetzinger*, 480 U.S. 23 (1987), and *Higgins v. Commissioner*, 312 U.S. 212 (1941). The activities that YA

conducted on PS's behalf were continuous, regular, and engaged in for the primary purpose of income or profit. And Ps have not established that the fees paid by portfolio companies were additional payments for the use of capital. Therefore, they have not established that the activities that YA conducted on PS's behalf were limited to either the management of investments or trading in stocks or securities.

*Held, further*, because PS "regularly [held] itself out as being willing and able to" purchase stock and debentures, the portfolio companies from which it made those purchases were its "customers," within the meaning of I.R.C. § 475(c)(1)(A). *Cf.* Treas. Reg. § 1.475(c)-1(a)(2).

*Held, further*, because PS "regularly purchase[d] securities from . . . customers in the ordinary course of a trade or business," it was a "dealer in securities," within the meaning of I.R.C. § 475(c)(1)(A), and thus subject to the mark-to-market rule provided in I.R.C. § 475(a)(2).

*Held, further*, to satisfy the identification requirement provided in I.R.C. § 475(b)(2), under which securities can be excepted from the mark-to-market rules of I.R.C. § 475(a), a dealer's records must explicitly state that the security in question is described in either I.R.C. § 475(b)(1)(A) or (B) or I.R.C. § 475(b)(1)(C); identification of a security in general terms as "held for investment" is insufficient to meet the requirement.

*Held, further*, Ps have not established that any portion of PS's taxable income was not effectively connected with its U.S. trade or business.

*Held, further*, a partnership's liability for withholding tax under I.R.C. § 1446 can be reduced by nonpartnership deductions of a foreign partner only if the foreign partner certifies those deductions under Treas. Reg. § 1.1446-6.

*Held, further*, a partnership's payment of withholding tax under I.R.C. § 1446 results in an overpayment for purposes of I.R.C. § 1464 only if the withholding tax paid exceeds the withholding tax properly

due. *Jones v. Liberty Glass Co.*, 332 U.S. 524 (1947). An overpayment does not result merely because the withholding tax paid in respect of a foreign partner exceeds the foreign partner's income tax liability for the year under I.R.C. § 871(b) or 882.

*Held, further*, PS's filing of Form 1065 for each of 2006, 2007, and 2008 did not commence the period of limitation on the assessment of I.R.C. § 1446 withholding tax because the return did not advise R of PS's potential liability for that tax. *Commissioner v. Lane-Wells Co.*, 321 U.S. 219 (1944); *Springfield v. United States*, 88 F.3d 750 (9th Cir. 1996); *Paschall v. Commissioner*, 137 T.C. 8 (2011).

*Held, further*, because the tax imposed by I.R.C. § 1446 is an income tax, PS is a "partner" within the meaning of I.R.C. § 6231(a)(2). Consequently, even if the periods of limitation on the assessment of I.R.C. § 1446 withholding tax commenced with PS's filing of Forms 1065, the Forms 872–P executed for 2006 and 2007 extended the period of limitation for the assessment of that tax for each of those years so that it remained open when R issued the FPAAs.

*Held, further*, PS's filing of Forms 1065 did not shield it from additions to tax under I.R.C. § 6651(a)(1) for its failure to file Forms 8804. Even if a Form 1065 required to be filed by I.R.C. § 6031(a) can, in some circumstances, serve as a "return" whose filing can prevent the imposition of an addition to tax under I.R.C. § 6651(a)(1), PS's Forms 1065 cannot be accepted as defective Forms 8804 because they fail at least three of the four elements of the test prescribed in *Beard v. Commissioner*, 82 T.C. 766 (1984), *aff'd*, 793 F.2d 139 (6th Cir. 1986). Although R apparently accepts that the Forms 1065 that PS filed for 2006, 2007, and 2008 were signed under penalties of perjury, those returns did not disclose the facts relevant to the determination that PS was engaged in a U.S. trade or business, they did not purport to be Forms 8804, and they were not filed on the basis of an honest and reasonable belief that they would satisfy PS's obligations to file Forms 8804.

*Held, further*, Ps have not met their burden of proving that PS's failure to file Forms 8804 and pay I.R.C. § 1446 withholding tax was due to reasonable cause and not willful neglect.

———————

*Ellis L. Reemer, Henry C. Cheng, Tamara L. Shepard, and Caryn G. Schechtman*, for petitioners.

*Gretchen A. Kindel, Robert T. Bennett, Rebecca J. Kalmus, Charles E. Buxbaum, Shawna A. Early, Kelly M. Davidson*, and *Travis Vance III*, for respondent.

OPINION

HALPERN, *Judge*:  In these cases, we review notices of final partnership administrative adjustment (FPAAs) in which respondent adjusted various partnership items reported by YA Global Investments, LP, a limited partnership (YA Global or the partnership) for the taxable years ended December 31, 2006, 2007, 2008, and 2009.[1]  The FPAAs reflect respondent's determination that the partnership was engaged in a U.S. trade or business during those years and that, consequently, it was liable for withholding tax under section 1446 on the portion of its taxable income effectively connected with that trade or business that was allocated to foreign partners.[2]  The FPAAs also determined that the partnership was liable for additions to tax under sections 6651(a)(1) and (2) and 6655 for its failure to file Forms 8804, Annual Return for Partnership Withholding tax, and its failure to pay estimated taxes and section 1446 withholding tax.[3]  As described in more detail below, in

———————

[1] Respondent also issued FPAAs for the partnership's 2010 and 2011 taxable years but made no adjustment to its partnership items for those years.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, 26 U.S.C., in effect for the years in issue, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect for those years, and Rule references are to the Tax Court Rules of Practice and Procedure in effect at the relevant times.

[3] In addition, each FPAA determined that the "I.R.C. § 6662 accuracy-related penalty is applicable."  Petitioners advise us that "[r]espondent has acknowledged . . . that he does not have sufficient evidence establishing his compliance with I.R.C.

addition to assigning error to respondent's determination that YA Global was engaged in a U.S. trade or business during the years in issue, petitioners[4] also raise various issues regarding the manner in which respondent computed the partnership's section 1446 withholding tax liability. And petitioners challenge respondent's determinations of additions to tax. Petitioners also allege that the applicable statute of limitations bars respondent from assessing the tax and additions to tax in issue for 2006 and 2007. In this Opinion, we address those issues raised by YA Global's taxable years ended December 31, 2006, 2007, and 2008. The partnership's 2009 taxable year raises additional issues that we will address in a subsequent Opinion after giving the parties the opportunity to submit supplemental briefs that take into account our resolution in this Opinion of those issues common to all four taxable years. In this Opinion, we address the following issues:

1. Can the activities of Yorkville Advisors, the manager of YA Global's assets, be attributed to the partnership?

2. If so, was YA Global engaged, through Yorkville Advisors, in the conduct of a U.S. trade or business during 2006, 2007, and 2008?

3. Was YA Global required to recognize gain under the "mark-to-market" rule of section 475(a)(2) for each of 2006, 2007, and 2008?

4. If YA Global was engaged in the conduct of a U.S. trade or business during 2006, 2007, and 2008, how much of YA Global's taxable income for each year was effectively connected with that trade or business?

---

§ 6751(b), and he has therefore conceded these penalties." Because respondent does not dispute petitioners' assertion, we treat him as having conceded the accuracy-related penalties determined in the FPAAs. Similarly, because petitioners make no argument on brief challenging the determination in the 2006 FPAA that YA Global had $23,483,852 of net earnings from self-employment, we treat them as having conceded that issue. *See Gregory v. Commissioner*, T.C. Memo. 2018-192, at *10–11; *Remuzzi v. Commissioner*, T.C. Memo. 1988-8, *aff'd on other grounds*, 867 F.2d 609 (4th Cir. 1989).

[4] The consolidated cases before us involve two petitioners. Yorkville Advisors, LLC, a Delaware limited liability company (Yorkville Advisors), was YA Global's tax matters partner during 2006. Another entity, Yorkville Advisors GP, LLC (Yorkville GP), was YA Global's tax matters partner during the remaining years in issue.

5. If YA Offshore Global Investments, Ltd. (YA Offshore) was allocated effectively connected taxable income for 2007 and 2008, can YA Global's liability for section 1446 withholding tax for each year be "adjusted" under I.R.C. § 1464 to reflect stipulated expenses of YA Offshore beyond its distributive share of partnership deductions?

6. Did YA Global's filing of Form 1065 for each of 2006, 2007, and 2008 commence the period of limitation on the assessment of I.R.C. § 1446 withholding tax for the year and, if so, was that period extended by the execution of Forms 872–P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items?

7. Is YA Global liable for additions to tax under I.R.C. § 6651(a)(1) and (2) for its failure to file Forms 8804 and pay I.R.C. § 1446 withholding tax?

For readers' convenience, we will present our findings of those facts relevant to each issue together with our analysis of the issue.

I.    *Attribution of Yorkville Advisors' Activities to YA Global*

A.    *Introduction*

The principal issue in the cases before us is whether YA Global engaged in a trade or business in the United States during the taxable years ended December 31, 2006, 2007, 2008, and 2009. If the partnership was so engaged, it was required by section 1446 to withhold and pay tax on that portion of its income effectively connected with its U.S. trade or business that was allocable to any foreign partners.

The cases present as a threshold issue the question of whether Yorkville Advisors' activities can be attributed to YA Global. Respondent acknowledges that "[a]s it had no employees, YA Global itself could not perform any activities." Therefore, respondent's conclusion that the partnership engaged in a U.S. trade or business necessarily rests on the premise that the activities of Yorkville Advisors, as the manager of the partnership's assets, can be attributed to the partnership.

B.     *Findings of Fact*

YA Global was formed as a Delaware limited partnership on January 2, 2001. In early 2007, YA Global registered under the laws of the Cayman Islands. From YA Global's formation until January 14, 2007, Yorkville Advisors was YA Global's sole general partner. From January 15, 2007, through December 31, 2011, Yorkville GP was YA Global's sole general partner. When petitioners filed their Petitions in these cases, YA Global's mailing address was in George Town, Grand Cayman.

In an Amended and Restated Investment Management Agreement entered into as of December 1, 2005 (2005 Agreement), YA Global retained Yorkville Advisors "to render investment management services and manage [YA Global's] securities investment account."[5] Yorkville Advisors maintained its headquarters in New Jersey. In the 2005 Agreement, YA Global "constitute[d] and appoint[ed]" Yorkville Advisors "as the Partnership's Agent and attorney-in-fact with full power and authority to buy, sell, or otherwise deal with the [Partnership's] account." 2005 Agreement § 2. The agreement further states that the "power of attorney" granted to Yorkville Advisors "is coupled with an interest and is irrevocable." *Id.*

Section 3 of the 2005 Agreement provided: "The Partnership shall promptly advise the Investment Manager of any specific investment restrictions relating to the Account. In the absence of such notice, the Investment Manager shall operate the Account without any agreed-upon restrictions with the Partnership." By its terms, the 2005 Agreement could be "terminated by either party with or without cause by the giving of not less than 30 days' written notice to the other party." 2005 Agreement § 10(a).

As of August 1, 2007, YA Global and Yorkville Advisors entered into a new agreement (2007 Agreement) that amended and restated the 2005 Agreement. The 2007 Agreement includes provisions that are substantively identical to those of the 2005 Agreement described above. (The termination provision of the 2007 Agreement appears as section 14(a).) In addition, section 9 of the 2007 Agreement states: "The

---

[5] YA Global entered into the 2005 Agreement under its former name, Cornell Capital Partners, LP. For convenience, we will refer to the partnership throughout as YA Global. Similarly, we will refer to YA Offshore Global Investments, Ltd. throughout as YA Offshore, even in regard to periods in which it was known as Cornell Capital Partners Offshore, Ltd.

activities engaged in by the Investment Manager on behalf of [YA Global] shall be subject to the policies of and control" of YA Global's general partner.[6]

Yorkville Advisors was compensated for its services by a management fee equal to a specified percentage (generally 2%) of the partnership's assets and a 20% incentive fee based on the partnership's profits.

YA Global filed a Form 1065 for each of the years in issue. The partnership's 2007 Form 1065 includes a Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., for Yorkville Advisors that shows an ending capital account balance of zero. The partnership's 2008 return does not include a Schedule K–1 for Yorkville Advisors.

C. *The Parties' Arguments*

Petitioners argue that the activities of one person cannot be attributed to another for the purpose of determining whether the second person is engaged in a U.S. trade or business unless the first person is an agent of the other under agency law.[7] They contend that, "[u]nder established agency law, both in general and as applied in tax cases, the key to determining whether a principal-agency relationship exists is the degree to which the principal has the right to control the putative agent." "The element of control," they assert, "is critical for attribution." Petitioners allege that "the investors who pooled their funds and gave them over to be managed by Yorkville and Yorkville GP did not exercise the requisite control to create an agency relationship."

Petitioners offer two alternative characterizations of the relationship between YA Global and Yorkville Advisors. First, they contend that the parties' relationship "was one of service recipient and service provider, not one of agency." In their Answering Brief, they suggest an alternative characterization, arguing that Yorkville Advisors' authority to act on YA Global's behalf was "coupled with an interest," in which case it would follow that Yorkville Advisors was not

---

[6] The record does not include an investment management agreement subsequent to the 2007 Agreement. Therefore, we infer that the 2007 Agreement remained in effect at least through the end of 2008.

[7] Petitioners argue that Congress should be "presumed to have incorporated" common law agency principles into the relevant statutory provisions "to determine when the actions of one party may be attributable to another."

a "true agent" because it acted to protect its own interests rather than to advance those of YA Global.

Respondent first contends that Federal tax law governs the question of when a foreign person can be treated as engaged in a U.S. trade or business by reason of the attribution to that person of activities conducted by another. In his view, attribution turns on "whether the putative agent was acting on behalf of or for the benefit of" the foreign person.

Next, respondent argues that, even if attribution of activities for tax purposes turns on agency law, the activities of Yorkville Advisors would still be attributed to YA Global. He contends that Yorkville Advisors was the partnership's agent "throughout the years at issue." He elaborates: "Yorkville Advisors' [sic] acted as YA Global's agent because YA Global and Yorkville Advisors agreed that Yorkville Advisors' [sic] would act on YA Global's behalf and YA Global had the right to control Yorkville Advisors' conduct."

Respondent rejects petitioners' claim that Yorkville Advisors was a service provider. He points to section 3 of each of the 2005 Agreement and the 2007 Agreement, which, in his description, allowed YA Global to "impose[] specific investment restrictions relating to [its] Account." Respondent concludes that "YA Global had the power to give interim instructions or directions." *See* Restatement (Third) of Agency (Third Restatement) § 1.01 cmt. f (Am. L. Inst., 2006) ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.").

D. *Analysis*

Both the 2005 Agreement and the 2007 Agreement refer to Yorkville Advisors as YA Global's "Agent." While that description is not, by itself, determinative, petitioners have not established that the relationship between Yorkville Advisors and YA Global was other than one of agency. Petitioners accept that the activities of an agent can be attributed to the agent's principal for the purpose of determining whether the principal is engaged in a U.S. trade or business. Therefore, we need not decide whether, as respondent suggests, activities can be

attributed for tax purposes even in the absence of an agency relationship.[8]

The distinction between an agency relationship and one of service provider and recipient turns not on the ability to provide direction but instead on *when* that direction may be provided. Service recipients need not accept whatever might strike a service provider's fancy. In a relationship of service provider and recipient, however, any instructions that limit the provider's discretion must be given at the outset: The recipient cannot vary the instructions midstream. By contrast, the principal in an agency relationship *can* give interim instructions. Section 1.01 of the Third Restatement defines "agency" as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." As that definition suggests, "the principal's right to control the agent's actions" is "[a]n essential element of agency." *Id.* cmt. f. Not only can the principal "initially state[] what the agent shall and shall not do"; the principal also "has the right to give interim instructions or directions to the agent once their relationship is established." *Id.* It is "[t]he power to give interim instructions [that] distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.*

We agree with respondent that each of the investment management agreements allowed YA Global to give interim instructions to Yorkville Advisors regarding the management of the partnership's account. As noted above, section 3 of each agreement requires the partnership to "promptly advise" Yorkville Advisors "of any specific investment restrictions relating to the Account." The requirement of prompt notice of any investment restrictions obviously presupposes that the partnership *could* impose restrictions on the manner in which Yorkville Advisors managed the partnership's accounts. And those restrictions could be changed from time to time as long as the partnership provided Yorkville Advisors with the requisite notice. The limits on Yorkville Advisors' discretion were not set once and for all at

---

[8] Respondent's proposed test, under which attribution would turn on "whether the putative agent was acting on behalf of or for the benefit of" a foreign person is almost certainly too broad. Courts have declined to attribute to a foreign person activities of another that benefit the foreign person. *E.g.*, *Amalgamated Dental Co., Ltd. v. Commissioner*, 6 T.C. 1009 (1949). Thus, more than mere benefit to the foreign person would be required to attribute to that person the activities of another even if the tax law provides a test separate from agency law.

the outset of the parties' relationship. It follows that Yorkville Advisors was not, as petitioner contends, a service provider.

As petitioners observe, "[a] power given as security does not create a relationship of agency." Third Restatement § 3.12 cmt b. Whether a power is given as security to protect rights of the holder affects the power's duration. As a general matter, a principal can terminate an agent's actual authority at any time, regardless of any agreement between them. *Id.* § 3.10(1). When a power is given as security, however, "[a] principal's manifestation of revocation is, unless otherwise agreed, ineffective to terminate [the] power." *Id.* § 3.10(2). A power given as security does not create an agency relationship "because it is neither given for, nor exercised for, the benefit of the person who creates it." *Id.* § 3.12 cmt. b. The holder of a power given as security "is not subject to the creator's control and the holder does not owe fiduciary duties to the creator." *Id.* Because the power is given to protect rights of the holder, it would defeat the power's purpose to allow the creator to control the holder or to terminate the power at will.

As noted above, section 2 of each investment management agreement provides that the "power of attorney" granted to Yorkville Advisors "is coupled with an interest and is irrevocable." But that characterization, like the contrary designation of Yorkville Advisors as YA Global's "Agent," is not itself dispositive. The investment management agreements do not identify the "interest" with which Yorkville Advisors' power of attorney is "coupled." Nor do petitioners in their briefs.

The coupling of Yorkville Advisors' power of attorney with its "interest" in serving as YA Global's investment manager cannot render its power irrevocable. A power given as security "is given to protect a legal or equitable title or to secure the performance of a duty apart from any duties owed the holder of the power by its creator that are incident to the relationship of agency." Third Restatement § 3.12. The authority granted to Yorkville Advisors under the investment management agreements cannot be viewed as having been granted to secure Yorkville Advisors' right to compensation for its services as YA Global's investment manager. As comment b to section 3.12 of the Third Restatement explains, "An agent's interest in being paid a commission is an ordinary incident of agency and its presence does not convert the agent's authority into a power held for the agent's benefit." If, however, Yorkville Advisors had "a distinct interest" in YA Global, separate from its status as the partnership's investment manager, "a power given to

protect that [other] interest [would be] a power given as security." *See* Third Restatement § 3.12 cmt. b.

The only interest disclosed in the record that Yorkville Advisors had in YA Global apart from its role as the partnership's investment manager was the general partner interest it held in the partnership until January 14, 2007. But Yorkville Advisors' authority as investment manager cannot be viewed as having been granted to secure its general partner interest in YA Global because the authority and the interest were not coterminous. A power given to secure legal or equitable title must be given "upon the creation of the . . . title," Third Restatement § 3.12, and necessarily terminates with the termination of "the interest secured," *id*. § 3.13(1)(a). The authority to manage YA Global's assets granted to Yorkville Advisors in the investment management agreements continued after the termination of Yorkville Advisors' interest as the partnership's general partner.

Moreover, the same ability of YA Global to control Yorkville Advisors that precludes the latter from being viewed as a service provider rather than an agent also demonstrates that Yorkville Advisors did not have a power coupled with an interest. As noted above, the holder of a power given as security cannot be subject to the creator's control. As also noted above, however, section 9 of the 2007 Agreement expressly subjects Yorkville Advisors' activities as investment manager to the control of Yorkville GP, YA Global's general partner. And under both the 2007 Agreement and the 2005 Agreement, YA Global could impose "restrictions" on Yorkville Advisors' decisions in managing the partnership's assets. The degree of control retained by YA Global is antithetical to the proposition that the partnership granted authority to Yorkville Advisors to protect some interest independent of the latter's role as the partnership's investment manager.

To sum up, both of the investment management agreements in effect during the years in issue expressly appoint Yorkville Advisors as YA Global's "Agent" in managing the partnership's assets. Petitioners have not established that that characterization was incorrect. YA Global's ability under each agreement to give interim instructions that would restrict Yorkville Advisors' discretion in managing the partnership's assets prevents the parties' relationship from being viewed as one of service provider and recipient. And in each agreement, YA Global retained a degree of control over Yorkville Advisors that prevents viewing the latter's powers as having been given to secure some unidentified interest in the partnership or its assets apart from

Yorkville Advisors' role as the partnership's investment manager. Instead, in each of the 2005 Agreement and the 2007 Agreement, YA Global manifested its assent to Yorkville Advisors' acting on the partnership's behalf and subject to the partnership's control in managing its assets. And Yorkville Advisors consented to act in that capacity. It follows that the relationship between the parties was one of "agency," as defined by section 1.01 of the Third Restatement and that, consequently, the activities Yorkville Advisors conducted pursuant to the 2005 Agreement and the 2007 Agreement can be attributed to the partnership for the purpose of determining whether the partnership was engaged in a U.S. trade or business during the years in issue. We now turn to the question of whether those activities rose to the level of a U.S. trade or business.

II. *YA Global's Conduct of a U.S. Trade or Business*

A. *Findings of Fact*

YA Global provided funding to portfolio companies in the form of convertible debentures, standby equity distribution agreements (SEDAs), and other securities. In a SEDA, YA Global committed to purchasing up to a specified dollar value of a portfolio company's stock over a fixed period, typically two years.

The number of shares that YA Global would receive in exchange for a given dollar amount advanced under a SEDA was typically determined using a discounted price. For example, in the SEDA that YA Global entered into on February 22, 2006, with Face Print Global Solutions, Inc. (Face Print), the "Purchase Price" used to determine the number of shares the partnership would receive from Face Print was stated as "97% of the Market Price during the Pricing Period."[9] The Pricing Period included the five Trading Days immediately preceding the date of the Advance (Advance Date). The "Market Price" was "the lowest VWAP [volume weighted adjusted price] of the Common Stock during the Pricing Period."[10] Respondent's expert, Roberts W.

---

[9] The parties stipulated that, "[w]hile specific terms may vary from transaction to transaction, the documents . . . with respect to [the] SEDA transaction between YA Global and Face Print Global Solutions, Inc. and the provisions contained in the documents are typical of SEDA transactions in which YA Global entered."

[10] Other SEDAs apparently provided for greater discounts. Petitioners did not object to respondent's proposed finding that, "[c]ommonly, the Purchase Price [used to determine the number of shares to be issued for an advance under a SEDA] was 95–

Brokaw III, a former investment banker and adjunct professor of finance at New York University, testified that he did not consider the discounts in SEDA pricing to be blockage discounts, which he defined as discounts "applied to securities because of some form of illiquidity."

In addition to granting YA Global the right to purchase stock at a discounted price, SEDAs typically required the portfolio company to pay to Yorkville Advisors and YA Global various fees upon the execution of the SEDA and additional fees upon each advance of funds. The Face Print SEDA, for example, required the company to pay Yorkville Advisors an initial structuring fee of $20,000 and an additional $500 structuring fee for each advance. Face Print also had to pay the partnership commitment fees in the form of (i) $200,000 worth of its common stock upon execution of the SEDA, (ii) 6% of each advance, withdrawn from the proceeds of the SEDA, and (iii) warrants allowing the partnership to purchase 26,325,000 shares of Face Print's common stock over five years at prices ranging from $0.15 to $0.35 per share.

The terms of at least some convertible debentures also allowed YA Global to acquire the stock of the issuer, upon conversion, at a discount. For example, section 3(a) of the convertible debenture issued to the partnership by Neomedia Technologies, Inc., on August 28, 2008, provided, subject to specified limitations: "This Debenture shall be convertible into shares of Common Stock at the option of the Holder, in whole or in part at any time and from time to time, after the Original Issue Date." That section further provided: "The number of shares of Common Stock issuable upon a conversion hereunder equals the quotient obtained by dividing (x) the outstanding amount of this Debenture to be converted by (y) the Conversion Price (as defined in *Section 3(c)(i)).*" Section 3.(c)(i) provided:

> The conversion price in effect on any Conversion Date shall be, at the sole option of the Holder, equal to either (a) Fifteen Cents ($0.15) (the "Fixed Conversion Price") or (b) ninety percent (90%) of the lowest closing Bid Price of the Common Stock during the thirty (30) trading days immediately preceding the Conversion Date as quoted by Bloomberg, LP (the "Market Conversion Price").

---

97% of the lowest 'Volume Weighted Average [Price]' ('VWAP') of the common stock during the Pricing Period."

The Neomedia Technologies convertible debenture, however, may not have been representative. The parties stipulated that "[w]hile specific terms may vary from transaction to transaction, the documents . . . with respect to a convertible debenture transaction between YA Global and LocatePLUS Holdings Corporation and the provisions contained in the documents are typical of convertible debenture transactions in which YA Global entered." Under the terms of the convertible debenture that LocatePLUS Holdings Corporation (LocatePLUS) issued to the partnership, if the partnership had elected to convert the debenture into stock, the number of shares that it would have been entitled to receive would have been determined by a fixed conversion price.[11]

The portfolio companies also paid fees in connection with at least some convertible debenture transactions.[12] For example, Kevin Kreisler, the former chief executive officer of a company called GreenShift, testified that when his company issued convertible debentures to YA Global, it paid transactional and structuring fees.[13] And a slide deck used for a presentation to prospective investors in the partnership describes convertible debentures as involving, in addition to "[w]arrant coverage" and interest, a "[o]ne time, non-recurring" "banker's fee." Although petitioners repeatedly question the reliability of marketing materials, the slide referring to fees paid in convertible debenture transactions was supported by testimony from Edward Schinik, Yorkville Advisors' chief financial officer. When asked about the slide, Mr. Schinik said he was not familiar with the specific term "banker's fee," but he agreed that "the fees, the interest rate, [and] the warrant coverage were all part of the economics" of a convertible debenture transaction.

---

[11] Petitioners cite the LocatePLUS convertible debenture in support of a proposed finding that "YA Global had the right to convert portions of the debt into common stock of the company, and [the] number of shares issued upon conversion was determined using a conversion price that was the lower of (i) a fixed price or (ii) a discount to an average market price computed over a specific period preceding the installment date." In support of that finding, petitioners cite section 17(i) of the debenture. That section defines "Company Conversion Price," which determined the number of shares LocatePLUS had to issue if it had elected to pay interest in stock.

[12] The LocatePLUS convertible debenture, which the parties have designated as representative, does not appear to have provided for the payment of fees.

[13] Mr. Kreisler did not specify whether GreenShift paid the fees to YA Global or to Yorkville Advisors. The convertible debenture that GreenShift issued to YA Global does not appear to be in the record.

Mr. Kreisler, the GreenShift CEO, shared Mr. Schinik's understanding. Mr. Kreisler was indifferent to the specific names given to required fees. When asked why GreenShift paid them, he responded: "I saw them as part of the embedded economics in the deal."

Similarly, when Jay Wright, the CEO of a company called Mobile Pro, was asked whether the fee his company paid in connection with its issuance of convertible debentures to YA Global was for services, he replied: "No. This was part of the overall economics of the transaction." He said the focus during the negotiations was on "the total cost [of] capital." He alluded to a tradeoff between fees and interest rates, with higher fees, for example, being a quid pro quo for a lower interest rate.

YA Global would typically exercise a conversion feature on a convertible note only when it was ready to sell the stock it would receive on conversion. According to Mark Angelo, the founder and president of YA Global and Yorkville Advisors, it would not "make sense" to convert a debenture and then hold the stock received.[14] When asked how long YA Global would typically hold a security in its portfolio, Mr. Angelo responded: "We targeted a 12-to-24 month investment horizon."

According to a private placement memorandum dated December 1, 2005 (December 2005 PPM), prepared in connection with the issuance of limited partnership interests in the partnership, the fees that Yorkville Advisors received from portfolio companies were "[t]ypically . . . generated by the Investment Manager for due diligence, structuring and commitment fees. Those fees "were intended to cover the Fund's and the Investment Manager's expenses and overhead." In 2004, however, the fees that Yorkville Advisors had received from portfolio companies "exceeded the Fund's and Investment Manager's expenses and overhead by a significant margin." Therefore, Yorkville Advisors planned, going forward, "to remit to the [partnership] any excess funds realized from these fees after the payment of all expenses and overhead." Consistent with those plans, the partnership agreements governing YA Global, as amended in 2007, provide that, if Yorkville Advisors received cash fees in excess of its expenses, it could remit the excess fees to YA Global or apply them in satisfaction of the management fee owed to Yorkville Advisors by the partnership.

The fees that Yorkville Advisors received from portfolio companies apparently did not continue to cover its expenses and

---

[14] Respondent's expert, Mr. Brokaw, agreed.

overhead throughout the years in issue. According to the partnership's financial statements, the cash fees that Yorkville Advisors was entitled to or did receive were approximately $33,400,000 in 2006, approximately $25,300,000 in 2007, and $10,047,387 in 2008. By contrast, Yorkville Advisors reported total deductions on its tax returns of about $29 million for 2006, $33 million for 2007, and $29.6 million for 2008.[15] Yorkville Advisors remitted to the partnership $7.4 million in fees in 2006 and $1,600,617 in 2007. The partnership's financial statements for 2008 make no mention of any remission of fees by Yorkville Advisors.

During the period from 2006 to 2008, the volume of transactions that Yorkville Advisors executed on behalf of YA Global declined. YA Global entered into 25 SEDA transactions in 2006, 19 in 2007, and only 9 in 2008. The partnership acquired 202 convertible debentures in 2006, 116 in 2007, and 111 in 2008.

In a letter to investors, Yorkville Advisors stated: "We have always said that part of what sets Yorkville apart is the way that it manages the transactions from start to finish. Part of our edge is that we identify, source, negotiate, conduct due diligence, structure the transactions, fund, and manage the majority of our deals." Yorkville Advisors employed in-house attorneys to structure transactions and draft deal documents.

Yorkville Advisors had more than 50 employees during 2006, 2007, and 2008. It had 56 employees in 2006. In February 2007, it had 51 employees. And it had 54 employees in 2008.

Yorkville Advisors paid substantial salaries, wages, and payroll taxes. On its 2006 tax return, Yorkville Advisors reported salaries and wages of over $15 million and payroll taxes of more than $750,000. On its 2007 return, Yorkville Advisors reported salaries and wages of almost $16.5 million and payroll taxes of almost $600,000. On its 2008 return, Yorkville Advisors reported salaries and wages of over $11 million and payroll taxes of more than $450,000.

Yorkville Advisors devoted most of its activities to YA Global during the years in issue. In 2005, Yorkville Advisors managed three other funds: Cornell Rx, Highgate House, and Montgomery Equity Partners. The assets of the other three funds, however, were

---

[15] The reported total deductions included office expense of $199,645 for 2006, $178,276 for 2007, and $252,003 for 2008.

considerably smaller than those of YA Global, whose assets constituted more than 72% of Yorkville Advisors' total assets under management. Cornell Rx was terminated in 2006. And Highgate House and Montgomery Equity Partners were restructured and effectively merged with YA Global on May 1 and July 1, 2006, respectively. Therefore, between July 1, 2006, and April 1, 2009, YA Global was the only fund that Yorkville Advisors managed.[16]

The December 2005 PPM describes the partnership's "investment objective" as "achiev[ing] superior risk-adjusted returns through capital appreciation primarily by making directly managed private equity and equity-related investments and, to a lesser extent, debt investments in public and private companies." Consistent with that objective, the partnership reported substantial net income on its financial statements for each of 2006, 2007, and 2008.[17]

Petitioners' expert, Josh Lerner, a professor of investment banking at Harvard Business School, prepared a report in which he compared YA Global "to the array of institutions that provide financing to companies." Among other things, he "conduct[ed] quantitative analyses of YA Global's fund performance and that of its investee firms." Dr. Lerner found that "the pattern of [the partnership's] returns closely matches those of [venture capital] funds, with a few very strong performers (more than 100 percent) that offset a large number of losses."

The FPAA for 2006 states: "It is determined that Cornell Capital Partners LP was engaged in a trade or business within the United States during the partnership taxable year ended December 31, 2006." The FPAAs for 2007 and 2008, while referring to YA Global, include substantially identical statements.

B. *Applicable Law*

Section 1446(a) requires a partnership to pay a withholding tax on the portion of any "effectively connected taxable income" allocable to a foreign partner. The term "effectively connected taxable income" generally refers to "the taxable income of the partnership which is effectively connected (or treated as effectively connected) with the

---

[16] On April 1, 2009, Yorkville Advisors launched YA Global Investments II, Ltd.

[17] The partnership reported more than $101 million of net income for 2006, more than $122 million for 2007, and more than $61 million for 2008.

conduct of a trade or business in the United States." § 1446(c). Although the question of when activities rise to the level of a U.S. trade or business frequently arises in determining the U.S. tax liability of foreign persons, neither the Code nor the regulations provide a comprehensive definition of what it means to be engaged in a U.S. trade or business.

Section 864(b) provides that "the term 'trade or business within the United States' includes the performance of personal services within the United States at any time within the taxable year."[18] That section goes on to list activities not within the definition of "trade or business within the United States," including trading in securities or commodities. *See* § 864(b)(2).

For the most part, courts have addressed on a case-by-case basis activities not within the per se rule for personal services and not covered by the trading safe harbors. Perhaps the closest any court has come to articulating a general definition of trade or business was when the Supreme Court stated, in *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987): "[N]ot every income-producing and profit-making endeavor constitutes a trade or business. . . . We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit."

But the courts have also recognized an exception to the general principle that continuous and regular activities directed at income or profit amount to a trade or business. A taxpayer whose activities are limited to investment—regardless of how continuous and regular those activities—is not engaged in a U.S. trade or business.

Although the investment exception is widely recognized, its rationale is unclear. And the absence of a clear rationale for the investment exception makes it difficult to define its parameters.

The investment exception traces its roots back to *Higgins v. Commissioner*, 312 U.S. 212 (1941). *Higgins* involved a Paris resident who maintained a New York office where employees managed his "extensive investments in real estate, bonds and stocks." *Id.* at 213. In computing his U.S. tax liability, he sought to deduct his investment

---

[18] The definition of "trade or business within the United States" provided in section 864(b) applies for purposes of parts I and II of subchapter N of chapter 1 (sections 861–898) and chapter 3 (the withholding rules provided in sections 1441 through 1464).

management expenses as ordinary and necessary business expenses under the predecessor of section 162. The Commissioner accepted that the expenses were ordinary and necessary. He also accepted that the taxpayer's real estate activities constituted a trade or business. But he disallowed that portion of the expenses allocable to the taxpayer's dealings in securities. While the taxpayer conceded that small investors were not engaged in a trade or business, he argued that his activities were different. Because his activities were much more extensive than those typical of small investors, he argued, his activities amounted to a trade or business. The Commissioner countered that personal investment activities, however extensive, cannot be a trade or business. The Court wrote that the determination of "whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case." *Id.* at 217. It added:

> The Bureau of Internal Revenue has this duty of determining what is carrying on a business, subject to reexamination of the facts by the Board of Tax Appeals and ultimately to review on the law by the courts on which jurisdiction is conferred. The Commissioner and the Board appraised the evidence here as insufficient to establish [the taxpayer's] activities as those of carrying on a business. The [taxpayer] merely kept records and collected interest and dividends from his securities, through managerial attention for his investment. No matter how large the estate or how continuous or extended the work required may be, such facts are not sufficient as a matter of law to permit the courts to reverse the decision of the Board.

*Id.* at 217–18.[19]

The *Higgins* opinion, as the Court later described it in *Commissioner v. Groetzinger*, 480 U.S. at 29-30, was "bare and brief" and "devoid of analysis." With "its stress on the facts of each case," *Higgins* "affords no readily helpful standard" for determining when a taxpayer is or is not engaged in a trade or business. *Id.* at 32. The Court in *Groetzinger* accepted that *Higgins* "must stand for the proposition

---

[19] Under the law in effect for the years at issue in *Higgins*, the taxpayer could have deducted the expenses in question only as trade or business expenses under the predecessor of section 162. Section 212 now allows a deduction for expenses incurred in income-producing activities that do not rise to the level of a trade or business, but Congress did not enact the predecessor of that section until 1942, in response to the Court's opinion in *Higgins*.

that full-time market activity in managing and preserving one's own estate is not embraced within the phrase 'carrying on a business,' and that salaries and other expenses incident to the operation are not deductible as having been paid or incurred in a trade or business." *Id.* at 30. But *Higgins* offers little or no guidance on how far the investment exception extends and whether it encompasses a taxpayer whose activities include anything beyond earning returns on invested capital.

### C. *The Parties' Arguments*

#### 1. *Respondent*

Though respondent asserts that "[t]he U.S. trade or business standard under section 864(b) does not hinge on labels," he nonetheless rests his argument on them. "During the Relevant Period,"[20] respondent asserts, "YA Global performed various lending, underwriting, and other financing activities and generally behaved like a lender and underwriter." Regarding YA Global's purported lending business, respondent asserts that, "[d]uring the Relevant Period, YA Global made hundreds of loans directly to companies in exchange for promissory notes and convertible debentures."[21] Respondent concludes that "YA Global's lending activities far exceeded the number of loans needed to establish a trade or business."

Respondent describes YA Global's role in a SEDA as that of an "intermediary," acquiring stock in exchange for advances and later reselling that stock in the market. The partnership, he says, "essentially perform[ed] the function of an underwriter." And underwriting services, respondent contends, "are a service provided to an issuer."

Respondent suggests that YA Global's transactions in convertible debentures, in addition to being part of a lending business, were also

---

[20] Respondent uses the term "Relevant Period" to refer to 2006 through 2011.

[21] Respondent bases his assertion in part on a proposed factual finding concerning the number of "promissory notes" issued to YA Global by portfolio companies during the years in issue. In response to that proposed finding, petitioners object to any suggestion that "YA Global received promissory notes as standalone securities." Petitioners contend that YA Global acquired promissory notes "only in limited contexts, primarily as part of equity-related investment packages." Because our analysis does not turn on whether any trade or business conducted by YA Global could be properly characterized as being, in particular, a *lending* business, we need not resolve the factual question of the extent to which YA Global acquired promissory notes other than as part of an "equity-related investment package."

part of an underwriting business. "Like SEDAs," respondent argues, "convertible debentures were targeted to the ultimate issuance of equity to the public markets." Respondent observes that YA Global would typically convert a debenture into stock (and thereby surrender the downside protection afforded by its creditor's rights) only when it was prepared to sell the stock received upon conversion. This practice, in respondent's view, "shows that equity acquired with respect to the convertible debentures was not held as an investment" but that "instead, YA Global made efforts to distribute the stock in a manner consistent with its underwriting or dealing activities."

Through its use of "SEDAs, convertible debentures, and promissory notes," respondent argues, "YA Global provided financial services to companies seeking funding." And "[t]he performance of services in the United States," respondent reminds us, "is (with limited exceptions) treated as a trade or business under the express language of section 864(b)." The fees paid by portfolio companies, in respondent's view, reinforce the conclusion that YA Global, through Yorkville Advisors, "was engaged in a services business." The receipt of fee income, respondent alleges, distinguishes YA Global from "[t]axpayers engaged merely in trading and investment."

Respondent denies petitioners' claim that he is raising a new issue in arguing that YA Global engaged in a trade or business because it provided services. Referring to a Chief Counsel Advice issued in 2014 regarding YA Global,[22] respondent asserts that he "has always contended that YA Global provided services for compensation." Respondent also points to references to the performance of services included in a stipulation the parties filed on August 28, 2020 (August 28 stipulation), and in respondent's Pretrial Memorandum.

Paragraph 1 of the August 28 stipulation states the parties' agreement as to respondent's contentions concerning YA Global's alleged U.S. trade or business and precludes respondent from "tak[ing] . . . the position that YA Global was engaged in a U.S. trade or business other than as stated in this paragraph." Paragraph 1(d) and (e) lists as examples of the activities involved in YA Global's alleged business "lending, underwriting, and stock distribution and any associated

---

[22] The parties agree that YA Global was the subject of Chief Counsel Advice 201501013 (Sept. 5, 2014).

services" and "services performed by YA Global and others on YA Global's behalf."

Respondent's Pretrial Memorandum stated: "During the years at issue, YA Global was engaged in a U.S. financing business, conducting, among other activities, lending and underwriting activities and services through its agent Yorkville Advisors." Two sentences later, respondent asserted: "In addition, as part of this business activity, YA Global, through its agent Yorkville Advisors, performed services in the United States for fees, which itself demonstrates that the activity constitutes a U.S. trade or business." Later, respondent argued that YA Global is ineligible for the trading safe harbor because it "did not seek to profit solely from a change in value of the securities it received from issuers and borrowers." Rather, respondent contended, "in exchange for performing its activities and services, YA Global received compensation in the form of fees, discounted property, interest, and spreads." "The receipt of compensation," respondent argued, "evidences the performance of services, which, if performed in the United States, is *per se* the conduct of a trade or business in the United States, under section 864(b)."

Respondent suggests that his references to the performance of services are not part of an additional argument, separate from his contention that YA Global engaged in underwriting and lending. According to respondent, "lending and underwriting themselves constitute services." Respondent denies "argu[ing] that services are involved apart from YA Global's lending and underwriting activities." He says his Pretrial Memorandum "makes plain that the fees-for-services argument is associated with, not independent of, respondent's argument that YA Global was in the lending and underwriting business." YA Global's receipt of fees for services, in respondent's view, simply establishes that it was engaged in the business of underwriting and lending.

Respondent reasons that the FPAAs' determinations that YA Global "was engaged in a trade or business in the United States" "were sufficient to put petitioners on notice of the issues in this case." Respondent concludes that he "has not raised a new issue or argued any theories beyond what [he] outlined at the start of the trial and well before."

Respondent argues that YA Global did not qualify for the section 864(b)(2) safe harbor because "financing activities" other than trading,

"such as lending and underwriting . . . are not covered by the safe harbors." The distinction between lending and underwriting, on the one hand, and trading, on the other, respondent explains, "is based on the nature and extent of the activities, including direct involvement with the issuer."

## 2. *Petitioners*

Petitioners argue: "*Even if* Yorkville's activities were attributable to YA Global, . . . those activities would not have given rise to a trade or business because the activities—had YA Global undertaken them directly—would have been in furtherance of investing YA Global's own funds and managing its own portfolio." Petitioners observe that continuous and regular activities directed toward profit do not necessarily constitute a trade or business. In support of that observation, petitioners cite *Higgins*, which they characterize as "seminal." Petitioners assert that YA Global's profits did not arise from the actions the partnership undertook through Yorkville Advisors. Instead, those profits "arose as a result of YA Global putting its capital at risk in the ventures of its portfolio companies."

Petitioners rely on Dr. Lerner's testimony that YA Global's variable returns are more like those of venture capital funds than of banks. They assert: "It is clear when looking at YA Global's returns as a whole that it generated profits and losses from putting its capital at risk. That is the hallmark of investment."

Petitioners allow that "[i]t is *possible* for a taxpayer to have a trade or business that is derived from providing capital to others" but only "if that trade or business is lending." Petitioners claim that "YA Global was not in the lending business" because the convertible debentures that YA Global received from portfolio companies "were not true loans."[23]

Petitioners also dispute respondent's analogy of YA Global's activities to those of an underwriter: "YA Global did not earn guaranteed returns or fee income for providing underwriting services. To the contrary, its returns were far from guaranteed, and they were

---

[23] Respondent asserts that petitioners cannot disavow the form of the convertible debentures and that, in any event, the form should be respected because it resulted from arm's-length relationships.

earned as a result of putting its own capital at risk, not from connecting companies with other investors."

Petitioners claim that, because respondent did not allege in his pleadings that YA Global's activities were subject to the per se rule that treats the performance of personal services as a U.S. trade or business, that issue is not before us. In addition to asserting that respondent's services argument is untimely, petitioners contend that that argument is "outside the scope of the stipulation filed by the parties on August 28, 2020." In the alternative, petitioners ask that, if we do consider the issue, we place the burden of proof on respondent.[24]

Regarding the merits of the "services" issue, petitioners deny that Yorkville Management or YA Global "provided any services to portfolio companies." They contend that "[t]he agreements requiring that portfolio companies pay fees to Yorkville made no mention of any services that Yorkville was to provide." "If the various 'fees' paid by portfolio companies were truly in exchange for services," petitioners reason, "then the amounts of those fees would have varied based on the amount of time Yorkville had to spend providing such services." But, they say, "[t]here is no evidence, . . . that that was the case." "In fact," petitioners observe, "the fees varied, both in name and in amount, on a deal-by-deal basis." Further, petitioners contend, "neither the Fund nor Yorkville ever got any fees unless the Fund closed a deal and put its capital at risk."

In petitioners' view, "[p]ortfolio companies looked to YA Global for capital, not for advice, consultation, or anything else particular to the knowledge and skills of Yorkville employees." "The 'fees' paid by portfolio companies," petitioners conclude, "were simply part of the cost they paid to gain access to YA Global's capital."

Petitioners liken the commitment fees in SEDAs to premiums paid for put options. "Because the SEDA gave the portfolio company the right, but not the obligation, to sell its stock to YA Global during a fixed period," petitioners reason, "it was a purchase by the company (and a sale by YA Global) of a put option." Petitioners assert: "The Code makes clear that transactions in options are capital transactions, not fees for

---

[24] Rule 142(a)(1) provides as a general rule that "[t]he burden of proof shall be upon the petitioner." But that general rule is subject to exceptions. Under one of those exceptions, respondent bears the burden of proof "in respect of any new matter." *Id.*

services."[25]  They conclude: "It is clear, then, that any commitment fees that portfolio companies paid to YA Global when they entered into a SEDA were not compensation for services.  Rather, they were income from capital assets, namely YA Global's investments in the portfolio companies."

Petitioners also deny that the pricing terms in SEDAs were evidence of the provision of underwriting services.  "The fact that YA Global may have purchased stock in SEDA transactions at a discount to market," they argue, "is . . . not evidence that it provided underwriting services to anyone."  They observe that the price of the portfolio company's stock on the date of an advance "could have been more or less than the purchase price determined using data from" the preceding five-day pricing period.  "Therefore," petitioners conclude, "even if YA Global were able to sell all of the portfolio company's stock on any particular day, there would be no guarantee that the price at which it purchased the stock would be set at a discount to the price at which it sold."  By contrast, petitioners contend, "in a typical underwriting arrangement . . . the underwriter is, in effect, guaranteed a specific percentage of the gross sales of a company's stock."

Consistent with their claim that YA Global's activities were limited to managing its investments, petitioners observe that the partnership "frequently held long positions in its companies' stock for long periods of time."  "In any case," petitioners argue, "to the extent YA Global generated its profits from acquiring and disposing of stock quickly, those activities render it a trader."  And petitioners seem to view the safe harbor for trading in stocks and securities provided in section 864(b)(2) as encompassing the judicially created safe harbor for investment.  Under what petitioners describe as the "broad definitions" of "securities" and "trading" provided in the regulations, "all of YA Global's transactions, including purchases of convertible debentures, converting them to stock, entering into SEDAs, purchasing stock

---

[25] Petitioners refer to section 1234(b)(1), which provides:  "In the case of the grantor of [an] option, gain or loss from any closing transaction with respect to, and gain on the lapse of, an option in property shall be treated as a gain or loss from the sale or exchange of a capital asset held not more than one year."

pursuant to SEDAs and selling stock, all [sic] fall within the definition of 'trading in stocks or securities.'"[26]

D.   *Analysis*

The issue of whether YA Global engaged in a U.S. trade or business through Yorkville Advisors during the years in issue turns on three questions.  First, were the activities Yorkville Advisors conducted on behalf of YA Global continuous, regular, and engaged in for the primary purpose of income or profit?  Second, were those activities limited to the management of investments?  And third, were they covered by the safe harbor provided in section 864(b)(2)(A) for trading in stocks or securities?  If the activities that Yorkville Advisors conducted on behalf of YA Global were continuous, regular, and directed at income or profit, went beyond the management of investments, and were not within the statutory safe harbor for securities trading, then YA Global was engaged in a U.S. trade or business as defined by section 864(b), *Groetzinger*, and *Higgins*.  The appropriate label for that business would be of no moment.  Regular and continuous activities directed at income or profit are, by definition, activities of a trade or business.  If those activities are conducted in the United States and are outside the

---

[26] Although the statutory safe harbors refer to "[t]rading in stocks or securities," *see* § 864(b)(2)(A)(i) and (ii), the regulations implementing those safe harbors refer to "[t]he effecting of transactions in the United States in stocks or securities," *see* Treas. Reg. § 1.864-2(c)(1) and (2).  Treasury Regulation § 1.864-2(c)(2)(i)(c) provides:

> For purposes of this paragraph, the term "securities" means any note, bond, debenture or other evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing; and the effecting of transactions in stocks or securities includes buying, selling (whether or not by entering into short sales), or trading in stocks, securities, or contracts or options to buy or sell stocks or securities, on margin or otherwise, for the account and risk of the taxpayer, and any other activity closely related thereto (such as obtaining credit for the purpose of effectuating such buying, selling, or trading).  The volume of stock or security transactions effected during the taxable year shall not be taken into account in determining under this paragraph whether the taxpayer is engaged in a trade or business in the United States.

Thus, as petitioners read the regulation, any buying or selling of stocks or securities, whether or not that buying or selling goes beyond investing and constitutes "trading," would be covered by the trading safe harbor.

judicially created exception for investment and the statutory safe harbor for trading, then the activities are those of a U.S. trade or business.

### 1. *Continuous, Regular, and Engaged in for Profit?*

Petitioners make no argument that Yorkville Advisors' activities were not regular, continuous, and directed at profit. Given the number of Yorkville Advisors' employees who devoted themselves to YA Global's affairs during the years in issue, petitioners have no apparent basis for denying that those activities were regular and continuous. And the record leaves no room for doubt that Yorkville Advisors sought to generate profits for the limited partners who invested in YA Global.[27]

### 2. *Limited to the Management of Investments?*

Petitioners' primary argument regarding the trade or business issue is that YA Global was simply an investor. That argument stands or falls on whether, as petitioners claim, the only returns YA Global and Yorkville Advisors earned from portfolio companies were returns on capital invested in those companies.

The record does not support petitioners' claim that the fees paid by the portfolio companies were simply additional payments for the use of capital. Petitioners assert that "YA Global/Yorkville never got any fees unless the Fund closed a deal and put its capital at risk." While it may be true that a portfolio company had no obligation to pay fees to either Yorkville Advisors or YA Global unless a transaction was consummated, the payment of fees did not depend on the partnership's putting its capital at risk. Some of the commitment fees required under the terms of a SEDA were payable upon execution of the relevant agreements, before the portfolio company sought any advances.

If the fees that portfolio companies paid were simply additional compensation for capital, those fees should have been paid entirely to YA Global. The funds provided to portfolio companies came from the partnership. The record discloses no instance in which Yorkville

---

[27] The December 2005 PPM confirms YA Global's profit-making intent in describing the partnership's "investment objective" as achieving "superior-risk adjusted returns." The PPM's use of the terms "investment" and "investments" does not, of course, establish that the activities that Yorkville Advisors conducted on behalf of YA Global were limited to the management of investments. But the PPM does confirm the obvious point that the partnership sought to earn positive returns for its limited partners.

Advisors provided capital to a portfolio company. And yet, Yorkville Advisors received cash fees from portfolio companies. The form of the transactions thus indicates that the portfolio companies received something of value from Yorkville Advisors above and beyond the capital they received from YA Global.

In objecting to proposed findings by respondent about specific types of fees, petitioners claim repeatedly that "the fees associated with transactions varied, both in name and amount." Petitioners thereby suggest that the labels applied to different fees had no real consequence. They seem to want us to believe, for example, that describing as a "structuring fee" an amount paid to Yorkville Advisors does not indicate that the fee was compensation for Yorkville Advisors' efforts in structuring the transaction. As another example, petitioners suggest that "'monitoring' fees were paid in cases where it was clear there would be nothing to monitor." Petitioners' position seems to rest on the premise that the fees Yorkville Advisors charged portfolio companies were at least misleading, if not downright deceptive.

The testimony of Messrs. Kreisler and Wright suggests that portfolio companies were relatively indifferent to whether the payments they made went to Yorkville Advisors or YA Global or whether the costs of the transaction to the companies took the form of interest, discounts, or fees given one label or another. But the characterization of fees should not have been a matter of indifference to Yorkville Advisors and YA Global's limited partners. For them, the labels given to the various fees had real economic consequences: Those designations affected whether the fees would go directly to the partnership (and thus necessarily shared among its limited partners) or instead were paid, in the first instance, to Yorkville Advisors, leaving to the latter's discretion the extent to which it would remit to the partnership any fees beyond those necessary to cover expenses.

In addition to paying at least market rates for the capital provided by YA Global,[28] the portfolio companies paid fees intended to

_____

[28] The record provides no grounds for concluding that the terms on which YA Global provided capital to portfolio companies failed to provide the partnership with at least market-based returns. Petitioners suggest, contrary to Mr. Brokaw's testimony, that the discounts at which YA Global could acquire portfolio company stock under a SEDA were "blockage" discounts, reflecting thin trading in the stock of the portfolio companies and compensating the partnership for the risk that it would be unable to sell its shares into the market without depressing the market price. We need

cover the costs of the activities that Yorkville Advisors conducted on the partnership's behalf—that is, identifying, sourcing and negotiating transactions, conducting due diligence, and structuring and managing the transactions.[29]  As indicated by the testimony of Messrs. Kreisler and Wright, the portfolio companies would not have entered into a transaction whose overall economics were unattractive.  If the portfolio companies were willing to cover both the cost of Yorkville Advisors' activities and the cost of the capital they received, it follows that Yorkville Advisors' activities had value to the portfolio companies.  If, as petitioners argue, Yorkville Advisors' activities were limited to managing YA Global's investments, the portfolio companies should have been unwilling to cover any of the costs of those activities.[30]

Concluding that the fees paid by portfolio companies were for benefits other than their receipt of capital does not depend on identifying specific services that the relevant agreements required Yorkville Advisors to provide.  There would have been no apparent need for an agreement to impose on Yorkville Advisors the obligation to negotiate, structure, and document the transaction to which the agreement related.  By the time the parties executed the agreement, the negotiating and structuring of the transaction would have been complete.

---

not resolve the dispute about whether the SEDA discounts were blockage discounts. Even if the discounts precisely compensated YA Global for the risk of being unable to sell the shares acquired without depressing their market price, the partnership would still have been paying an arm's-length price for the stock.  The absence of market benchmarks for evaluating the terms of the convertible debentures makes it difficult to assess the adequacy of the stated interest rates.  Those rates were presumably lower than what would have been provided in the absence of the conversion feature.  But the record provides no evidence that any discount in interest rates was more than what would have been necessary to cover the value of the conversion right.

[29] While the fees that Yorkville Advisors was entitled to receive were intended to cover its expenses—and did so for 2004, and apparently for 2005 and 2006 as well—they seem not to have covered all of Yorkville Advisors' expenses for 2007 or 2008.  As shown in our findings of fact, Yorkville Advisors' expenses did not decline at the same rate as the fees it received, perhaps because some of its expenses, such as office rent and at least some salaries, did not vary directly with transaction volume.  Even so, the fees that Yorkville Advisors received, or was entitled to receive, covered 76.7% of expenses (as reported on Yorkville Advisors' tax return) for 2007 and 33.9% for 2008.

[30] Comparing YA Global's situation to that of the taxpayer in the "seminal" but "devoid of analysis" case on which petitioners rely, we doubt that the portfolio companies in which Mr. Higgins invested would have been favorably disposed to a request that they pay him fees sufficient to cover the costs of his New York office.

Nor is it of any moment that the fees that portfolio companies paid to Yorkville Advisors were not measured by the hours that Yorkville Advisors' employees devoted to a particular transaction. While charging a set amount per hour spent may be a common way to bill for legal and other services, parties can also agree to the provision of services in exchange for fixed fees.

More generally, the fees charged to portfolio companies were intended to cover Yorkville Advisors' variable costs and overhead. Yorkville Advisors was allowed, at its discretion, to remit to YA Global only that portion of the fees that exceeded the expenses incurred. We can thus infer that the amounts of the fees were set with an eye to the transaction costs incurred even if the fees were not determined by a strict hourly rate.

It makes sense that the portfolio companies saw value in Yorkville Advisors' activities. The transactions in which they received needed capital would not have occurred but for Yorkville Advisors' efforts. YA Global's mere showing up on a portfolio company's doorstep with capital in hand would not have allowed the company to use that capital in its business. More had to be done. And that something more—the source of its professed competitive "edge"—was done by Yorkville Advisors.[31]

In that respect, the activities that Yorkville Advisors conducted on behalf of YA Global can be meaningfully distinguished from those of a typical investor. Investors who purchase securities on the open market do not deal directly with the companies in which they invest. Any benefit to the issuer from the investor's purchase is negligible. The issuer receives no additional capital at that time. A given investor's market purchase increases the demand for the issuer's security and, together with other purchases, may increase the security's market price—an eventuality presumably favored by the issuer's management. But the issuer itself realizes no immediate benefit from any increase in the price at which its securities trade in the market. Even an investor who buys securities upon initial issuance provides no benefit to the issuer other than the capital provided. By contrast, when the purchaser of a security goes beyond simply deciding whether to purchase a security on the terms offered and arranges and structures the transaction in

---

[31] As noted above, petitioners acknowledge that "[t]he 'fees' paid by portfolio companies were . . . part of the cost they paid to gain access to YA Global's capital." Precisely. Paying to gain *access to* capital is not the same as paying *for* capital.

which the security is issued, the issuer realizes a benefit beyond the receipt of capital. In that circumstance, the issuer would have reason to pay for that additional benefit, as YA Global's portfolio companies apparently did in paying fees intended to cover the costs of Yorkville Advisors' activities.[32]

Petitioners' reliance on section 1234(b)—the provision regarding the termination of options—is misplaced. As noted above, petitioners cite the provision in support of their claim that SEDA commitment fees were income from capital assets rather than compensation for services. As respondent reminds us, however, that section, by its terms, does not apply "to any option granted in the ordinary course of the taxpayer's trade or business of granting options." § 1234(b)(3). Claiming as authority for the proposition that the partnership was not engaged in a U.S. trade or business a provision that would apply *only if* the SEDA transactions were not part of a trade or business assumes the point in issue.

Moreover, SEDA commitment fees can be readily distinguished from premiums paid in a typical put option. The premium paid for a put option generally compensates the writer for the risk that it will be called upon to purchase the subject property at a price that proves to be more than the property is worth when the option is exercised. As we explained in *Federal Home Loan Mortgage Corp. v. Commissioner* (*Freddie Mac*), 125 T.C. 248, 263–64 (2005):

> [I]n a typical put option, the optionee is willing to pay a premium to the optionor for the right to sell a security to the optionor at an agreed price sometime in the future. If the market value of the security falls below the exercise price, the optionee can sell the security to the optionor at a price greater than its value on the exercise date. That potential opportunity is what the optionee paid for. Likewise, the premium received by the optionor is compensation for accepting the potential risk of having to purchase at an unfavorable price. If the market value of the security rises above the exercise price, the option will not be exercised, and the optionor keeps the option

---

[32] In *Commissioner v. Groetzinger*, 480 U.S. at 30, the Court interpreted *Higgins* as "stand[ing] for the propositions that full-time *market* activity in managing and preserving one's own estate is not embraced within the phrase 'carrying on a business.'" (Emphasis added.)

premium for having accepted the risk associated with uncertainty.

By contrast, the price YA Global would pay for stock issued for a SEDA advance would almost certainly (and by apparent design) be at a discount to the market price. A SEDA would seldom, if ever, require the partnership to purchase stock for a price in excess of its value at the time of purchase.

Petitioners refer us to a definition of "put option" provided in Investopedia.com, an online financial reference guide. According to Investopedia:

> A put option . . . is a contract giving the option buyer the right, but not the obligation, to sell—or sell short—a specified amount of an underlying security at a predetermined price within a specified time frame. This predetermined price at which the buyer of the put option can sell the underlying security is called the strike price.

James Chen, *Put Option: What It Is, How It Works, and How to Trade Them*, Investopedia, https://www.investopedia.com/terms/p/putoption.asp (last updated Mar. 2, 2022). "An option's value is informed by the difference between the fixed strike price and the market price of the underlying security." Jason Fernando, *Option Strike Prices: How It Works, Definition, and Example*, Investopedia, https://www.investopedia.com/terms/s/strikeprice.asp (last updated Apr. 24, 2023).

In a SEDA, however, neither the number of shares to be sold nor the price to be paid for those shares is set upon execution of the contract. Under the definition provided in the very authority petitioners cite, therefore, a SEDA is not a put option.

Referring to *Freddie Mac*, petitioners remind us that "[t]his Court has specifically recognized that a 'commitment fee,' when it is paid in exchange for the right, but not the obligation, to enter into an agreement with predefined terms, is effectively a premium for a put option." In *Freddie Mac*, we treated as option premiums commitment fees that originators of mortgages paid to the taxpayer for the option of selling it mortgages. Although the agreement between the taxpayer and originators provided a formula for determining the price the taxpayer would pay for a mortgage if an originator chose to sell it, the exact price could not be determined when the parties executed the agreement.

Instead, that price would depend on the movement of interest rates between the execution of the agreement and any sale of the mortgage. But the formula had the effect of requiring the taxpayer to pay a minimum price. The taxpayer's yield from a mortgage could not exceed a stated maximum. Therefore, the agreement protected the originator from declines in the value of the subject mortgage due to increases in interest rates beyond the specified yield. *See Freddie Mac*, 125 T.C. at 264 ("If interest rates rise above the agreed maximum yield, [the taxpayer] is required to purchase the mortgage on terms less favorable than they would have been at current rates."). In that respect, the agreements at issue in *Freddie Mac* are distinguishable from SEDAs. As respondent observes, "when YA Global entered into a SEDA, it did not have any exposure to price fluctuations prior to the time of 'exercise' (when it acquired stock from the issuer), because it always bought stock at a discount to the prevailing market price." Conversely, "[u]nlike a put option, SEDAs did not protect issuers against the risk of a decline in their stock price (due to the floating purchase price)."

The record provides no evidence that YA Global treated SEDA commitment fees as put option premiums. Options generally receive open transaction treatment. The tax treatment of the premium paid for the option will depend on whether it is exercised. In the case of a put option, the premium is treated as a reduction in the purchase price of the property if the option is exercised. *E.g.*, Rev. Rul. 58-234, 1958-1 C.B. 279, 285. Otherwise, the grantor of the option recognizes ordinary income upon the option's lapse, *id.* at 284, unless section 1234(b)(1) applies to treat the amount as short-term capital gain.

Petitioners fail to explain how the prescribed treatment of option premiums could have applied to SEDA commitment fees. Suppose a portfolio company elected to receive an advance of less than the maximum amount allowed under a SEDA. What portion of the commitment fee would be applied to reduce YA Global's purchase price for the stock issued in that advance? In theory, the commitment fee, if treated as an option premium, would have to be prorated among all of the shares YA Global purchases under the SEDA. But the number of shares that YA Global would ultimately purchase could not be determined until all possible advances had been made.

### 3. *Trading Safe Harbor*

Just as the activities that Yorkville Advisors conducted on behalf of YA Global were not limited to the management of the partnership's

investments, those activities were not limited to trading in stocks or securities. The reason that YA Global was not an investor during the years in issue was not that its portfolio turned over too rapidly. Instead, YA Global fails to qualify for the investment safe harbor because the income the partnership earned from portfolio companies went beyond returns on invested capital. In that respect, YA Global can be distinguished from both investors and traders. Traders, like investors, simply earn returns on the capital they invest. Because the portfolio companies compensated Yorkville Advisors and the partnership for benefits that went beyond the use of invested capital, YA Global was neither an investor nor a trader.[33] The activities that Yorkville Advisors conducted on the partnership's behalf during the years in issue were not covered by either the judicially created safe harbor for the managing of investments or the statutory safe harbor for trading in securities provided in section 864(b)(2)(A).

4.    *Conclusion: Petitioners' Failure to Meet Their Burden of Proof*

To sum up, the record establishes that the activities that Yorkville Advisors conducted on behalf of YA Global were continuous, regular, and directed at income or profit, went beyond the management of investments, and were not within the statutory safe harbor for securities trading. It follows that petitioners have not met their burden of proving that YA Global was not engaged in a U.S. trade or business— as defined by section 864(b), *Groetzinger*, and *Higgins*—during the years in issue.

---

[33] YA Global would not fall within the trading safe harbor even if we were to accept that, under Treasury Regulation § 1.864-2(c)(2)(i)(*c*), the safe harbor covers any buying and selling of stocks or securities. The activities that Yorkville Advisors conducted on behalf of YA Global went beyond buying and selling socks or securities. Petitioners make no argument that the activities that Yorkville Advisors conducted in identifying, sourcing, and negotiating transactions—activities for which Yorkville Advisors was compensated by portfolio companies—were "closely related" to buying, selling, or trading in stocks or securities. Yorkville Advisors' activities can be readily distinguished from obtaining credit to buy, sell, or trade in stocks or securities. Yorkville Advisors' work in arranging for the issuance of stock or convertible debentures by a portfolio company could be viewed as a precondition to its purchase of that stock or those debentures. In that limited sense, Yorkville Advisors' activities could be likened to a taxpayer's obtaining the credit necessary to purchase stock or securities. But the taxpayer's obtaining of credit would not provide a benefit to the issuer of the stock or securities for which the issuer could be expected to compensate the taxpayer. As respondent observes, "Taxpayers engaged merely in trading and investment simply do not earn income designated as fees."

Petitioners' burden is not limited to establishing that YA Global was not in a trade or business of underwriting or lending. The issue before us is not so narrowly circumscribed. The FPAAs reflect respondent's determination that YA Global "was engaged in a trade or business within the United States." The petition assigns error to respondent's determinations that the partnership was engaged in a U.S. trade or business during the years in issue. Respondent's answer denies that he erred as alleged.

Therefore, the issue defined by the pleadings is whether YA Global was engaged in a trade or business—of any sort—during the taxable years in issue. Petitioners seem to have viewed their task as limited to refuting the specific arguments respondent advanced. The August 28 stipulation may reflect petitioners' mistaken assumption that, in circumscribing respondent's arguments, they would be limiting their factual burden.

The August 28 stipulation had no effect on the burden of proof. Rule 142(a)(1) provides: "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent."[34] While petitioners amended their Petitions before trial to raise affirmative issues, respondent did not amend his Answer until April 2023, more than two years after the initial round of posttrial briefs. As explained *infra* Part V.A, the amended Answer respondent ultimately filed does not address the question of *whether* YA Global was engaged in a U.S. trade or business but only the amount of withholding tax that would be due should we to determine (as we have) *that* the partnership was so engaged. Moreover, even an amended answer does not shift the burden of proof if it "assert[s] . . . a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency." *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981). The arguments respondent has advanced about *why* YA Global was engaged in a U.S. trade or business are not inconsistent with the FPAAs' determinations *that* YA Global was engaged in a U.S. trade or business. Consequently,

---

[34] Petitioners' petition, as amended, asserts that respondent has the burden of proof in regard to the adjustments set forth in the FPAAs because "[t]he FPAAs fail to identify the factual basis for any of the adjustments." Petitioners make no argument on brief, however, concerning the applicability of section 7491, which, in specified circumstances, can shift the burden of proof to the Commissioner.

respondent has not raised a "new matter" for which Rule 142(a) would assign him the burden of proof.

Petitioners had the burden of proving that YA Global was not engaged in a U.S. trade or business during the years in issue. They have not met that burden. Therefore, we conclude that YA Global *was* engaged in a U.S. trade or business during the years in issue.

YA Global's conduct of a trade or business in the United States, however, does not, by itself, establish that the partnership is liable for section 1446 withholding tax in any particular amounts. The partnership's liability under section 1446 depends on that portion of its taxable income that is both (1) effectively connected with its U.S. trade or business and (2) allocable to foreign partners. As explained in more detail *infra* Part IV, respondent contends that all of the taxable income YA Global reported was effectively connected with its U.S. trade or business. But respondent also argues that, in one respect, the partnership's taxable income for each of 2006, 2007, and 2008 differs from what it reported on its Form 1065 for the year. According to respondent, the partnership's reported taxable income must be adjusted to reflect the application of section 475's mark-to-market rules. Therefore, before considering the extent to which the partnership's taxable income is effectively connected with its U.S. trade or business, we must consider whether the amount of the partnership's taxable income for each year depends in part on the rules provided in section 475.

III. *Applicability of Section 475's Mark-to-Market Rules*

A. *Findings of Fact*

Yorkville Advisors and YA Global used slide decks to make presentations to prospective investors or portfolio companies. One of those slide decks describes the partnership's "competitive edge" in "deal origination." It notes that "[c]ompanies seeking capital contact the Firm directly." The slide deck also refers to introductions provided by investment bankers, referrals from securities attorneys and accounting firms, YA Global's sponsorship of industry conferences, and the consistent quotation in the press of Yorkville Advisors' "Principals and Bankers" "as authorities on structured finance." Another slide deck, for a presentation by Yorkville Advisors, states: "Strong reputation leads many issuers to contact us directly."

Mr. Angelo confirmed that "industry professionals . . . came to us." "Investment banks [and] placement agents," he said, "would call us and show us potential investment opportunities." In addition, "law firms [and] accounting firms . . . would show [Yorkville Advisors] potential investment opportunities." Mr. Angelo also confirmed that Yorkville Advisors' personnel "went out and . . . attended a lot of conferences" in industries in which they sought to source transactions and "would look to speak to management" of potential portfolio companies.

Section 3.4 of the Face Print SEDA included the following among representations and warranties that the partnership (as "Investor") made to Face Print (the "Company"):

> The securities are being purchased by the Investor for its own account, for investment purposes. The Investor agrees not to assign or in any way transfer the Investor's rights to the securities or any interest therein and acknowledges that the Company will not recognize any purported assignment or transfer except in accordance with applicable Federal and state securities laws. No other person has or will have a direct or indirect beneficial interest in the securities. The Investor agrees not to sell, hypothecate, or otherwise transfer the Investor's securities unless the securities are registered under Federal and applicable state securities laws or unless, in the opinion of counsel satisfactory to the Company, an exemption from such laws is available.

Similarly, section 2(a) of the Securities Purchase Agreement that the partnership entered into with LocatePLUS (also included among the partnership's representations and warranties) states:

> Each Buyer[35] is acquiring the Securities for its own account for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the Securities Act [of 1933]; provided, however, that by making the representations herein, such Buyer reserves the right to dispose of the Securities at any time in accordance with or pursuant to an effective

---

[35] A schedule attached to the agreement identifies the partnership as the only "Buyer."

registration statement covering such Securities or an available exemption under the Securities Act. Such Buyer does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

The partnership's Form 1065 for 2006 reported total taxable income of $99,272,114, consisting of $27,557,943 of interest, $1,212,281 of ordinary dividends, $66,353,835 of short-term capital gain, $1,756,027 of long-term capital gain, $9,797,190 of other income, and $7,405,162 of other deductions. The sum of those amounts appears on line 26(d) of Part II of Schedule M–3, Net Income (Loss) Reconciliation for Certain Partnerships. Line 22(b) of that same schedule shows a temporary difference between financial statement income and taxable income of $3,588,938, which an explanatory statement identifies as "change in unrealized appreciation."

The partnership's 2007 Form 1065 reported total taxable income of $124,781,391, consisting of $45,083,015 of interest, $739,568 of ordinary dividends, $72,034,012 of short-term capital gain, $540,186 of long-term capital loss, $9,056,334 of other income, and $1,591,352 of other deductions. The return also reported foreign taxes paid of $38,208. The total taxable income shown on line 26(d) of Schedule M–3 Part II ($124,743,183) is the difference between the partnership's total taxable income and the foreign taxes paid. Line 22(b) of that schedule shows a temporary difference of $2,337,280, which an explanatory statement describes as a change in unrealized appreciation or depreciation. (The $2,337,280 temporary difference reduced the partnership's financial statement net income but was added back to arrive at taxable income.)

The partnership's 2008 Form 1065 reported total taxable income of $48,542,819, consisting of $50,148,704 of interest, $557,181 of ordinary dividends, $17,074,059 of short-term capital gain, $22,498,796 of long-term capital loss, $5,186,508 of other income and $1,924,837 of other deductions. Line 26(d) of Schedule M–3, Part II shows the sum of those amounts. Line 22(b) of that same schedule shows a temporary difference of $13,393,454, which an explanatory statement identifies as a change in unrealized depreciation. (The temporary difference was included in financial statement income but not taxable income.) The temporary difference YA Global reported on line 22(b) of Schedule M–3, Part II of its 2008 Form 1065 is the net of two amounts shown on the partnership's 2008 income statement: a $13,813,194 "[i]ncrease in unrealized appreciation of investments and forward currency contracts

for the year" and a $419,740 "[u]nrealized loss in securities distributed to Partners." The partnership's 2008 return also reports "other credits" of $249,917, identified as "U.S. tax withheld."

The Form 1065 that YA Global filed for each of 2006, 2007, and 2008 reported no ordinary business income on line 22.

The 2006 FPAA states respondent's determination that the partnership "was a dealer in securities within the meaning of I.R.C. § 475 during the 2006 tax year." Consequently, the partnership "was required to apply the 'mark to market' accounting rules described therein and all gains or losses are treated as ordinary income or loss." The FPAAs for 2007 and 2008 state similar determinations for those years.

The 2006 FPAA determined that the partnership had "[n]et ordinary business income for the 2006 tax year [of] $102,861,052.00," which the FPAA describes as "Form 1065 Schedule M–3 Part II line 26(d) less line 22(b), treated as ordinary." ($102,861,052 is the sum of the $99,272,114 total taxable income reported by the partnership and the $3,588,938 change in unrealized appreciation included in financial statement income but not taxable income.) The 2007 and 2008 FPAAs determined net ordinary business income for those years of $122,405,903 and $61,936,273, respectively. Respondent derived those amounts in the same manner he employed for 2006, using the amounts shown on lines 26(d) and 22(b) of the Schedule M–3 Part II of the partnership's return for the year.[36] The 2008 FPAA also disallowed the $249,917 of other credits reported by the partnership on the ground that those credits "have not been substantiated."[37]

---

[36] The $122,405,903 net ordinary business income determined in the 2007 FPAA is the difference between the $124,743,183 reported on line 26(d) of Schedule M–3, Part II and the $2,337,280 temporary difference reported on line 22(b). Because the amount reported on line 26(d) was reduced by the foreign taxes YA Global purported to have paid, the ordinary business income respondent determined for 2007 was also reduced by that amount. The 2007 FPAA, however, redetermined the partnership's foreign taxes paid to be zero, on the ground that the partnership had not substantiated the reported amount. Although the Petitions assigned error to respondent's disallowance of the foreign taxes claimed by the partnership for 2007, petitioners make no argument on brief in support of that assignment of error.

[37] Although the Petitions assign error to respondent's disallowance of the credit for U.S. tax withheld that YA Global reported for 2008, petitioners make no argument on brief to support the claim in the Petitions that "[t]he Partnership substantiated

B.    *Applicable Law*

Section 475(a) provides rules regarding the treatment of "securities" held by a "dealer in securities."  Section 475(a)(1) requires the securities included in the dealer's inventory to be valued at their fair market value.  Section 475(a)(2) provides:

> In the case of any security which is not inventory in the hands of the dealer and which is held at the close of any taxable year—
>     (A) the dealer shall recognize gain or loss as if such security were sold for its fair market value on the last business day of such taxable year, and
>     (B) any gain or loss shall be taken into account for such taxable year.

Any gain or loss recognized under section 475(a)(2) is "treated as ordinary income or loss."  § 475(d)(3)(A)(i).

Section 475(c)(1) defines "dealer in securities" as "a taxpayer who—(A) regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business; or (B) regularly offers to enter into, assume, offset, assign or otherwise terminate positions in securities with customers in the ordinary course of a trade or business."  For purposes of section 475, the term "security" includes "any . . . share of stock in a corporation," § 475(c)(2)(A), any "note, bond, debenture, or other evidence of indebtedness," § 475(c)(2)(C), and any warrant to acquire stock, § 475(c)(2)(E).[38]    Treasury Regulation § 1.475(c)-1(a) provides:  "Whether a taxpayer is transacting business with customers is determined on the basis of all of the facts and circumstances."

Section 475(b)(1) lists securities to which the mark-to-market rules of section 475(a) do not apply.  Among the listed exceptions are

> (A) any security held for investment, [and]

---

Other credits as reflected on Form 1065 . . . [for] taxable year 2008, and therefore the Partnership is entitled to a $249,917 credit in taxable year 2008."  We therefore uphold respondent's determination that the partnership's other credits for 2008 were zero.

[38] Section 475(c)(2)(E) includes within the definition of "security" any "evidence of an interest in, or a derivative financial instrument in, any security described in [section 475(c)(2)(A), (B), (C), or (D)] . . . including any option, forward contract, short position, and any similar financial instrument in such a security."

(B)(i) any security described in subsection (c)(2)(C) [that is, a note, bond, debenture, or other evidence of indebtedness] which is acquired (including originated) by the taxpayer in the ordinary course of a trade or business of the taxpayer and which is not held for sale . . .

§ 475(b)(1). Treasury Regulation § 1.475(b)-1(a) provides: "[A] security is held for investment (within the meaning of section 475(b)(1)(A)) or not held for sale (within the meaning of section 475(b)(1)(B)) if it is not held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business."

To qualify a security for one of the exceptions listed in section 475(b)(1), a taxpayer must identify it as such. Section 475(b)(2) provides:

A security shall not be treated as described in subparagraph (A), (B), or (C) of paragraph (1), as the case may be, unless such security is clearly identified in the dealer's records as being described in such subparagraph before the close of the day on which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe).

Treasury Regulation § 1.475(b)-2(a) elaborates:

An identification of a security as exempt from mark to market does not satisfy section 475(b)(2) if it fails to state whether the security is described in—
(1) Either of the first two subparagraphs of section 475(b)(1) (identifying a security as held for investment or not held for sale); or
(2) The third subparagraph thereof (identifying a security as a hedge).

Revenue Ruling 97-39, 1997-2 C.B. 62, 62, addresses several issues "to enable taxpayers to comply with the mark-to-market requirements of § 475." Issue 6 asks: "Is a dealer in securities required to use a special procedure to comply with the identification requirements under § 475?" *Id.* at 63. The ruling answers that question in the negative, explaining:

Unless the Commissioner otherwise prescribes, a dealer may comply with the identification requirements under

§ 475 using any reasonable method . . . . The identification, however, must be made on, and retained as part of, the dealer's books and records. The dealer's books and records must clearly indicate . . . that it is being made for purposes of § 475. . . . Under § 1.475(b)-2(a), an identification need not distinguish between an exception under § 475(b)(1)(A) (concerning certain securities held for investment) and one under § 475(b)(1)(B) (concerning securities not held for sale). Exceptions under either of these provisions, however, must be distinguished from exceptions under § 475(b)(1)(C) (concerning securities held as hedges).

*Id.* at 63–64.

C.    *The Parties' Arguments*

1.    *Petitioners*

Petitioners assert that YA Global was not a dealer in securities, within the meaning of section 475(c)(1), because the partnership's "portfolio companies were not its 'customers,' nor were the anonymous investors who purchased the companies' stock on public exchanges." Petitioners also seem to argue that all of the securities YA Global held at the end of any of the taxable years in issue were exempt from section 475(a) by reason of the exception provided in section 475(b)(1)(A) for "securit[ies] held for investment."

Petitioners claim that statements in the SEDA agreements and securities purchase agreements under which YA Global purchased stock, warrants, and convertible debentures satisfy section 475(b)(2)'s identification requirement. In particular, they point to the partnership's representation in section 3.4 of the Face Print SEDA that the partnership was purchasing Face Print stock "for investment purposes" and section 2(a) of the Securities Purchase Agreement with LocatePLUS that the partnership was acquiring the LocatePLUS convertible debentures "for investment."

Petitioners find "nothing in the statute or regulations that requires a taxpayer to identify a security by specifically writing the words 'section 475.'" In petitioners' reading of the Code and regulations, a taxpayer need only "describe the security as being either (1) held for investment or not held for sale or (2) a hedge (that otherwise meets the requirements of section 475(b)(1)(C), which is not relevant here)."

2. *Respondent*

Regarding YA Global's status as a dealer in securities, respondent, as we understand him, does not claim that the partnership regularly *sold* securities to customers but contends that the portfolio companies from whom the partnership *purchased* securities were its customers. Respondent concedes that "[t]here is . . . no case law under section 475 that specifically addresses the relevant facts and circumstances necessary for finding customers."

Finding a dearth of specific authority under section 475, respondent looks to caselaw under section 1221(a), which excludes from the definition of "capital asset" "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." That caselaw, as respondent describes it, focuses on whether the taxpayer acts as a middleman and profits from marking up the property it buys and sells.

Respondent contends that "[t]he language in the various instruments . . . providing that the securities were acquired for investment purposes, is not sufficient for purposes of [the identification requirement of] section 475." To comply with section 475(b)(2), respondent suggests, the identification must be "specific to section 475." By that, respondent means that the identification must state "that the security is described in section 475(b)(1)(A), (B), or (C)." Respondent observes that the text on which petitioners rely included in the Face Print SEDA and the LocatePLUS Securities Purchase Agreement "does not state that the security is described in one of the subsections of section 475(b)(1)." Moreover, that text "does not specify that [it] is even applicable for federal tax purposes." Respondent surmises that "[t]his language was most likely added for securities law purposes."

D. *Analysis*

1. *YA Global's Status as a "Dealer in Securities"*

The threshold issue raised by respondent's determination that YA Global was subject to the mark-to-market rules of section 475 is whether the partnership was a "dealer in securities" for each of the years in issue. Petitioners do not contest that the stock, debt instruments, and warrants the partnership held were "securities" within the meaning of section 475(c)(2). Nor do they dispute that YA Global regularly purchased those securities from portfolio companies. We have already concluded that those purchases occurred in the ordinary course of a

trade or business. Therefore, YA Global was a dealer in securities if the portfolio companies from which it regularly purchased stock, warrants, and debt instruments were the partnership's "customers."

To determine whether YA Global was a dealer in securities within the meaning of section 475(c)(1), we need not resort to analogous authorities such as caselaw under section 1221(a). Instead, we can make that determination on the basis of section 475 and its accompanying regulations. Treasury Regulation § 1.475(c)-1(a)(2) provides: "For purposes of section 475(c)(1)(B), the term dealer in securities includes, but is not limited to, a taxpayer that, in the ordinary course of the taxpayer's trade or business, regularly holds itself out as being willing and able to enter into either side of a transaction enumerated in section 475(c)(1)(B)." Section 475(c)(1)(B), again, treats as a dealer in securities a taxpayer who regularly offers to deal in positions in securities with customers in the ordinary course of its trade or business. Treasury Regulation § 1.475(c)-1(a)(2), in contrast to the statute it interprets, does not use the term "customers." In place of that term, the regulation refers to the taxpayer's "regularly hold[ing] itself out as being willing and able to enter into" specified positions. The regulation thus establishes that a taxpayer's "customers," for purposes of section 475(c)(1)(B), are those with whom the taxpayer does what it "regularly holds itself out" to do. And we see no grounds for giving the term "customers" a different meaning for purposes of section 475(c)(1)(A) than for section 475(c)(1)(B).

The record leaves no doubt that YA Global held itself out as being willing and able to provide capital to portfolio companies.[39] Yorkville Advisors cultivated a reputation that led portfolio companies to contact it directly. The introductions and referrals received and the recognition it garnered in the press attest to the breadth of its and YA Global's reputations. Those reputations could not have developed if Yorkville Advisors and YA Global had not held themselves out as standing ready to enter into transactions involving the partnership's purchase of debt securities and stock issued by portfolio companies.

Because YA Global "regularly [held] itself out as being willing and able to" purchase stock and debentures, the portfolio companies from

---

[39] As previously noted, petitioners repeatedly question the reliability of marketing materials as evidence. Regardless of their reliability for other purposes, we accept those materials as evidence of how Yorkville Advisors and YA Global held themselves out to, and were perceived by, potential investors and portfolio companies.

which it made those purchases were its "customers," within the meaning of section 475(c)(1)(A). Treas. Reg. § 1.475(c)-1(a)(2). Because YA Global "regularly purchase[d] securities from . . . customers in the ordinary course of a trade or business," it was a "dealer in securities," within the meaning of section 475(c)(1)(A). Consequently, the partnership was subject to the mark-to-market rule provided in section 475(a)(2).

2. *The Section 475(b)(1)(A) Exception for Securities Held for Investment*

The parties' dispute concerning the "held for investment" exception provided in section 475(b)(1)(A) centers on the identification requirement of section 475(b)(2). Again, respondent makes no argument that the purchasers to whom YA Global sold its securities on the market were its "customers." It follows that the securities held by YA Global would be covered by the investment exception if the partnership properly identified them as such. (For the same reason, the debentures the partnership held would qualify for the exception provided in section 475(b)(1)(B)(i) if properly identified, but petitioners do not argue that YA Global identified the debentures as covered by that exception.)

Although the record does not support petitioners' assertion that "YA Global's SEDAs and securities purchase agreements consistently stated that the securities it purchased were held for investment," we take respondent to have conceded the point. As petitioners remind us, the parties stipulated that the documents executed in connection with the Face Print SEDA and the LocatePLUS convertible debentures were "typical." But that stipulation does not establish that the agreements under which YA Global purchased *any* securities it held at the end of *any* of the years in issue had identical terms. The very stipulations on which petitioners rely acknowledge the possibility that "specific terms may vary from transaction to transaction."

Nonetheless, respondent appears to accept that every SEDA and every securities purchase agreement had a statement regarding YA Global's investment purpose materially identical to that included in the Face Print SEDA and the LocatePLUS securities purchase agreement. In their Opening Brief, petitioners, citing the Face Print SEDA and the parties' stipulation about its typicality, proposed a finding of fact that "SEDA agreements contained a statement that YA Global was purchasing the securities for its own account, and for investment purpose." Respondent could have objected to petitioners' proposed finding because the record does not support it (specifically, because the

record does not establish that all SEDA agreements had statements as to investment purpose materially identical to that included in the Face Print SEDA). While respondent *did* object to petitioners' proposed finding, his objection was narrower. He objected only "[t]o the extent the finding implies that the inclusion of this language satisfies the identification requirement in section 475(b)(2)." To that extent, respondent observes, the finding states a legal conclusion that he judges to be "inaccurate." But respondent did not question the factual accuracy of the finding as to the statement included in SEDA agreements other than the Face Print SEDA.

Similarly, petitioners proposed a finding that "[t]he securities purchase agreements pursuant to which YA Global purchased convertible debentures contained a provision stating that the Fund was buying the securities for its own account and for investment only." In support of their proposed finding, petitioners cite the LocatePLUS securities purchase agreement and the parties' stipulation as to *that* agreement's typicality. Again, while respondent could have objected that the record does not support the proposed finding, he instead objected on more limited grounds, stating that, "[t]o the extent the finding implies that the inclusion of this language satisfies the identification requirement in section 475(b)(2)," the finding draws an "inaccurate" legal conclusion.

Even accepting that all agreements had materially identical descriptions of YA Global's investment purpose in acquiring the securities in question, we agree with respondent that those descriptions do not satisfy section 475(b)(2)'s identification requirement. Petitioners, again, assert: "All that is required under [the statute and regulations] is that a taxpayer describe the security as being either (1) held for investment or not held for sale or (2) a hedge." Petitioners' paraphrase of Treasury Regulation § 1.475(b)-2(a) is inaccurate. The regulation does not require mere description of the purpose for which a dealer holds a security. Instead, to meet the requirement of section 475(b)(2), the description of a security in the dealer's books and records must "*state* whether the security is described in—(1) Either of the first two subparagraphs of section 475(b)(1) (identifying a security as held for investment or not held for sale); or (2) [t]he third subparagraph thereof (identifying the security as a hedge)." Treas. Reg. § 1.475(b)-2(a) (emphasis added).

As we read Treasury Regulation § 1.475(b)-2(a), it *does* require "writing the words 'section 475.'" An identification cannot "state" that

the security is described in either section 475(b)(1)(A) or (B) or instead in section 475(b)(1)(C) without referring to the section in which those subparagraphs appear. ("State" is not synonymous with "demonstrate" or "indicate.")[40]

Requiring an explicit statement that a security is described in either section 475(b)(1)(A) or (B) or section 475(b)(1)(C) is consistent with the apparent purpose of section 475(b)(2)'s temporal condition. The statute requires that a security be "clearly identified in the dealer's records as being described in [section 475(b)(1)(A), (B), or (C)] *before the close of the day* on which it was acquired, originated, or entered into." § 475(b)(2) (emphasis added). The temporal requirement prevents taxpayers from gaining the benefit of hindsight, choosing the rules that will govern the timing and character of the income they recognize from a security only after seeing whether the security's value increases or decreases. Ambiguous identifications could allow dealers to get the benefit of hindsight, claiming that an identification was sufficient if circumstances develop under which exception from the mark-to-market rule would be advantageous or, alternatively, claiming that an identification was inadequate if application of the mark-to-market rule would be preferable. Requiring an explicit statement that a security is described in either section 475(b)(1)(A) or (B) or in section 475(b)(1)(C) prevents ambiguity and thus ensures that dealers cannot benefit from hindsight.

The statements of YA Global's investment purpose in the Face Print SEDA and the securities purchase agreement executed in connection with the LocatePLUS convertible debentures do not satisfy the identification requirement of section 475(b)(2), as interpreted by Treasury Regulation § 1.475(b)-2(a). Neither agreement "states" that the securities purchased thereunder are described in section 475(b)(1)(A) (or in either section 475(b)(1)(A) or (B)). Therefore, petitioners have not established that any of the securities it held at the

---

[40] Therefore, we do not accept petitioners' suggestion that Revenue Ruling 97-39 "goes beyond what is required by the statute and the Regulations." Instead, Treasury Regulation § 1.475(b)-2(a) supports the ruling's conclusion that "[t]he dealer's books and records must clearly indicate . . . that [the identification] is being made for purposes of § 475." An identification that "states" that a security is described either in section 475(b)(1)(A) or (B) or in section 475(b)(1)(C) will necessarily be "made for purposes of § 475."

end of any of the years in issue were described in section 475(b)(1)(A) and thus excepted from the mark-to-market rules of section 475(a).[41]

### 3. *Conclusion*

For the reasons explained above, we conclude that YA Global was a "dealer in securities," within the meaning of section 475(c)(1)(A), and thus subject to the mark-to-market rule provided in section 475(a)(2). Petitioners have not demonstrated that the partnership identified, in accordance with section 475(b)(2), any of the securities it held at the end of 2006, 2007, or 2008 as having been "held for investment" within the meaning of section 475(b)(1)(A). Nor have petitioners demonstrated that any of the amounts reported on line 22(b) of Schedule M–3 Part II of the partnership's returns were attributable to assets that were not securities, within the meaning of section 475(c)(2). Therefore, with one qualification, we uphold respondent's inclusion in the partnership's ordinary business income for each of 2006, 2007, and 2008 of the amounts reported on line 22(b) of part II of the partnership's Schedule M–3 for the year. We do not agree with respondent that the mark-to-market adjustment for 2008 should be reduced by the $419,740 described in the partnership's 2008 financial statements as "[u]nrealized loss in securities distributed to Partners." Any securities distributed by the partnership during 2008 would not have been "held [by the partnership] at the close of [the] taxable year" and thus would not have been subject to section 475(a)(2).[42] Therefore, we conclude that

---

[41] Even if we were to accept that every SEDA and every securities purchase agreement issued in connection with a portfolio company's issuance of convertible debentures included a statement that satisfied the identification requirement of section 475(b)(2), petitioners have not established the portion of the changes in unrealized appreciation or depreciation included in its financial statement income for each year that was attributable to SEDAs or convertible debentures.

[42] In addition, we do not uphold in full respondent's determinations of YA Global's ordinary business income. For each of 2006, 2007, and 2008, respondent reclassified as ordinary business income each item of income, gain, deduction, or loss reported by the partnership. To the extent that the amounts of capital gain or loss reported by the partnership were attributable to securities, within the meaning of section 475(c)(2), those amounts would be treated as ordinary income or loss under section 475(d)(3)(A). And petitioners have not established that any of the amounts reported as capital gain or loss were attributable to assets of YA Global other than securities. Nor have petitioners established that any of the amounts reported as other income or other deductions were required to be separately stated under section 702(a). But section 702(a)(5) requires the separate statement of dividends, and respondent has offered no justification for including in ordinary business income the amounts the

the partnership was required to recognize mark-to-market gain under section 475(a)(2) for 2008 of $13,813,194—the amount identified on the partnership's financial statements as "[i]ncrease in unrealized appreciation of investments and foreign currency contracts for the year."

Having established YA Global's taxable income for 2006, 2007, 2008, the next step in the determination of the partnership's liability for section 1446 withholding tax is to consider the extent to which the partnership's taxable income was effectively connected with the partnership's U.S. trade or business and allocable to foreign partners.

IV.    *YA Global's Effectively Connected Taxable Income*

A.    *Findings of Fact*

YA Global invested primarily in microcap and low-priced public companies traded in the over-the-counter public markets.

Although the FPAAs for 2006, 2007, and 2008 determined that YA Global owed withholding tax of $15,900,807, $27,800,851, and $16,882,544, respectively, they provided no details of how respondent computed the partnership's alleged liability. In response to an informal discovery request, however, respondent's counsel provided supporting details to petitioners in October 2018. But respondent did not share those details with the Court in his posttrial briefs. Therefore, in an order issued on February 28, 2023 (February 28 Order), we directed respondent to "submit a report explaining in detail the calculations underlying his determination of [YA Global's] section 1446 withholding tax liability for each of the years in issue." Our February 28 Order also stated:

> [I]f the calculations that respondent provides in response
> to this order differ from those previously provided to
> petitioners' counsel, or if petitioners object to those
> calculations for reasons beyond those raised in their
> posttrial briefs, petitioners may advise the Court by filing

partnership reported as dividends. In addition, respondent's reduction of ordinary business income for 2007 by the foreign taxes reportedly paid by the partnership is obviously in error. Even leaving aside that respondent disallowed the foreign taxes as unsubstantiated and petitioners do not contest that disallowance on brief, foreign taxes are not deductible by a partnership. Instead, each partner is treated as having paid the partner's proportionate share of foreign taxes paid by the partnership. *See* § 901(b)(5). Each partner then chooses to either deduct or credit the taxes. Treas. Reg. § 1.702-1(a)(6).

a motion for leave to respond to respondent's report, provided that any such motion is filed within one week after respondent submits his report.

Respondent timely filed his Report on March 14, 2013. Petitioners did not move for leave to respond to respondent's Report.

### B. *Applicable Law*

To review, section 1446 applies to a partnership if (1) the "partnership has effectively connected taxable income for any taxable year" and (2) "any portion of such income is allocable under section 704[43] to a foreign partner." § 1446(a).

In general, section 1446(c) defines "effectively connected taxable income" to mean "the taxable income of the partnership which is effectively connected (or is treated as effectively connected) with the conduct of a trade or business in the United States." When the two conditions specified in section 1446(a) are met, that section provides that the partnership must "pay a withholding tax . . . at such time and in such manner as the Secretary shall by regulations prescribe."

The rules for determining whether income is effectively connected with a U.S. trade or business differ depending on the nature and source of the income. Section 864(c)(2) addresses U.S.-source fixed or determinable annual or periodical income and gain or loss from sources within the United States from the sale or exchange of capital assets. The determination of whether income, gain, or loss within the scope of section 864(c)(2) is effectively connected with a U.S. trade or business is generally made taking into account such factors as "whether—(A) the income, gain, or loss is derived from assets used or held for use in the conduct of such trade or business, or (B) the activities of such trade or business were a material factor in the realization of the income, gain, or loss."

---

[43] Under section 704, a partner's distributive share of the partnership's income, gain, loss, deduction, or credit is generally determined by the partnership agreement. § 704(a). If, however, the partnership agreement does not include allocation provisions, or if the allocations provided for in the agreement lack substantial economic effect, then each partner's distributive share of the partnership's income, gain, loss, deduction, or credit is determined "in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances)." § 704(b).

53

Special rules apply, however, to

> any dividends or interest from stocks or securities, or any gain or loss from the sale or exchange of stocks or securities which are capital assets, which is from sources within the United States and derived by a nonresident alien individual[44] or a foreign corporation in the active conduct during the taxable year of a banking, financing, or similar business in the United States.

Treas. Reg. § 1.864-4(c)(5)(ii). Income, gain, or loss within the scope of Treasury Regulation § 1.864-4(c)(5)(ii) is treated as effectively connected only in specified circumstances. For example, interest or dividends are effectively connected if (1) the securities that gave rise to the income are attributable to the U.S. office through which the taxpayer carries on its banking, financing, or similar business and (2) the taxpayer acquired the securities (a) "[a]s a result of, or in the course of making loans to the public," or (b) in the case of dividends, the taxpayer acquired the stock on which the dividends were paid "[i]n the course of distributing such stocks . . . to the public." Treas. Reg. § 1.864-4(c)(5)(ii)(*a*)(*1*) and (*2*). Treasury Regulation § 1.864-4(c)(5)(i) provides:

> A nonresident alien individual or a foreign corporation shall be considered for purposes of this section . . . to be engaged in the active conduct of a banking, financing, or similar business in the United States if at some time during the taxable year the taxpayer is engaged in business in the United States and the activities of such business consist of any one or more of the following activities carried on, in whole or in part, in the United States in transactions with persons situated within or without the United States:
> > (*a*) Receiving deposits of funds from the public,
> > (*b*) Making personal, mortgage, industrial, or other loans to the public,
> > (*c*) Purchasing, selling, discounting, or negotiating for the public on a regular basis, notes,

---

44 Section 703(a) provides, subject to specified exceptions, that "[t]he taxable income of a partnership shall be computed in the same manner as in the case of an individual." None of the specified exceptions would prevent treating YA Global as an individual for purposes of Treasury Regulation § 1.864-4(c)(5)(ii).

drafts, checks, bills of exchange, acceptances, or other evidences of indebtedness,

(*d*) Issuing letters of credit to the public and negotiating drafts drawn thereunder,

(*e*) Providing trust services for the public, or

(*f*) Financing foreign exchange transactions for the public.

Any U.S.-source income, gain, or loss not covered by section 864(c)(2) is treated as effectively connected with the taxpayer's U.S. trade or business regardless of the factual connection between the specific item and the taxpayer's business. § 864(c)(3).

As a general rule, "no income, gain, or loss from sources without the United States shall be treated as effectively connected with the conduct of a trade or business within the United States." § 864(c)(4)(A). Foreign-source dividends or interest, however, are effectively connected if they are attributable to "an office or other fixed place of business within the United States" and "derived in the active conduct of a banking, financing, or similar business within the United States." § 864(c)(4)(B). Section 864(c)(5)(A) provides that, for purposes of section 864(c)(4)(B),

in determining whether a nonresident alien individual or a foreign corporation has an office or other fixed place of business, an office or other fixed place of business of an agent shall be disregarded unless such agent (i) has the authority to negotiate and conclude contracts in the name of the nonresident alien individual or foreign corporation and regularly exercises that authority or has a stock of merchandise from which he regularly fills orders on behalf of such individual or foreign corporation, and (ii) is not a general commission agent, broker, or other agent of independent status acting in the ordinary course of his business[.]

An agent can be an independent agent even if the agent is related to the principal and even, in some circumstances, if the agent acts "exclusively, or almost exclusively" for that principal. *See* Treas. Reg. § 1.864-7(d)(3)(ii) and (iii). Treasury Regulation § 1.864-7(d)(3)(ii) provides: "The determination of whether an agent is an independent agent . . . shall be made without regard to facts indicating that either the agent or the principal owns or controls directly or indirectly the other

or that a third person or persons own or control directly or indirectly both." And Treasury Regulation § 1.864-7(d)(3)(iii) provides:

> Where an agent who is otherwise an independent agent . . . acts in such capacity exclusively, or almost exclusively, for one principal who is a nonresident alien individual or a foreign corporation, the facts and circumstances of a particular case shall be taken into account in determining whether the agent, while acting in that capacity, may be classified as an independent agent.

In *InverWorld, Inc. v. Commissioner*, T.C. Memo. 1996-301, 1996 WL 352998, we concluded that a U.S. subsidiary of a foreign parent was not an independent agent of its parent. The subsidiary "had few clients" other than its parent and the parent's clients. *Id.*, 1996 WL 352998, at *27. We found that "the services that [the subsidiary] performed were almost exclusively for" its parent. *Id.* And the record did "not establish that [the subsidiary] marketed its services to clients on its own." *Id.* On the basis of the record, we concluded that the subsidiary "was not an 'independent agent' within the meaning of section 1.864-7(d)(3), Income Tax Regs." *Id.* The exclusivity of the parties' relationship, though not dispositive under the applicable regulations, seems to have weighed heavily in our conclusion. The only other factor we noted in the course of our analysis is that the subsidiary did not market its services to others.

Rules provided in sections 861 through 865 determine the source of various types of income. Interest is generally U.S. source if it is paid on an obligation of the United States, the District of Columbia, a noncorporate resident, or a domestic corporation. § 861(a)(1). Otherwise, the interest is foreign source. § 862(a)(1). Dividends paid by a domestic corporation are generally U.S. source while those paid by most foreign corporations are foreign source. §§ 861(a)(2), 862(a)(2). Gains on sales of personal property are generally sourced by reference to the seller's residence. § 865(a). Section 865(e)(2)(A), however, provides: "Notwithstanding any other provisions of this part, if a nonresident maintains an office or other fixed place of business in the United States, income from any sale of personal property . . . attributable to such office or other fixed place of business shall be sourced in the United States." Section 865(e)(3) provides that "[t]he principles of section 864(c)(5) shall apply in determining whether a taxpayer has an office or other fixed place of business and whether a sale is attributable to such an office or other fixed place of business." In

determining the source of gains from sales of personal property by a partnership, the rules of section 865 shall, "except as provided in regulations . . . be applied at the partner level." § 865(i)(5).

C.    *The Parties' Arguments*

1.    *Respondent*

Respondent contends that all of YA Global's income "is effectively connected with the conduct of [the partnership's] lending and underwriting business." He notes that any U.S.-source income other than capital gains or fixed or determinable annual or periodical income would be effectively connected under section 864(c)(3). Respondent would include in that category YA Global's gain or loss from the sale or deemed sale of securities.[45]

Respondent accepts that the determination of whether YA Global's U.S.-source dividends, interest, and capital gain or loss are effectively connected with its U.S. trade or business is governed by the special rules provided in Treasury Regulation § 1.864-4(c)(5)(ii) rather than the generally applicable asset use and business activities tests provided in section 864(c)(2). He asserts: "YA Global's lending business fits squarely within the definition of the 'active conduct of a banking, financing, or similar business'" provided in Treasury Regulation § 1.864-4(c)(5)(i). "Throughout the years at issue," he reasons, "YA Global regularly and continuously negotiated and received convertible debt instruments and promissory notes, which amounted to making loans to the public, and purchasing, selling, discounting, or negotiating for the public on a regular basis, notes, drafts, checks, bills of exchange, acceptances, or other evidences of indebtedness." Respondent thus concludes that, "for the purposes of section 864(c), YA Global was engaged in the active conduct of a banking, financing, or similar business in the United States."

Respondent argues that "[t]he stock and securities giving rise to" YA Global's interest and dividend income "were acquired through the

---

[45] Because we have concluded that YA Global was a dealer in securities and did not properly identify its securities as held for investment, its gains and losses from sales of securities (including deemed sales under section 475(a)(2)) would be "treated as ordinary income or loss" under section 475(d)(3). In respondent's view, "it does not necessarily follow that the underlying assets are not capital assets." Respondent argues, however, that "[i]t would seem appropriate" to treat as "ordinary assets" securities not identified as having been held for investment.

active financing business carried on in a U.S. office, including the office located [in] Jersey City, New Jersey" that was "simultaneously the office of YA Global, Yorkville Advisors . . . and Yorkville GP." He notes that, "[i]n the course of carrying on this business, YA Global received interest-bearing promissory notes and convertible debt instruments," "may have received warrants from the issuers as consideration for making loans, and frequently converted debt instruments into stock." He argues that "all U.S.-source interest and dividends generated by the convertible debt, warrats [sic], stock, and other securities acquired in connection with YA Global's financing business, and U.S.-source gain from capital assets (if any), are treated as effectively connected with the conduct of a U.S. trade or business." In reaching that conclusion, respondent implicitly equates the portfolio companies to which YA Global provided financing and "the public." And he argues that "[d]ividends qualify [as effectively connected income] as they are received on stock in the course of distributing it to the public."

Respondent contends that, "[i]f some portion of YA Global's U.S. source income is not effectively connected under Treas. Reg. § 1.864-4(c)(5), it would be tested under the general effectively connected income rules for U.S.-source income." He reasons that YA Global's U.S.-source interest and fee income would be effectively connected under the business activities test because "the origination of loans is clearly a material factor in the interest and fees." The same would be true, he argues, of dividends or gains from stock received upon the conversion of a convertible debenture or in connection with a SEDA.

Although respondent flatly asserts that "[m]ost, if not all, of [YA Global's] income comes from sources within the United States," he also contends that, to the extent that the partnership received "foreign-source interest, dividends, and gain or loss from sales of stocks or securities generated by the convertible debt, warrants, stock and other securities acquired in connection with YA Global's lending and underwriting business," those items of income, gain, or loss "were effectively connected with the conduct of a U.S. trade or business." He rests that conclusion in part on the premise that "[t]he office of Yorkville Advisors is attributable to YA Global for purposes of section 864(c)(4)([B]) because Yorkville Advisors is a dependent agent of YA Global and Yorkville Advisors negotiated hundreds of contracts on behalf of YA Global during the years in issue."

2.   *Petitioners*

Petitioners have not directly addressed the question of the extent to which YA Global's income, gain, or loss would be effectively connected with any U.S. business in which we determine the partnership to have been engaged.   In the list of issues included in both his Pretrial Memorandum and his Opening Brief, respondent included the following: "Was the income YA Global received from the trade or business effectively connected with the conduct of such trade or business pursuant to section 864(c)?"  Petitioners included no similar question in the list of issues included in either their Pretrial Memorandum or their Opening Brief.   Apparently as a consequence, neither of petitioners' briefs explicitly addresses the question of how much of YA Global's income would be effectively connected taxable income (ECTI) in the event that we determine that the partnership was engaged in a U.S. trade or business.

Nonetheless, some of the arguments petitioners advance in regard to other issues would, if accepted, affect the amount of YA Global's ECTI.  For example, in arguing that the transactions in stocks or securities that Yorkville Advisors conducted on behalf of YA Global were covered by the safe harbor for securities trading provided in section 864(b)(2)(A)(i), petitioners refer to Yorkville Advisors as "an independent agent."  Petitioners appear to ground that characterization on the premise that Yorkville Advisors "managed multiple funds," so that the transactions it entered into that involved YA Global were in furtherance of its own business.   If petitioners were correct that Yorkville Advisors was an independent agent, then, under section 864(c)(5)(A), Yorkville Advisors' office could not be attributed to YA Global.  Consequently, section 864(c)(4)(B) would not apply to treat any of YA Global's foreign-source income, gain, or loss as effectively connected with its U.S. trade or business.   Instead, under section 864(c)(4)(A)'s general rule, none of YA Global's foreign-source income, gain, or loss could be treated as effectively connected.

Petitioners also steadfastly deny that YA Global was involved in the distribution of stock and thus was (or was analogous to) an underwriter.  The partnership, they insist, "did not connect buyers and sellers of stock."  They continue: "It did not advertise its holdings as inventory, nor did it provide price quotes to potential purchasers.  It did not engage in merchandising functions at all."  "[W]hen YA Global wanted to sell stock," petitioners observe, "it had to engage the services of third-party broker-dealers."  If, as respondent accepts, any U.S.-

source dividends that YA Global received on stock acquired under a SEDA were derived by the partnership "in the active conduct . . . of a banking, financing, or similar business in the United States," Treas. Reg. § 1.864-4(c)(5)(ii), and if, as petitioners contend, YA Global did not acquire that stock "in the course of distributing [it] . . . to the public," Treas. Reg. § 1.864-4(c)(5)(ii)(*a*)(*2*), then those dividends would not be effectively connected with YA Global's U.S. trade or business.

D.   *Analysis*

The record does not support petitioners' argument (again, made in a different context) that Yorkville Advisors was an independent agent of YA Global. As noted above, petitioners base that argument on the premise that Yorkville Advisors was engaged in an investment management business independent of any business conducted by YA Global, in pursuance of which Yorkville Advisors managed funds other than YA Global. We have found, however, that Yorkville Advisors devoted most of its activities to YA Global during the years in issue. Between June 1, 2006, and April 1, 2009, YA Global was the only fund that Yorkville Advisors managed. *See supra* Part II.A. While Treasury Regulation § 1.864-7(d)(3)(iii) contemplates the possibility that, depending other facts and circumstances, an agent who acts exclusively for one principal can nonetheless be classified as an independent agent, petitioners point to no other facts or circumstances that would support that classification of Yorkville Advisors' relationship with YA Global. The record provides no evidence, for example, that Yorkville Advisors marketed its investment management services to unrelated funds. *See InverWorld, Inc. v. Commissioner*, 1996 WL 352998, at *27. We therefore accept respondent's claim that "YA Global is considered to have had a U.S. office within the meaning of section 864(c)(5), as referenced in section 865(e)(3), throughout the Relevant Period."

Before accepting respondent's claim that all of YA Global's income from personal property was U.S. source and effectively connected, however, we must consider section 865(i)(5). That section, again, provides that, subject to any regulatory exceptions, the sourcing rules for personal property sales provided in section 865 "shall apply at the partner level." In the absence of an applicable exception to section 865(i)(5)'s mandate, the relevant question in determining the source of a foreign partner's share of gain or loss from YA Global's sale of securities or other personal property would be whether the partner "maintains an office or other fixed place of business in the United States" to which that gain or loss is attributable. § 865(e)(2)(A). We might

assume that YA Global's U.S. office "should be deemed to have been [a] U.S. office" of each of its foreign partners. *Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Commissioner*, 149 T.C. 63, 85 (2017), *aff'd*, 926 F.3d 819 (D.C. Cir. 2019). Because we are here concerned, however, not with the foreign partners' substantive tax liability but instead YA Global's liability for withholding tax under section 1446, we need not rest our analysis on such an assumption, however reasonable it might be.

In the context of section 1446 withholding tax, Treasury Regulation § 1.1446-2(a) provides an exception to section 865(i)(5)'s mandate of partner-level source determinations. Treasury Regulation § 1.1446-2(a) provides: "The calculation of partnership ECTI allocable to foreign partners . . . and the partnership's withholding tax obligation are partnership-level computations solely for purposes of determining the 1446 tax." A partnership's section 1446 tax liability depends on the ECTI allocable to foreign partners. Whether the partnership's income from sales of personal property is effectively connected under section 864(c) depends in part on the source of that income. And the income's source depends on the nexus between the income and a U.S. office or other fixed place of business. § 865(e)(2)(A). We thus conclude that, "solely for purposes of determining the 1446 tax," section 865(e)(2)(A) treats income from sales of personal property as U.S.-source income if that income is attributable to a U.S. office or other fixed place of business maintained (or attributable to) the partnership. Treas. Reg. § 1.1446-2(a). At least for that purpose, it is of no moment whether the partnership's office or fixed place of business can be attributed to the partnership's foreign partners (or whether a foreign partner otherwise maintains a U.S. office or fixed place of business to which the income might be attributable).

We have no doubt that YA Global's income from sales of personal property was attributable to Yorkville Advisors' U.S. office, which we have already concluded was also YA Global's U.S. office. Yorkville Advisors' U.S. office was "a material factor" in the production of that income, and "activities of the type from which such income" was derived were "regularly carrie[d] on" at that office. *See* §§ 864(c)(5)(B), 865(e)(3).

Therefore, at least for purposes of determining YA Global's section 1446 withholding tax liability, the partnership's income from sales of personal property is U.S.-source income under section 865(e)(2)(A). To the extent that that income arises from sales of personal property other than capital assets, the income is effectively connected

under section 864(c)(3) without regard to the specific factual connection between the income and the partnership's business.

We agree with respondent that it is "appropriate" to treat YA Global's securities as assets other than capital assets. We disagree with respondent, however, that that classification "does not necessarily follow" from section 475(d)(3)(A)(i)'s treatment as ordinary income or loss of the partnership's gains or losses with respect to securities. Respondent overlooks sections 64 and 65. Section 64 provides: "Any gain from the sale or exchange of property which is treated or considered, under other provisions of this subtitle, as 'ordinary income' shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231(b)." Section 65 provides a corresponding rule for losses: "Any loss from the sale or exchange of property which is treated or considered, under other provisions of this subtitle, as 'ordinary loss' shall be treated as loss from the sale or exchange of property which is not a capital asset."

To review, we have established that any gain or loss recognized by YA Global with respect to securities is treated, by reason of section 475(d)(3)(A) and section 64 or 65, as gain or loss from the sale or exchange of property which is not a capital asset. And we have also established that any such gain or loss would be U.S. source under section 865(e)(2)(A). It follows, then, that the determination of the effectively connected status of that gain or loss is governed by section 864(c)(3). Under section 864(c)(3)'s per se rule, any gain or loss recognized by YA Global with respect to securities was effectively connected with its U.S. trade or business.

We now turn to petitioners' denial that YA Global engaged in the distribution of stock. Whether YA Global's business included the distribution of stock would be irrelevant to the determination of the partnership's ECTI unless, as respondent claims, the partnership was engaged "in the active conduct during [2006, 2007, and 2008] of a banking, financing, or similar business in the United States." Treas. Reg. § 1.864-4(c)(5)(ii).

Whether the partnership's U.S. trade or business was, in particular, "a banking, financing, or similar business," within the meaning of Treasury Regulation § 1.864-4(c)(5)(i), turns on whether the portfolio companies to which the partnership provided financing were a broad enough class to constitute "the public." The regulatory definition of a banking, financing, or similar business, with its repeated references

to "the public," seems to contemplate retail operations. But YA Global did not hold itself out to any and all potential customers who sought financing. Instead, it targeted what might be referred to as a niche market. The portfolio companies with which the partnership dealt made up a small slice of potential recipients of the types of services described in Treasury Regulation § 1.864-4(c)(5)(i).

Even if we were to accept that YA Global made loans to the public, and thus was engaged in the active conduct of a banking, financing, or similar business, U.S.-source dividends on stock acquired under a SEDA would not be effectively connected unless the partnership acquired that stock in the course of distributing it to the public. Treas. Reg. § 1.864-4(c)(5)(ii)(*a*)(*1*) and (*2*).

Under the circumstances, we need not decide whether the portfolio companies to which YA Global made loans were a broad enough group to constitute "the public" or whether the partnership acquired any dividend-paying stock under a SEDA in the course of distributing that stock to the public. The record does not allow us to determine the source of the dividends and interest YA Global received, much less the extent to which the partnership's U.S.-source dividends were paid in respect of stock acquired in a SEDA.

In short, petitioners have not met their burden of establishing that any portion of the partnership's taxable income was not effectively connected with its U.S. trade or business. Indeed, petitioners advance no explicit argument at all on the question of the extent to which the partnership's income is effectively connected. And they did not move for leave to respond to the Report respondent submitted in response to the February 28 Order. Petitioners' inaction indicates that they generally accept the premise reflected in that Report that all of the items of income, gain, loss, or deduction YA Global reported on its return for each of 2006, 2007, and 2008 were effectively connected with the partnership's U.S. trade or business. Therefore, we uphold respondent's determination to that effect.[46] For the reasons explained above, we also

_____

[46] According to the FPAAs, YA Global paid withholding tax under section 1441 or 1442 for each of 2006, 2007, and 2008. For each year, the FPAA determined the reported withholding tax to be zero. Although the Petitions assigned error to those determinations, petitioners make no argument on brief challenging them. Moreover, respondent's determinations that the partnership did not owe withholding tax under section 1441 or 1442 are consistent with his position, which we have upheld, that all of the partnership's taxable income was effectively connected with a U.S. trade or

uphold respondent's determination that the gain or loss the partnership recognized under section 475(a) for each year was also effectively connected with its U.S. trade or business. It follows that YA Global was required to pay withholding tax under section 1446(a) on the portion of its effectively connected taxable income allocable to foreign partners. We next consider whether the partnership's withholding tax can be "adjusted" to reflect stipulated expenses of one of its foreign partners beyond that partner's distributive share of the partnership's deductions.

V.   *Effect of YA Offshore's Nonpartnership Expenses on YA Global's Section 1446 Withholding Tax Liability*

A.   *Findings of Fact*

YA Global's Form 1065 for each of 2006, 2007, and 2008 included at least one Schedule K–1 issued to a partner identified as foreign. The partnership's 2006 return included Schedules K–1 for YA Offshore, Highgate House Global, Ltd. (Highgate House), and Montgomery Equity Partners Offshore, Ltd. (Montgomery), each of which was identified as a foreign corporation.[47] The return also includes Schedules K–1 for Fortis Prime Fund Solutions Custodial Services (Ireland) (Fortis), identified as a foreign partnership, and Jeffrey Roland, identified as a foreign individual.[48] The partnership's 2007 Form 1065 includes Schedules K–1 for YA Offshore, Highgate House, Montgomery, and Mr. Roland, although Mr. Roland's 2007 Schedule K–1 states as zero his share of each of the partnership's items of income, gain, loss, or deduction for the year. YA Offshore is the only partner issued a Schedule K–1 for 2008 that the schedule identifies as foreign.

The Schedule K–1 that YA Global issued to YA Offshore for 2007 allocated to YA Offshore $79,866,034 of taxable income. YA Offshore's 2008 Schedule K–1 allocated to it taxable income of $37,805,018. Under

---

business. *See* §§ 1441(c)(1), 1442(b). We therefore uphold the determinations in the FPAAs that the partnership's withholding tax under sections 1441 and 1442 was zero for each of 2006, 2007, and 2008.

[47] The parties stipulated that "[f]or the taxable years 2006 through 2011," YA Offshore, "an entity organized under the laws of the Cayman Islands, was a limited partner of YA Global." They agree that YA Offshore "was classified as a corporation for U.S. purposes."

[48] Although the Schedule K–1 issued to Mr. Roland designates him as a foreign rather than domestic partner, it gives for him a mailing address in New Jersey.

respondent's calculations, YA Offshore's share of YA Global's mark-to-market loss for 2007 was $1,495,971.

The parties stipulated expenses that YA Offshore "directly incurred . . . related to its investment in YA Global" for 2007, 2008, 2009, and 2010. The stipulated expenses for 2007 and 2008 were $12,081,846 and $22,187,150, respectively.

In the Report respondent submitted in response to our February 28 Order, providing details regarding the calculation of the section 1446 withholding tax liabilities determined in the FPAAs, he acknowledged that his computation of YA Global's 2006 liability took into account the ECTI allocable to only three partners, YA Offshore, Highgate House, and Montgomery, whom respondent describes as the partnership's "three largest" foreign partners. "In 2006," respondent observes, "YA Global had over 100 partners, both U.S. and foreign." In computing YA Global's section 1446 liability for 2007, respondent again took into account the ECTI allocable to YA Offshore, Highgate House, and Montgomery.[49]

Respondent's Report also acknowledges that the $27,800,851 section 1446 liability stated in the 2007 FPAA reflects an arithmetic error. In computing the foreign partners' shares of ECTI, respondent allocated to Highgate House and Montgomery their proportionate shares of YA Global's $2,337,280 mark-to-market loss for 2007. In addition, however, respondent erroneously allocated all of that loss to YA Offshore. By overallocating the partnership's mark-to-market loss, respondent understated the foreign partners' shares of the partnership's ECTI and thus the partnership's section 1446 liability. Respondent's Report provides corrected calculations that show that the partnership's section 1446 liability for 2007 was $28,095,309.

In an Amended Answer filed in April 2023, respondent alleged "an increase in the amount of withholding tax under section 1446 . . . due from YA Global Investments, LP . . . for 2006, in the amount of $66,771, pursuant to the provisions of § 6226(f),[50] for a revised total

---

[49] "In 2007," respondent says, "YA Global had a handful of partners, both U.S. and foreign."

[50] Section 6226(f) provides that a court with which a petition for readjustment of partnership items is filed "shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the [FPAA] relates, the proper allocation of such items among the partners, and the applicability of any

liability of $15,967,578." That increase in withholding tax takes into account the partnership's ECTI allocable to Fortis and Mr. Roland.

Respondent's Amended Answer also "alleges an increase in the amount of the section 1446 tax due from YA Global for 2007, in the amount of $294,458, pursuant to the provisions of I.R.C. § 6226(f), for a revised total liability of $28,095,309." That increase in section 1446 tax reflects respondent's correction of the arithmetic error described in the Report he submitted in response to our February 28 Order.

In their Reply to respondent's Amended Answer, petitioners deny that, if the partnership owes any section 1446 withholding tax for 2006 or 2007, that liability should be increased as alleged in the Amended Answer. Petitioners contend that each increase in withholding tax liability that respondent asserted in his Amended Answer "constitutes an 'increase in deficiency' or a new matter for purposes of Rule 142, and, therefore, the burden of proving this increase in section 1446 tax is on Respondent." Respondent's burden, they suggest, includes supporting what they describe as his "implicit allegation that Fortis' partners were all foreign."

B. *Applicable Law*

As noted *supra* Part II.B, section 1446(a) requires a partnership to pay a withholding tax on the portion of any ECTI allocable to a foreign partner. Section 1446(b)(1) provides that "[t]he amount of the withholding tax payable by any partnership under [section 1446(a)] shall be equal to the applicable percentage of the effectively connected taxable income of the partnership which is allocable under section 704 to foreign partners." The "applicable percentage," in respect of any foreign partner, is the highest rate of tax specified in either section 1 or section 11(b)(1), depending on whether the foreign partner is a corporation. § 1446(b)(2).

Treasury Regulation § 1.1446-1(c)(1) provides:

[A] partner of [a] partnership is generally a foreign partner if the partner is a nonresident alien, foreign partnership . . . foreign corporation . . . foreign estate or trust . . . as those terms are defined under section 7701 and the

---

penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item."

regulations thereunder, or a foreign organization described in section 501(c), or other foreign person.

A partnership is a foreign partnership unless it was "created or organized in the United States or under the law of the United States or of any State." § 7701(a)(4) and (5). Treasury Regulation § 1.1446-5(c) provides "look-through" rules under which a lower-tier partnership can treat ECTI allocable to a foreign upper-tier partnership as allocable to a partner of the upper-tier foreign partnership if specified certification requirements are met.

Under section 1461, withholding agents are personally liable for the tax they are required to deduct and withhold under chapter 3 (sections 1441 through 1464). If the recipient of the income subject to withholding pays the tax against which the withholding tax could be credited, however, the withholding agent is relieved of liability for withholding tax but not "for interest, or any penalties or additions to the tax otherwise applicable in respect of [the withholding agent's] failure to deduct and withhold." § 1463.

Treasury Regulation § 1.1446-3(e)(1) applies the principle of section 1463 to the specific case of partnership withholding under section 1446:

> [A] partnership that is required to pay 1446 tax but fails to do so, or pays less than the amount required under this section, is liable under section 1461 for the payment of the tax required to be withheld under chapter 3 of the Internal Revenue Code and the regulations thereunder unless, and to the extent, the partnership can demonstrate pursuant to paragraph (e)(2) of this section, to the satisfaction of the Commissioner or his delegate, that a foreign partner has paid the full amount of tax required to be paid by such partner to the Internal Revenue Service.

A partnership seeking to rely on the exemption from liability must "provide sufficient information to the IRS [Internal Revenue Service] to determine that the partner's tax liability was satisfied or established to be zero." Treas. Reg. § 1.1446-3(e)(2).

While a foreign partner's distributive share of partnership deductions may reduce its allocable share of the partnership's ECTI, and thus the partnership's section 1446 withholding tax liability, the statutory rules provide no mechanism to take into account, for purposes

of section 1446, nonpartnership deductions allowable to the foreign partner that would reduce its U.S. tax liability.  Rules adopted in temporary regulations in 2005 and in final regulations in 2008 fill that gap by allowing partnerships to rely on certifications provided by foreign partners of the nonpartnership deductions they expect to be available to reduce the taxable income attributable to their U.S. businesses.  *See generally* Treas. Reg. § 1.1446-6.

Section 1464 provides:  "Where there has been an overpayment of tax under this chapter, any refund or credit made under chapter 65 [sections 6401 through 6432] shall be made to the withholding agent unless the amount of such tax was actually withheld by the withholding agent."  In the absence of a statutory definition of the term "overpayment," the Supreme Court concluded in *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531 (1947), that the term should be "read . . . in its usual sense, as meaning any payment in excess of that which is properly due."

If a foreign corporation is a member of a partnership engaged in a U.S. trade or business, the foreign corporation is "considered as being engaged in a trade or business within the United States."  § 875(1).  In that case, the foreign corporation is subject to tax on the taxable income effectively connected with its U.S. trade or business, § 882(a)(1), and the corporation is generally required to report that tax on Form 1120–F, U.S. Income Tax Return of a Foreign Corporation, Treas. Reg. § 1.6012-2(g)(1)(i).

If the corporation fails to file the required return, or the return filed is not "true and accurate," the corporation is not entitled to "receive the benefit of the deductions and credits allowed to it" by subtitle A (sections 1 through 1563).  § 882(c)(2).  A foreign corporation's return qualifies as true and accurate only if it is filed "on a timely basis."  Treas. Reg. § 1.882-4(a)(3)(i).  A return filed more than 18 months after the due date provided in section 6072 does not satisfy the timely filing requirement, but that requirement can be waived "if the foreign corporation establishes to the satisfaction of the Commissioner or his or her delegate that the corporation, based on the facts and circumstances, acted reasonably and in good faith in failing to file a U.S. income tax return."  Treas. Reg. § 1.882-4(a)(3)(i) and (ii).

C. *The Parties' Arguments*

1. *Petitioners*

In arguing that section 1464, rather than section 1463, "is relevant . . . for 2007 and 2008," petitioners implicitly concede that YA Offshore's stipulated nonpartnership expenses for those years are not sufficient to eliminate its income tax liability. They make no argument that any of YA Global's foreign partners certified their nonpartnership deductions in accordance with Treasury Regulation § 1.1446-6, conceding that that regulation "is inapplicable here." And they concede that "YA Offshore did not file its Form 1120–F for . . . 2007 within the time prescribed." Petitioners allege, however, that respondent abused his discretion in denying YA Offshore's request for a waiver of the timely filing requirement. On that premise, they claim that YA Global's liability for section 1446 withholding tax for 2007, as well as 2008, should be "adjusted" under section 1464 to reflect YA Offshore's nonpartnership expenses. As a result of those expenses, petitioners posit, "if YA Global were to pay the full amount of withholding tax that Respondent asserts is due for [2007 or 2008], YA Global would be immediately entitled [under section 1464] to a refund of the amount that exceeded YA Offshore's liability for that year." Petitioners suggest that we can and should take those potential refunds into account in determining the amount of YA Global's liability for withholding tax under section 1446.

2. *Respondent*

While respondent is unclear as to whether he considers section 1464 applicable at all to the cases before us, he clearly disputes the conclusion petitioners would draw from that section. Twice in his Reply Brief, he describes section 1464 as "not applicable." In a response he filed to petitioners' Report on questions we raised in a posttrial Order, however, respondent advised us that he "does not dispute that section 1464 and Treas. Reg. § 1.1464-1 are applicable to the partnership's 2006, 2007, and 2008 taxable years." Even so, respondent seems to stand by the claim he made in his Reply Brief that "[s]ection 1464 does not allow YA Global to reduce its section 1446 withholding tax liability to equal the foreign partners' total income tax liability." In his view, a partnership is entitled to a refund under section 1464 "only to the extent the partnership pays to the Internal Revenue Service an amount in excess of its section 1446 withholding tax liability." "That," he says, "has not been done here."

In his response to petitioners' Report, respondent took issue "with the fundamental and repeated premise of petitioners' position, *i.e.*, if the partnership pays the amount of section 1446 withholding tax the Court determines to be due by operation of section 1446 and its regulations, it will have overpaid the tax due." He also questions whether "an overpayment of tax [can] arise[] out of the application of section 1464."

Respondent finds nothing in the regulations that indicates "that a foreign partner's income tax liability, except to the extent it is established to have been satisfied or was zero, is relevant to the computation of YA Global's section 1446 withholding tax liability." "For 2007," respondent observes, "petitioners make no showing that YA Offshore paid its tax liability or had no liability." Similarly, "petitioners have not established, and cannot establish, YA Offshore's tax liability for 2008 to be zero."

D.    *Analysis*

Petitioners concede that YA Global did not follow the sole procedures—those specified in Treasury Regulation § 1.1446-6—by which nonpartnership deductions that do not eliminate a foreign partner's income tax liability for a year can be taken into account to reduce the partnership's section 1446 withholding tax liability. In effect, petitioners rely on section 1464 as a back-door means of giving effect to YA Offshore's nonpartnership deductions despite YA Offshore's failure to have certified those deductions.

Petitioners' argument starts from the premise that YA Global's payment of an amount of section 1446 withholding tax determined without regard to YA Offshore's nonpartnership deductions would result in an "overpayment." Their premise, however, assumes the point in issue. The partnership's payment of withholding tax would result in an overpayment, as defined in *Liberty Glass Co.*, 332 U.S. at 531, only if the tax paid exceeded the amount "properly due." And the amount paid would not exceed the amount of withholding tax properly due unless YA Global's nonpartnership deductions reduce the partnership's withholding tax liability. Petitioners simultaneously argue that (1) YA Offshore's nonpartnership deductions must be taken into account to avoid an overpayment, and (2) an overpayment would result because YA Offshore's nonpartnership deductions must be taken into account. Their argument is, in a word, circular.

Petitioners seem to be asking us to determine an overpayment in *withholding* tax by comparing the amount of withholding tax paid to the amount of *income* tax properly due from YA Offshore. The tax for which respondent seeks to hold YA Global liable, however, is the partnership's own withholding tax liability under section 1461—not YA Offshore's liability for income tax under section 882. A partnership's withholding tax liability under section 1446 in regard to a foreign partner will often exceed the foreign partner's tax liability: The partnership's withholding tax liability is computed at the highest marginal rate, regardless of the foreign partner's effective tax rate. And the partnership's withholding tax liability does not take into account nonpartnership deductions available to the foreign partner unless the foreign partner certifies those deductions in accordance with the procedures specified in Treasury Regulation § 1.1446-6.

Section 1464, again, allows a credit or refund for "an overpayment of tax under this chapter." Section 1464 appears in chapter 3, as do sections 1446 and 1461. By contrast, section 882—the provision that imposes income tax liability on YA Offshore—appears in chapter 1. Therefore, the determination of any overpayment in section 1446 withholding tax under chapter 3 should compare the amount of withholding tax paid to the amount of withholding tax properly due under section 1446.

The tax imposed on a withholding agent and the tax imposed on the recipient of the income are not one and the same. Petitioners stress that point in arguing that Forms 872-P executed to extend the period of limitation on the assessment of income tax did not extend the period of limitation on the assessment of section 1446 withholding tax. *See infra* Part VI.D.3.a. But in arguing for an adjustment to YA Global's section 1446 withholding tax liability by reason of section 1464, they seem to have lost sight of the point on which they rely in that other context. (As we explain *infra* Part VI.D.4, withholding taxes *are* income taxes, just not the same income taxes as those imposed on the income recipient.)

Because the withholding tax and the tax on the income subject to withholding, though both income taxes, are nonetheless separate taxes, petitioners' attempt to conjure an overpayment mixes apples and oranges. In determining whether YA Global's payment of withholding tax would result in an overpayment, as defined by *Liberty Glass Co.*, if the amount paid does not take into account nonpartnership deductions available to YA Offshore, the tax paid should be compared to the section

1446 withholding tax properly due. Petitioners, in failing to make the correct comparison, have resorted to circular reasoning.

Stated differently, petitioners cannot rely on section 1464 alone to support their claim that YA Offshore's nonpartnership deductions must be taken into account in computing YA Global's section 1446 withholding tax liability. Petitioners need some other authority to support their position. In the absence of any such authority, payment of an amount of withholding tax that does not take into account YA Offshore's nonpartnership deductions would not result in an overpayment that could be refunded or credited to YA Global under section 1464. That section cannot make YA Offshore's nonpartnership deductions relevant to the computation of YA Global's section 1446 withholding tax liability if they would not otherwise be relevant.

Petitioners, however, cite no authority other than section 1464 for their requested adjustment. The certification procedures specified in Treasury Regulation § 1.1446-6 (and the temporary regulations that preceded it) provide the only means by which a partner's nonpartnership deductions can be taken into account to reduce, but not eliminate, a partnership's section 1446 withholding tax liability. And petitioners concede that YA Global and YA Offshore did not follow those procedures.

Petitioners argue that, if YA Global is required to pay amounts of withholding tax for 2007 and 2008 that do not reflect YA Offshore's nonpartnership deductions, respondent will receive a windfall. Even if that were true, petitioners offer us no legal basis on which we could forestall that prospect as part of the current proceedings.

Because we conclude that any deductions allowable to YA Offshore against the income effectively connected with its U.S. trade or business for 2007 and 2008 beyond its distributive share of YA Global's deductions have no bearing on YA Global's withholding tax liability under section 1446, we need not decide whether respondent abused his discretion in declining to waive the timely filing requirement for YA Offshore's 2007 Form 1120–F.

We thus agree with respondent that all of the taxable income YA Global reported was effectively connected with a U.S. trade or business and that YA Offshore's nonpartnership deductions have no bearing on the partnership's section 1446 withholding tax liabilities. And the law requires those liabilities to be computed taking into account the ECTI allocable to all of the partnership's foreign partners.

On the basis of a preponderance of the evidence, we conclude that Fortis and Jeffrey Roland were both foreign partners of YA Global.[51] Consequently, we need not decide whether, as petitioners contend, respondent bears the burden of proof in regard to the increases in YA Global's section 1446 withholding tax liabilities for 2006 and 2007 asserted in respondent's Amended Answer.

Contrary to petitioners' suggestion, the identity of Fortis's partners would have no bearing on YA Global's liability for 2006 under the generally applicable rules. The Schedule K–1 that YA Global issued to Fortis for 2006, which identified Fortis as a foreign partnership, is evidence that Fortis was created or organized outside the United States. Thus, under the generally applicable rules, Fortis would be a foreign partner of YA Global even if all of its own partners were U.S. persons.

Not surprisingly, the record includes no evidence that YA Global received from Fortis the certification required to apply the look-through rules provided in Treasury Regulation § 1.1446-5(c). YA Global did not believe itself to have been engaged in a U.S. trade or business. It thus had no reason to ask Fortis for the required certification. And Fortis had no apparent reason to have volunteered whatever certification it might have been able to provide. In the unlikely event that YA Global had received from Fortis the certification required to apply the look-through rules, it would have been to petitioners' advantage to introduce the certification into evidence. We thus infer from their failure to have done so that YA Global did not receive any such certification. *See Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947).

We therefore conclude that YA Global is liable for section 1446 withholding tax of $15,967,578 for 2006. We also accept that the partnership's liability under section 1446 for 2007 as determined in the FPAA reflects an arithmetic error. We conclude that YA Global is liable for section 1446 withholding tax of $28,095,309 for 2007, as stated in the Report respondent submitted in response to our February 28 Order and as formally determined in his Amended Answer. The 2008 FPAA determined that YA Global was liable for section 1446 withholding tax for that year of $16,882,544, and respondent's Amended Answer did not

---

[51] Mr. Roland's use of a U.S. mailing address does not establish that he was not a foreign partner. Section 1446(e) defines "foreign partner" to mean "any partner who is not a United States person." The classification of an individual as a United States person turns on the individual's citizenship and residence—not on the mailing addresses he or she might happen to use. *See* § 7701(a)(30).

change that determination. But the liability stated in the 2008 FPAA reflects respondent's determination that YA Global was required to recognize $13,393,454 of mark-to-market gain for the year under section 475(a)(2). For the reasons stated *supra* Part III.D.3, we have concluded that the partnership's mark-to-market gain for 2008 was instead $13,813,194. The calculation of ECTI allocable to YA Offshore for 2008, and thus the partnership's section 1446 liability for that year, should take into account that increased amount of mark-to-market gain.

We have determined that YA Global is liable for section 1446 withholding tax of $15,967,578 for 2006, $28,095,309 for 2007, and, for 2008, an amount to be determined by the parties under Rule 155. We now consider whether the statute of limitations provided in section 6501(a) bars respondent from assessing the partnership's section 1446 liabilities for two of those years.

## VI.   *Statute of Limitations*

### A.   *Introduction*

Petitioners contend that the period of limitation for the assessment of any liability of YA Global for section 1446 withholding tax for each of 2006 and 2007 has expired. To prevail in that argument, petitioners will have to establish, first, that the period of limitation for each year began running when the partnership filed its Form 1065 for the year. If, instead, the period of limitation on the assessment of section 1446 withholding tax begins to run only with a partnership's filing of Form 8804, the applicable periods never began to run. Even if petitioners prevail in their argument that the applicable periods of limitation began to run with the partnership's filing of its Form 1065, they will also need to establish that consents to extend those periods did not cover the assessment of the partnership's liability under section 1446.

### B.   *Jurisdiction*

The parties did not address the question of our jurisdiction to determine the periods of limitation on the assessment of YA Global's section 1446 withholding tax liabilities. Our statutory jurisdiction in considering a petition for readjustment of partnership items is "to determine all partnership items of the partnership for the partnership taxable year to which the [FPAA] relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a

partnership item." § 6226(f). If the period of limitation on the assessment of any liability of YA Global for withholding tax under section 1446 for 2006 and 2007 is not a partnership item, we would lack jurisdiction to determine the applicable period.

As noted above, in a prior opinion in these cases we concluded that "withholding tax liability under section 1446 is a partnership item." *YA Glob. Invs., LP v. Commissioner*, 151 T.C. 11, 12 (2018). It follows from that conclusion that the applicable period of limitation on assessment of any such a liability is also a partnership item.

In *Diamond Gardner Corp. v. Commissioner*, 38 T.C. 875, 881 (1962), we concluded that the effect of "the statute of limitations in the Internal Revenue Code . . . is, for all practical purposes, to extinguish a barred tax liability." In that respect, the statute of limitations on assessment of tax differs from most statutes of limitations, which merely provide an affirmative defense to the obligor. Typical statutes of limitations affect the remedies available to the creditor but generally do not eliminate liability altogether. Our conclusion in *Diamond Gardner Corp.* that the tax statute of limitations is different was grounded in section 6401(a), which provides: "The term 'overpayment' includes that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto." If a taxpayer's payment of a deficiency after the expiration of the period of limitation for assessing it would give rise to a refundable overpayment, we reasoned in *Diamond Gardner Corp.*, then the tax statute of limitations *does* eliminate a taxpayer's liability. Therefore, determining whether the statute of limitations allows the assessment of YA Global's liability for section 1446 withholding tax is necessary to determine whether any such liability exists. If, as we have already concluded, the partnership's liability for section 1446 withholding tax is a partnership item, then so, too, is the applicability of the statute of limitations on the assessment of that liability.

Because we have jurisdiction to consider petitioners' statute of limitations argument, we now turn to the two issues on which petitioners must prevail in order to sustain their argument.

C.    *Forms 1065 as Trigger for Section 6501(a) Period of Limitation*

1.    *Findings of Fact*

Although YA Global filed Form 1065 for each of 2006, 2007, and 2008, it did not file a Form 8804 for any of those years.

2.    *Applicable Law*

a.    *Statutes and Regulations*

Section 6011(a) provides: "When required by regulations prescribed by the Secretary any person made liable for any tax imposed by this title, or with respect to the collection thereof, shall make a return or statement according to the forms and regulations prescribed by the Secretary." Treasury Regulation § 1.1446-3(d)(1)(iii) requires "[e]very partnership (except a publicly traded partnership . . . ) that has effectively connected gross income for the partnership's taxable year allocable under section 704 to one or more of its foreign partners . . . [to] file Form 8804, 'Annual Return for Partnership Withholding Tax (Section 1446).'"

Section 6031(a) provides:

> Every partnership . . . shall make a return for each taxable year, stating specifically the items of its gross income and the deductions allowable by subtitle A, and such other information . . . as the Secretary may by forms and regulations prescribe, and shall include in the return the names and addresses of the individuals who would be entitled to share in the taxable income if distributed and the amount of the distributive share of each individual.

Any domestic partnership that has income, deductions, or credits for a taxable year must file a Form 1065 for that year. § 6031(a); Treas. Reg. § 1.6031(a)-1(a). Foreign partnerships generally must file Form 1065 if they have gross income that is effectively connected with a U.S. trade or business or U.S.-source gross income. Treas. Reg. § 1.6031(a)-1(b).

Section 6501(a) generally requires "any tax imposed by" title 26 to "be assessed within 3 years after the return was filed." It defines "return," for purposes of chapter 66 (the "Limitations" provisions

included in sections 6501 through 6533), as "the return required to be filed by the taxpayer."

Section 6229(a) provides a special rule for the assessment of tax attributable to partnership or affected items.[52] That section provides as a general rule that

> the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of—
> (1) the date on which the partnership return for such taxable year was filed, or
> (2) the last day for filing such return for such year (determined without regard to extensions).

Section 6229(a), when applicable, merely extends the period of limitation prescribed by section 6501(a); it does not create a separate and independent period of limitation. *See, e.g.*, *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533 (2000). The Commissioner's issuance of an FPAA suspends the period of limitation to allow for judicial review. *See* § 6229(d).

b.      *Caselaw*

i.      *Zellerbach Paper Co.*

The question of when a document counts as a return for the purpose of commencing the period of limitation on assessment has been the subject of considerable litigation.  One early case arose from Congress's retroactive application of the Revenue Act of 1921, ch. 136, 42 Stat. 227, which did not become law until November 23, 1921, but was given retroactive effect to the beginning of the year.  The taxpayer in *Zellerbach Paper Co. v. Helvering*, 293 U.S. 172 (1934), had, before the enactment of the 1921 Act, filed a return under the Revenue Act of 1918, ch. 18, 40 Stat. 1057, for its fiscal year ended April 30, 1921. Under regulations, taxpayers who had initially filed returns under the 1918 Act and owed additional tax by reason of the 1921 Act were required to file supplemental returns for the affected year. Although the new law increased the tax owed by the taxpayer by what the Court

---

[52] An item is an "affected item" "to the extent [it] is affected by a partnership item."  § 6231(a)(5).

described as "little more than a nominal amount," *id.* at 175, the taxpayer had not filed a supplemental return. At issue was whether the taxpayer's filing of its initial return in July 1921 commenced the period of limitation on assessment. The Court reasoned that a second return, had it been filed, would have been "an amendment or supplement to" the taxpayer's initial return. *Id.* at 180. The need for a supplement, the Court concluded, did not prevent the filing of the initial return from commencing the period of limitation on assessment. "Perfect accuracy or completeness," the Court wrote "is not necessary to rescue a return from nullity, if it purports to be a return, is sworn to as such . . . and evinces an honest and genuine endeavor to satisfy the law." *Id.* The Court continued:

> This is so though at the time of filing the omissions or inaccuracies are such as to make amendment necessary. Even more clearly is it so when the return is full and accurate in the beginning under the statutes then in force, but is made inaccurate or incomplete by supervening changes of the law, unforeseen and unforeseeable. Supplement and correction in such circumstances will not take from a taxpayer, free from personal fault, the protection of a term of limitation already running for his benefit.

*Id.*

## ii.  *Germantown Trust Co.*

Another early case, *Germantown Trust Co. v. Commissioner*, 309 U.S. 304 (1940), involved a trust company that had established a fund for the benefit of its clients. The trust company filed a fiduciary income tax return on the fund's behalf.  Each participant reported the participant's share of the fund's income.  The Commissioner determined that the trust was properly classified as a corporation and sought to assess tax accordingly.  The trust company argued that the assessment was statute barred.  Resolution of the case turned on the choice between two alternative statutory rules.  The trust company relied on a rule requiring assessment within two years after the filing of the return. The Commissioner relied on a special rule that applied when a corporation filed no return but its shareholders reported their shares of the corporation's income.  In that circumstance, the Commissioner could assess tax up to four years after the filing of the last of the shareholders' returns.   The Court reasoned that the trust company's perhaps

erroneous filing of a fiduciary return rendered the special rule inapplicable. Instead, the Court held that the filing of the fiduciary return, which the parties and the Court agreed had appropriately determined the case's appellate venue, also commenced a two-year period of limitation under the general statutory rule. In support of that conclusion, the Court noted that the fiduciary return "contained all of the data from which a tax could be computed and assessed although it did not purport to state any amount due as tax." *Id.* at 308.

### iii. *Lane-Wells*

In *Commissioner v. Lane-Wells Co.*, 321 U.S. 219 (1944), the Court addressed the situation in which a taxpayer files only one of two required returns. The case involved a corporate successor whose predecessor, Technicraft Engineering Corp. (Technicraft), was determined to have been a personal holding company. For each of the years in issue, Technicraft had filed a regular Form 1120, U.S. Corporation Income Tax Return, that specifically denied that it had been a personal holding company. Therefore, Technicraft did not file the separate Form 1120H, United States Return of Personal Holding Company, required of personal holding companies. At issue was whether (1) Technicraft's filing of regular Forms 1120 commenced the period of limitation on the assessment of the personal holding company tax, and (2) Lane-Wells Co. (Lane-Wells) was liable, as transferee, for a penalty for Technicraft's failure to have filed personal holding company returns. With one qualification, the Court resolved both issues in the Government's favor.[53]

Lane-Wells, the transferee corporation, relied on the Court's prior decision in *Germantown Trust Co.* The Court in *Lane-Wells* distinguished *Germantown Trust*, noting that "the only liability involved" in that case "was for a Title I income tax, and the return was addressed to that liability." *Commissioner v. Lane-Wells*, 321 U.S. at 222–23. The regular corporate tax and the separate personal holding company tax were imposed by two different titles of the Revenue Act of 1934, ch. 277, 48 Stat. 680. Thus, Lane-Wells, as transferee, was "under

---

[53] During the first two of the three years at issue in *Lane-Wells*, the failure-to-file penalty was automatic. For the third year, the newly enacted reasonable cause exception was available but had not been considered by the Board of Tax Appeals. The Supreme Court thus remanded the case for the limited purpose of allowing consideration of the reasonable cause exception for the last of the three years in issue.

liabilities for two taxes and under an obligation to file two returns." *Id.* at 223.

The Court went on to note that Technicraft's Forms 1120 "did not show the facts on which [personal holding company tax] liability would be predicated." *Id.* In fact, those returns "expressly denied" liability for the personal holding company tax. *Id.* In response to the taxpayer's suggestion that a separate return for personal holding company tax was not strictly necessary in that the required information could have been solicited on the regular Form 1120, the Court emphasized the discretion allowed to the Commissioner in prescribing the required forms:

> Congress has given discretion to the Commissioner to prescribe by regulation forms of returns and has made it the duty of the taxpayer to comply. It thus implements the system of self-assessment which is so largely the basis of our American scheme of income taxation. The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished. For such purposes the regulation requiring two separate returns for these taxes was a reasonable and valid one and the finding of the Board of Tax Appeals that the taxpayer is in default is correct.

*Id.* at 223–24.[54]

iv.     Springfield *and* Paschall

The Court's opinion in *Lane-Wells* did not make clear whether the failure to have disclosed the facts that would have established liability for the personal holding company tax was critical to its conclusion or instead simply reinforced a conclusion that it would have reached solely on the distinction between the corporate income tax and the personal holding company tax. Several lower courts, however, have viewed as necessary to the result the failure to have disclosed facts on which liability would be predicated. For example, in *Springfield v. United States*, 88 F.3d 750, 752 (9th Cir. 1996), the Court of Appeals for the

---

[54] The specific issue before the Court in *Lane-Wells* is now addressed by statute. *See* § 6501(f) (providing a six-year period of limitation on the assessment of personal holding company tax, commencing with the corporation's filing of a regular corporate income tax return).

Ninth Circuit interpreted *Lane-Wells* as having established the principle that "a taxpayer does not start the statute of limitations running by filing one return when a different return is required if the return filed is insufficient to advise the Commissioner that any liability exists for the tax that should have been disclosed on the other return."

This Court adopted the Ninth Circuit's interpretation of *Lane-Wells* in *Paschall v. Commissioner*, 137 T.C. 8, 16 (2011). *Paschall* involved a taxpayer liable for the excise tax imposed by section 4973 on excess contributions to a Roth IRA. The taxpayer had not filed the Forms 5329, Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts, on which the excise tax was to be reported. He argued, however, that the Form 1040, U.S. Individual Income Tax Return, that he had filed for each year in issue had been sufficient to commence the period of limitation on assessment. Although the Form 1040 included a line for reporting the section 4973 excise tax and similar taxes, the taxpayer left that line blank on each of the Forms 1040. We reasoned that, "[u]pon review of Mr. Paschall's Forms 1040, [the Commissioner] was not reasonably able to discern that Mr. Paschall was potentially liable for a section 4973 excise tax." *Id.* Therefore, following *Lane-Wells* and *Springfield*, we concluded that the taxpayer's filing of Forms 1040 had not commenced the period of limitation on the assessment of the excise tax.

### v. *Beard*

In *Beard v. Commissioner*, 82 T.C. 766 (1984), *aff'd*, 793 F.2d 139 (6th Cir. 1986), this Court looked to the Supreme Court's opinions in *Zellerbach Paper Co.*, *Germantown Trust Co.*, *Lane-Wells*, and one other early case, *Florsheim Brothers Drygoods Co. v. United States*, 280 U.S. 453 (1930), discussed *infra* Part VII.B.2, for guidance on what qualifies as a "return" for purposes of the failure-to-file addition to tax provided in section 6651(a)(1). Although the Supreme Court opinions all addressed issues regarding the statute of limitations, we reasoned in *Beard*, 82 T.C. at 777, that "a return that is sufficient to trigger the running of the statute of limitation must also be sufficient for the purpose of section 6651(a)(1)." We discerned from the Supreme Court's jurisprudence four "elements" of a "test to determine whether a document is sufficient for statute of limitations purposes." *Id.* "First, there must be sufficient data to calculate tax liability; second, the document must purport to be a return; third, there must be an honest and reasonable attempt to satisfy the requirements of the tax law; and

fourth, the taxpayer must execute the return under penalties of perjury." *Id.*

### 3. *The Parties' Arguments*

#### a. *Petitioners*

Petitioners advance two separate arguments in support of the proposition that YA Global's filing of its Form 1065 for each of the years in issue commenced the period of limitation on the assessment of the partnership's section 1446 withholding tax liability. First, they argue that the Form 1065 for each of the years in issue was "the return" required under section 6501(a). And second, petitioners posit that, even if Form 8804 was the return whose filing was "technically required" to commence the period of limitation, YA Global's Forms 1065 were "adequate for that purpose."

##### i. *Form 1065 as "the Return" Required to Commence the Period of Limitation*

Petitioners' primary argument rests in part on our prior opinion classifying YA Global's section 1446 withholding tax liability as a partnership item. "Because Section 1446 withholding tax is a partnership item," petitioners reason, "Section 6229 requires that a Form 1065 be filed to trigger the statute of limitations."

Petitioners also observe that the Form 1065 required by section 6031(a) is the return by which the partnership reports "information for the purpose of carrying out the provisions of subtitle A." And they remind us that section 1446 is included in subtitle A. (Subtitle A, captioned "Income Taxes," includes sections 1 through 1563.) The Form 1065 YA Global filed, petitioners insist, disclosed that the partnership "had foreign partners with U.S.-source income" and "also included all the information Respondent needed to compute any section 1446 withholding."

Petitioners suggest that the Forms 8804 that YA Global failed to file should be viewed as "supplemental returns" under *Zellerbach Paper Co.* Therefore, they reason, "[a] partnership's failure to file a Form 8804 when required may result in delinquency penalties under section 6651 and 6655, but it cannot cause the period of limitations to remain open indefinitely if the partnership has filed a Form 1065."

ii.    *Adequacy of Forms 1065 as Substitutes for Forms 8804*

As a fallback argument, petitioners suggest that, even if Forms 8804 were the returns "technically required to commence the period of limitations," the Forms 1065 that YA Global filed should be accepted as "adequate for that purpose . . . because they (1) set forth the facts establishing liability for the tax, and (2) contained sufficient information to enable the Commissioner to compute the tax (even if the information was imperfect)." They observe that "YA Global's Forms 1065 made clear that it was a partnership and that it had foreign partners." Those facts alone, they contend, "establish liability for Section 1446 withholding tax." They add:

> YA Global's Forms 1065 also provided all the data for Respondent to compute the extent of the Fund's withholding tax liability. In fact, Respondent did compute the section 1446 withholding tax he asserts is due based on the information that YA Global provided on the Forms 1065. . . . Respondent needed no information whatsoever beyond what was provided in the Forms 1065 to compute the Section 1446 withholding tax he claims is due.

Analogizing YA Global's Forms 1065 to the fiduciary income tax returns filed by the trust company in *Germantown Trust Co.*, petitioners argue that "[t]he facts in this case are virtually identical to those in" that case. By contrast, petitioners attempt to distinguish *Lane-Wells* on the ground that, in that case, "the taxpayer had two separate tax liabilities—income tax liability and personal holding tax liability—each of which required a separate return." Because section 6501(a) uses "a definite article" with "a singular subject" (the return), petitioners reason that, "absent a clear statutory or regulatory mandate to the contrary, a taxpayer should not have to file two separate returns with respect to the *same* tax for statute of limitations purposes."

Next, petitioners invoke what they refer to as *Beard*'s "substantial compliance" requirements. "All four prongs of the *Beard* test," they allege, "were satisfied by YA Global's filing of the Forms 1065." They repeat their claim that "there is no question that the Forms 1065 filed by the Fund supplied all of the data necessary for Respondent to calculate the Fund's section 1446 withholding tax liability." Even if the forms had not supplied all necessary data, petitioners suggest, respondent could have obtained the requisite information (as he in fact

did) by auditing YA Global's returns. Regarding the second *Beard* factor, petitioners argue: "[T]he Forms 1065 purported to be the Fund's returns for reporting partnership items, and they were filed as such. Each also contained 'a specific statement of items of income, deductions, and credits in compliance with the statutory duty to report information.'" "*Third*," they say, "the Fund honestly and reasonably intended to comply satisfy [sic] its tax obligations by filing the Forms 1065." Elaborating on that point, they add: "The Fund, in good faith and based on its tax advisors' guidance, believed it was not engaged in a USTB [U.S. trade or business], and it reported all of its income as portfolio income on the Forms 1065." And there is no "dispute that the Forms 1065 were signed under penalties of perjury."

Finally, petitioners complain that, under respondent's view of the law, a partnership "that reasonably believes it has no section 1446 withholding tax liability" would have "no way . . . to trigger the statute of limitations." They remind us of our observation in *Wells v. Commissioner*, T.C. Memo. 2018-188, at *6–7, that "a majority of courts and this Court have consistently held that a tax return containing only zeros is not a valid return because it does not contain sufficient information for the Commissioner to calculate and assess a tax liability." Therefore, petitioners assume that YA Global's filing of Forms 8804 consistent with its belief that it was not engaged in a U.S. trade or business would have been ineffective to start the period of limitation on the assessment of section 1446 withholding tax liability.

b. *Respondent*

Respondent focuses on section 6501(a)'s definition of "return" as "the return required to be filed by the taxpayer." YA Global did not file its information returns on Forms 1065 as a *taxpayer*. Form 1065, as respondent observes, "does not include any line items where a partnership could report any withholding taxes due, including the section 1446 withholding tax." YA Global is a taxpayer, as respondent sees it, only because of its liability for withholding tax under section 1446. Therefore, the returns the partnership should have filed *as a taxpayer* were the Forms 8804 that it neglected to file. "Finding [that] the Form 1065 is the appropriate return for reporting the section 1446 withholding tax," respondent reasons, "would render superfluous Form 8804 and the regulations prescribing its filing."

Respondent suggests that petitioners ignore "the relationship between sections 6501 and 6229." Because "[s]ection 6229 does not

create a separate limitations period but rather provides a minimum period which merely extends the general limitations period under section 6501," respondent argues, section 6501 necessarily requires the filing of a return other than the partnership return whose filing serves as a point of reference under section 6229.

Respondent also challenges petitioners' reliance on *Beard*. *Beard* focused "on the issue of whether a tampered return constituted a return for various statutory purposes." Respondent accepts "that the Forms 1065 filed by YA Global were valid returns." The issue, as respondent sees it, is whether the partnership's Form 1065 "can be used to satisfy a dual purpose." In that regard, respondent contends, *Beard* and similar authorities do not allow the partnership's "filing of Form 1065" to "be used as a basis for satisfying YA Global's obligation to file a return of the section 1446 withholding tax." "YA Gobal's Forms 1065," respondent asserts, "do not have sufficient data to calculate YA Global's section 1446 withholding tax liability, do not purport to be a return [sic] of withholding tax, and do not reflect YA Global's honest and reasonable attempt to satisfy YA Global's withholding tax obligations under section 1446."

Respondent allows that the "rule" articulated in *Germantown Trust* "works when the taxpayer is required to file only one return, and the taxpayer filed the wrong return." By contrast, *Lane-Wells* established that a scenario in which "the taxpayer has liabilities for two taxes or is obligated to file two returns . . . require[s] a different answer." In those situations, "a return being offered for both purposes must not only contain sufficient information to compute the tax at issue but also sufficient facts on which the second liability would be predicated."

"[F]ar from reporting the section [1446] withholding tax liability," respondent contends, "the Forms 1065 that YA Global filed specifically negate any suggestion that YA Global was liable for [that] tax." The partnership's Forms 1065 did "not set forth specific information about the amount of [the partnership's] effectively connected income." The Forms 1065 "did not show any business income" and "reveal[ed] no facts on which respondent could ascertain that YA Global was liable for the section 1446 withholding tax."

Respondent also argues that the partnership's Forms 1065 do not purport to be returns of YA Global's section 1446 withholding tax liability and "cannot be considered honest and reasonable attempts to satisfy the Form 8804 filing requirements for purposes of starting the

limitations period on withholding tax reportable on Form 8804." "Rather than reporting the number of foreign partners, the amount of effectively connected income allocable to them, and the basic adjustments called for on Form 8804," respondent asserts, "YA Global reported on Forms 1065 the bare minimum of general information."

4. *Analysis*

As in *Paschall*, 137 T.C. at 16, "[t]he resolution of this issue is governed by the Supreme Court's decision in *Commissioner v. Lane-Wells Co.*" Like the Ninth Circuit, we have interpreted *Lane-Wells* as establishing that "a taxpayer does not start the statute of limitation running by filing one return when a different return is required if the return filed is insufficient to advise the Commissioner that any liability exists for the tax that should have been disclosed on the other return." *Id.* (quoting *Springfield*, 88 F.3d at 752).

Petitioners do not deny that, if YA Global was liable for section 1446 withholding tax for any of the years in issue, it was required to file a Form 8804 for the year in addition to its Form 1065. But the partnership did *not* file a Form 8804 for any of those years. And the Forms 1065 that the partnership *did* file were "insufficient to advise the Commissioner" of the partnership's liability for section 1446 withholding tax that it should have disclosed on Forms 8804. *Paschall*, 137 T.C. at 16 (quoting *Springfield,* 88 F.3d at 752).

That YA Global was a partnership with foreign partners was obviously not enough to establish the partnership's liability for section 1446 withholding.[55] The partnership's conduct of a trade or business in the United States is critical to its liability for the withholding tax. And YA Global did not disclose *that* fact on its Forms 1065. Instead, YA Global implicitly denied that it was engaged in a U.S. trade or business by reporting no ordinary business income on its Forms 1065. As petitioners admit in connection with their discussion of the third *Beard* factor ("honest and reasonable attempt to satisfy the . . . law"), YA Global "reported all of its income as portfolio income on the Forms 1065" in the belief that it was *not* engaged in a U.S. trade or business.

It may be true that, in computing YA Global's section 1446 withholding tax liability, respondent used no amounts that were not

_____

[55] If those facts alone had been sufficient to establish liability, petitioners should have conceded these cases long ago.

shown on the partnership's Forms 1065. But the returns did not disclose the key fact that made those amounts relevant to the calculation of withholding tax liability: the partnership's conduct of a U.S. trade or business. Under *Commissioner v. Lane-Wells*, 321 U.S. at 223, a taxpayer's filing of one return cannot start the period of limitation on the assessment of a tax required to be shown on an unfiled return unless the return filed "show[s] the facts on which liability [for the tax sought to be assessed] would be predicated." The prospect that the missing facts could have been discovered on audit is of no moment. The same could have been said in *Lane-Wells*, *Springfield*, and *Paschall*.

YA Global's case can be distinguished from *Germantown Trust Co.* on the same ground that *Lane-Wells* was distinguishable from the earlier case. YA Global filed only one of two required returns. It correctly filed Forms 1065. Its error was in not *also* filing Forms 8804. By contrast, only one return had to be filed in respect of the fund whose tax liability was at issue in *Germantown Trust*. If the Commissioner had been right that the fund was an association taxable as a corporation, the form the trust company filed, a fiduciary tax return, was the wrong form.

As noted above, petitioners attempt to distinguish *Lane-Wells* on the ground that the taxpayer in that case was liable for two different taxes. They argue that a taxpayer liable for a single tax should generally not be required to file two separate returns to commence the running of the period of limitation on the assessment of that tax. Petitioners give insufficient heed to section 6229. Because of that section, when a taxpayer's liability is attributable to one or more partnership items (or affected items), the taxpayer's ability to gain full repose under the statute of limitations will always require the filing of two returns: the partnership's information return filed on Form 1065 and whatever return is required to report the tax sought to be assessed. The underlying section 6501(a) period of limitation commences with the filing of a single return—in this case, Form 8804. But section 6229 provides for the potential extension of the section 6501(a) period of limitation when the tax sought to be assessed "is attributable to any partnership item (or affected item)." We have already determined that YA Global's liability for section 1446 withholding tax is *itself* a partnership item. Even if it were not, it would be *attributable to* partnership items (the foreign partners' shares of the partnership's income, gain, loss, and deduction, to the extent effectively connected with its U.S. trade or business). *See* Treas. Reg. § 301.6231(a)(3)-1(a)(1)(i) (including in the definition of "partnership item" "[t]he

partnership aggregate and each partner's share of . . . [i]tems of income, gain[,] loss, deduction, or credit of the partnership").

In arguing that YA Global's Form 1065 was "the return" referred to in section 6501(a) in regard to the assessment of section 1446 withholding tax because of our prior conclusion that the partnership's liability for tax is a partnership item, petitioners confuse the section 6501(a) period of limitation and the potential extension of that period by reason of section 6229. Contrary to petitioners' assertion, section 6229 does not "require[] that a Form 1065 be filed to *trigger* the statute of limitations." That period necessarily begins with the filing of the return reporting the tax sought to be assessed (usually, a partner's income tax return), regardless of whether the partnership ever files an information return on Form 1065. The partnership's filing of Form 1065 simply provides a reference point for determining the extent to which section 6229 may extend the underlying section 6501(a) period of limitation.

The text of section 6031(a) does not support petitioners' argument that YA Global's Form 1065 was "the return" referred to by section 6501(a). Petitioners quote section 6031(a) selectively to suggest that the return filed under that section is the appropriate return for reporting *any* information required to carry out a provision of subtitle A. Section 6031(a) actually requires the reporting of "items of [a partnership's] gross income and the deductions allowable by subtitle A, and such other information . . . as the Secretary may by forms and regulations prescribe." Petitioners correctly observe that section 1446 is included in subtitle A. But Form 1065 would be the proper form for reporting information concerning a partnership's liability for section 1446 withholding tax only if a regulation or the form itself said so. Petitioners point to no regulation that requires the reporting of section 1446 withholding tax on Form 1065. Nor have they identified any place on the form itself that calls for the disclosure of information concerning a partnership's section 1446 withholding tax liability. That absence presumably reflects the decision to require, by Treasury Regulation § 1.1446-3(d)(1)(iii), that a partnership report on a separate form information concerning section 1446 withholding tax.

We can also readily dismiss petitioners' claim that Form 8804 is simply a "supplement" to Form 1065. To begin with, YA Global's case is readily distinguishable from *Zellerbach Paper Co.* The latter case arose because of Congress' retroactive application of a new revenue act late in its initial year of application. Taxpayers who had already filed returns under the old law had to supplement those returns if the new law

resulted in additional tax.  But in *Zellerbach Paper Co.*, the initial and supplemental returns were of the same type:  corporate income tax returns.  By contrast, while Form 8804 is an income tax return required by section 6011, Form 1065 is an information return required by section 6031(a).  By petitioners' reasoning, the period of limitation on the assessment of a partnership's section 1446 withholding tax liability would begin with the partnership's filing of a Form 1065 regardless of whether the partnership "supplemented" its Form 1065 with Form 8804.  Because Form 1065 is an information return—not a tax return—the filing of that form can never start the section 6501(a) period of limitation on the assessment of any tax.  As respondent says, a partnership does not file a Form 1065 as a *taxpayer* but instead as a passthrough entity.  Therefore, a partnership's filing on Form 1065 of the information return required by section 6031(a) serves only as a point of reference for determining the extent to which section 6229 might extend the section 6501(a) period of limitation for the assessment of deficiencies attributable to partnership items.

*Beard* provides petitioners no help.  Although *Beard* involved the section 6651(a)(1) failure-to-file penalty, we have applied the *Beard* test for the purpose of determining when a return is sufficiently compliant that its filing commences the period of limitation on assessment.  *See, e.g.*, *Hulett v. Commissioner*, 150 T.C. 60 (2018), *rev'd and remanded on other grounds sub nom. Coffey v. Commissioner*, 987 F.3d 808 (8th Cir. 2021).  If petitioners are correct that "[a]ll four prongs of the *Beard* test were satisfied by YA Global's filing of [its] Forms 1065," then *Beard*, as applied to the statute of limitations issue before us, would conflict with *Lane-Wells*, as interpreted by *Paschall*.  In the event of conflict, *Lane-Wells* and *Paschall* would take precedence.  Each of those cases directly involved the statute of limitations.  *Beard*, a failure-to-file case, provides only analogous authority.

But no such conflict exists.  As explained *infra* Part VII.B.4, the Forms 1065 that the partnership filed satisfy at most only one of the four *Beard* factors as a substitute for the Forms 8804 that the partnership should have filed. (Respondent apparently accepts that YA Global's Forms 1065 were signed under penalties of perjury.)  That very partial compliance with *Beard* is insufficient to override the clear import of *Lane-Wells* as interpreted by *Paschall*.

Finally, we need not address the question of whether a partnership that reasonably believes itself not to be subject to the withholding tax imposed by section 1446 can take action to commence

the running of the period of limitation on the assessment of that tax. Petitioners have not established that the statute of limitations must be interpreted in such a way as to ensure that a taxpayer who believes it is not subject to tax can take measures to begin the running of the period of limitation on the assessment of that tax. To the contrary, as we wrote in *Rhone-Poulenc*, 114 T.C. at 540, quoting *E.I. DuPont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924): "Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government."

Moreover, petitioners have not established the premise of their argument. *Wells* and the cases it cited were all tax-protester cases. The inadequacy of an all-zero return filed on the basis of frivolous tax-protester arguments does not establish that a protective return reporting all zeros filed by a taxpayer who, in good faith, believes itself not to be subject to a tax would *also* be inadequate to commence the running of the period of limitation on the assessment of that tax. We rejected as invalid the return filed by the tax protester in *Wells*, T.C. Memo. 2018-188, at *7, not only because it reported all zeros but also because the filing of that return did "not constitute an honest and reasonable attempt to satisfy the requirements of the tax law." The same was true of each of the cases cited in *Wells* for the proposition petitioners cite. *See United States v. Mosel*, 738 F.2d 157, 158 (6th Cir. 1984); *United States v. Smith*, 618 F.2d 280, 281 (5th Cir. 1980); *Cabirac v. Commissioner*, 120 T.C. 163, 169 (2003), *aff'd*, No. 03-3157, 2004 WL 7318960 (3d Cir. Feb. 10, 2004); *Arnett v. Commissioner*, T.C. Memo. 2006-134, 2006 WL 1764402, at *2, *aff'd*, 242 F. App'x 496 (10th Cir. 2007); *Halcott v. Commissioner*, T.C. Memo. 2004-214, 2004 WL 2110086, at *3. Therefore, YA Global might have been able to commence the running of the period of limitation on the assessment of its section 1446 withholding tax liability if it had filed a Form 8804 for each of the years in issue reporting zero liability, describing its activities, and explaining the grounds for its belief that it was not engaged in a U.S. trade or business. *Cf. White Eagle Oil & Refin. Co. v. Commissioner*, 19 B.T.A. 185, 189–90 (1930) (accepting as a valid return for purposes of the statute of limitations a blank form accompanied by a signed affidavit attesting to a corporation's termination of business). We need not decide that question because YA Global did not file such returns. If it *had*, however, *Wells* and the cases it cited would not have compelled us to reject those returns as invalid.

D.     *Extension of Section 6229 Period*

Even if YA Global's filing of Form 1065 for each of 2006 and 2007 commenced the period of limitation on the assessment of section 1446 withholding tax for the year, the period remained open when respondent issued the FPAA for the year because of agreements reached by YA Global and respondent to extend the applicable period of limitation.

1.     *Findings of Fact*

a.     *2006 Extensions*

YA Global filed its 2006 Form 1065 on or about October 15, 2007. On January 29, 2010, Mr. Angelo, on behalf of Yorkville Advisors and YA Global, signed a Form 872–P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items. The form expresses the agreement between YA Global and the Commissioner to allow the IRS to "assess any federal income tax attributable to the partnership items of [YA Global] against any partner for the period(s) ended December 31, 2006 at any time on or before February 28, 2011." A representative of the IRS signed the form on February 25, 2010.

On July 19, 2010, Mr. Angelo signed a second Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2006 taxable year. That form extended through June 30, 2011, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the second Form 872–P on July 21, 2010.

On December 20, 2010, Mr. Angelo signed a third Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2006 taxable year. The third form extended through December 31, 2011, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the third Form 872–P on January 3, 2011.

On August 31, 2011, Mr. Angelo signed a fourth Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2006 taxable year. The fourth form extended through November 30, 2012, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the fourth Form 872–P on September 1, 2011.

None of the first four Forms 872–P executed in regard to YA Global's 2006 taxable year included any additions to the form's

preprinted language other than inserting the last day of the taxable year covered by the form and the last date for assessment.

On February 24, 2012, Mr. Angelo signed a fifth Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2006 taxable year. The fifth form extended through July 31, 2013, the period of limitation on the assessment of specified taxes. And the specified liabilities are not limited to those described in the form's preprinted text. Text added to the preprinted form specifies that the taxes covered by the extension included "income and/or withholding tax required to be paid and/or withheld at source (under chapter 3 of the Internal Revenue Code) due on Form 8804 or Form 1042." A representative of the IRS signed the fifth Form 872–P on April 2, 2012.

On March 24, 2013, Mr. Angelo signed a sixth Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2006 taxable year. The sixth form extended through December 31, 2014, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the sixth Form 872–P on April 2, 2013.

On July 16, 2014, Mr. Angelo signed a seventh Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2006 taxable year. The seventh form extended through March 31, 2015, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the seventh Form 872–P on July 22, 2014.

The sixth and seventh Forms 872–P included the same added text as the fifth regarding the assessment of withholding tax liabilities.

Respondent issued the 2006 FPAA on March 6, 2015.

b.    *2007 Extensions*

On December 20, 2010, Mr. Angelo, on behalf of Yorkville Advisors and YA Global, signed a Form 872–P in regard to the partnership's 2007 taxable year. That form extended through December 31, 2011, the period of limitation on  the assessment of the specified taxes. A representative of the IRS signed the form on April 14, 2011.

On August 31, 2011, Mr. Angelo, on behalf of Yorkville Advisors and YA Global, signed a second Form 872–P in regard to the partnership's 2007 taxable year. That form extended through November

30, 2012, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the second 2007 Form 872–P on September 1, 2011.

Neither of the first two Forms 872–P executed in regard to YA Global's 2007 taxable year included any additions to the form's preprinted text other than inserting the last day of the taxable year covered by the form and the last date for assessment.

On February 24, 2012, Mr. Angelo, on behalf of Yorkville Advisors and YA Global, signed a third Form 872–P in regard to the partnership's 2007 taxable year. The third 2007 form extended through July 31, 2013, the period of limitation on the assessment of specified taxes. And, as with the fifth, sixth and seventh Forms 872–P executed for 2006, the specified taxes covered by the third 2007 form were not limited to those described in the form's preprinted text. Text added to the preprinted form specified that the taxes covered by the extension included "income and/or withholding tax required to be paid and/or withheld at source (under Chapter 3 of the Internal Revenue Code) due on Form 8804 or Form 1042." A representative of the IRS signed the third 2007 Form 872–P on April 2, 2012.

On March 24, 2013, Mr. Angelo signed a fourth Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2007 taxable year. The fourth 2007 Form 872–P extended through December 31, 2014, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the fourth 2007 Form 872–P on April 2, 2013.

On July 16, 2014, Mr. Angelo signed a fifth Form 872–P on behalf of Yorkville Advisors and YA Global for the partnership's 2007 taxable year. The fifth 2007 Form 872–P extended through March 31, 2015, the period of limitation on the assessment of the specified taxes. A representative of the IRS signed the fifth 2007 Form 872–P on July 22, 2014.

The fourth and fifth 2007 Form 872–P included the same added text as the third regarding the assessment of withholding tax liabilities.

Respondent issued the 2007 FPAA on the same date (March 6, 2015) that he issued the 2006 FPAA.

2.    *Applicable Law*

a.    *Statutes and Regulations*

Section 6231(a)(2) defines the term "partner" for purposes of subchapter C of chapter 63 (sections 6221 through 6234) to mean "(A) a partner in the partnership, and (B) any other person whose income tax liability under subtitle A is determined in whole or in part by taking into account directly or indirectly partnership items of the partnership."

Section 6501(c)(4)(A) allows a taxpayer and the Internal Revenue Service to extend the applicable period of limitation by mutual agreement.  According to the statute:

> Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title . . . both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon.

§ 6501(c)(4)(A).

b.    *Caselaw*

In *S–K Liquidating Co. v. Commissioner*, 64 T.C. 713 (1975), we concluded that the Commissioner's issuance of a notice of deficiency for withholding tax for two calendar years did not preclude him from later issuing a notice of deficiency in corporate income tax for a fiscal year of the corporation that was included within the two calendar years covered by the prior notice.  *See* § 6212(c) (generally prohibiting the issuance of two notices of deficiency for the same taxable year).  We reasoned that "[t]he two statutory notices of deficiency" issued to the taxpayer were "based on two separate returns, the returns cover different taxable periods, and the asserted liabilities originate from taxes enacted for different purposes."  *S–K Liquidating Co.*, 64 T.C. at 716.  We acknowledged that the withholding tax "is an 'income tax' in that it is imposed under chapter 3 (Withholding of Tax on Nonresident Aliens, etc.) of subtitle A (Income Tax)," *id.* at 718, but we nonetheless held that section 6212(c)'s prohibition against the determination of additional deficiencies did not preclude the Commissioner's issuance of a second deficiency notice.  "Though both taxes are imposed under the income tax subtitle of title 26," we wrote, "one tax is on the income of [the taxpayer]

and the other is on the disbursements to another (the nonresident alien taxpayer)." *Id.*

*InverWorld, Ltd. v. Commissioner*, 98 T.C. 70 (1992), *aff'd*, 979 F.2d 868 (D.C. Cir. 1992), involved a foreign corporation that had received both a notice of liability for unpaid withholding tax and a notice of deficiency in corporate income tax. The taxpayer filed a petition in response to the notice of liability but not the notice of deficiency. It then moved for leave to amend its petition to contest the income tax deficiencies the Commissioner had determined. We denied the taxpayer's motion because allowing the amendment would have expanded the Court's jurisdiction beyond that created by the initial petition.[56] We reasoned that "[t]he tax imposed by section 1441 et seq. relates to withholding tax liability, not corporate income tax liability." *Id.* at 77. Following *S–K Liquidating*, we concluded that the notice of liability for withholding tax and the notice of deficiency in corporate income tax sent to the taxpayer "must be considered independently for purposes of determining the extent of this Court's jurisdiction." *Id.* at 82. The taxpayer's petition assigning error to the determinations in the notice of liability did not give us jurisdiction to consider the determinations regarding corporate income tax liability set forth in the notice of deficiency. The corporation's "liability for withholding tax and its liability for corporate income tax," we wrote, "are based upon separate returns and therefore separate deficiency determinations." *Id.* at 84.

### 3. *The Parties' Arguments*

#### a. *Petitioners*

Petitioners argue that "the Original Forms 872–P"[57] did not "evidence[] an objective manifestation of [their] agreement to extend the statute of limitations with respect to section 1446 withholding tax." They note that the initial Forms 872–P extended the period for assessing

---

[56] Rule 41(a) provides: "No amendment shall be allowed after expiration of the time for filing the petition . . . which would involve conferring jurisdiction on the Court over a matter which otherwise would not come within its jurisdiction under the petition as then on file." Rule 41(a) was amended, without substantive effect, as of March 20, 2023.

[57] Petitioners use the term "Original Forms 872–P" to refer to those signed by Mr. Angelo on January 29, July 19, and December 20, 2010, and August 31, 2011. In other words they refer to those forms (the first four for 2006 and the first two for 2007) that did not include additional text referring specifically to withholding taxes.

"income tax" against "any partner." Petitioners argue that the section 1446 withholding tax is not an income tax and YA Global is not a partner in itself. Relying on *InverWorld*, petitioners insist that "this Court has made clear they [income tax and withholding tax] are not the same thing at all." Petitioners also argue that "YA Global could not be a partner in itself." Given the usual meaning of "partner," they contend, YA Global's tax matters partner "could not have understood from the Original Forms 872–P that they were meant to apply to the [partnership] itself." Petitioners acknowledge, however, that section 6231(a)'s definition of partner extends more broadly than the term's common meaning. Petitioners allege that, even under that "special definition," YA Global was not a partner. The partnership, they argue, "could not have any income tax liability at all (let alone any income tax liability determined by taking into account partnership items)."

b.  *Respondent*

Respondent argues that "[t]he section 1446 withholding tax is a federal income tax." The provision is included in subtitle A, which bears the caption "Income Taxes." Because the section 1446 withholding tax is an "income tax," respondent contends, it is "covered by Form 872–P, regardless of whether the form includes a specific reference to it."

Respondent reasons that the preprinted text on Form 872–P, which refers to the assessment of "any federal income tax attributable to the partnership items of the partnership . . . against any partner," "should be read in light of the statue [that is, section 6229] for which the form is being used." As respondent observes, section 6229 provides a minimum period "for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year." "Therefore," respondent reasons, "the term 'federal income tax' in Form 872–P is synonymous with taxes imposed by subtitle A."

Respondent also argues that YA Global is a "partner," within the meaning of section 6231(a)(2), "because it is a person under section 7701(a)(1),[58] it has an income tax liability in the form of the section 1446 withholding tax, and the section 1446 withholding tax is determined by taking into account items of the partnership."

_____

[58] Section 7701(a)(1) provides:  "The term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation."

Respondent asserts that "the common understanding of the term 'partner' is not determinative here, as the TEFRA provisions under former sections 6221 *et seq.* have their own definitions and structure which govern the interpretation of the Forms 872–P."

Respondent concludes that "the pertinent Forms 872–P," apparently including those that did not specifically mention section 1446 withholding tax, "are effective in extending the period of limitations with respect to YA Global's section 1446 withholding tax liability."

4.  *Analysis*

If the period of limitation on the assessment of YA Global's section 1446 withholding tax liability remained open when the Forms 872–P that specifically referred to that tax were executed, then respondent's ability to assess that tax would clearly not be barred by section 6501(a). The relevant question is whether, if the partnership's filing of its Forms 1065 for 2006 and 2007 commenced the running of the section 6501(a) period, as well as the potential extension of that period under section 6229(a), the initial Forms 872–P that did not specifically refer to the section 1446 withholding tax nonetheless extended the period of limitation on the assessment of that tax by reason of section 6229. That question, in turn, boils down to whether the tax imposed by section 1446 is an "income tax."

The preprinted text of the initial Forms 872–P, while not mentioning section 1446 specifically, *did* extend the period for assessment of "any federal income tax attributable to partnership items of the partnership . . . against any partner." The section 1446 withholding tax is undeniably "attributable to partnership items" of YA Global. Indeed, we concluded in *YA Global Investments, LP*, 151 T.C. at 16, that the section 1446 withholding tax is *itself* a partnership item. Even if it were not itself a partnership item, the tax would be attributable to the portions of YA Global's ECTI allocable to its foreign partners. And *those* items are undeniably partnership items. *See* Treas. Reg. § 301.6231(a)(3)-1(a)(1)(i) (including within the definition of "partnership items" "[t]he partnership aggregate and each partner's share of . . . [i]tems of income . . . of the partnership").

If the section 1446 withholding tax is an income tax, then YA Global would fall within the definition of "partner" provided in section 6231(a)(2). As noted above, that definition includes "any . . . person

whose *income* tax liability under subtitle A is determined in whole or in part by taking into account directly or indirectly partnership items of the partnership." (Emphasis added.) Petitioners' only argument that YA Global is not a "partner," within the meaning of section 6231(a)(2), is that the partnership is not liable for any income tax. If the section 1446 withholding tax in issue is an income tax, then YA Global *is* liable for an income tax. And its liability for that tax is determined by taking into account partnership items. Therefore, if the section 1446 withholding tax is an income tax, then YA Global is a partner.

For the reasons stated above, the question of whether the initial Forms 872–P extended the period of limitation on the assessment of YA Global's section 1446 withholding tax liability for 2006 and 2007 comes down to whether that tax is an income tax. We have no doubt that it is. As respondent emphasizes, section 1446 is in subtitle A of title 26, which is captioned "Income Taxes." And in *S–K Liquidating*, 64 T.C. at 718, we concluded that the withholding taxes "imposed under chapter 3 . . . of subtitle A" (that is, sections 1441 through 1465) are income taxes. That a withholding tax imposed under chapter 3 is separate from the corporate income tax imposed by section 11, as we concluded in *S–K Liquidating* and *InverWorld*, does not establish that the withholding tax is not *also* an income tax.

Petitioners suggest that the initial Forms 872–P that include no additions to their preprinted text addressed the section 1446 withholding tax only "obscurely." That may be so. But it is also beside the point. The preprinted text covered the section 1446 withholding tax. That tax is an income tax. And the partnership, as a person whose liability for that tax is determined by partnership items, is a "partner" within the meaning of section 6231(a)(2). That the parties—or at least Mr. Angelo—may not have had section 1446 withholding taxes in mind when agreeing to the extension is of no moment. Whether a taxpayer and the Commissioner have agreed to extend the period of limitation on assessment under section 6501(c)(4) is determined by their objective acts—typically, their signing of a consent form. *See, e.g., Kronish v. Commissioner*, 90 T.C. 684, 693 (1988). A taxpayer's subjective belief about the scope of the agreement is irrelevant; instead, the written terms govern. *Id.*

E.      *Conclusion*

For the reasons explained above, petitioners have not established that the period of limitation for the assessment of YA Global's liability

for section 1446 withholding tax for each of 2006 and 2007 expired before respondent issued the FPAA for the year. Because the partnership did not file a Form 8804 for either year, the applicable period of limitation never began to run. Moreover, even if the partnership's filing of a Form 1065 for each year commenced the running of the period of limitation, the consents executed by the parties on Forms 872–P extended that period by reason of section 6229. Specific reference to section 1446 withholding tax on the extension forms was unnecessary. The forms' preprinted language covered the assessment of that tax (an income tax) against YA Global (considered, for that purpose, a partner).

VII. *Additions to Tax*

A. *Introduction*

The FPAA for each of 2006, 2007, and 2008 determined that YA Global "is liable under I.R.C. § 6651(a)(1) for failure to file Form 8804 and liable under I.R.C. § 6651(a)(2) and 6655 for failure to pay I.R.C. § 1446 withholding tax." Petitioners advance two arguments why YA Global should not be subject to the additions to tax respondent determined even if (as we have already concluded) the partnership was engaged in a U.S. trade or business during the years in issue. First, they argue that, under *Beard*, the Form 1065 that the partnership filed each year should be treated as having satisfied its obligation to have filed a Form 8804. And second, petitioners argue that the partnership's failure to have filed Forms 8804, and its failure to have paid withholding tax, was attributable to reasonable cause.[59] We address each of petitioners' arguments, in turn, below.

B. *Adequacy of Form 1065*

1. *Findings of Fact*

Although, as previously noted, the Form 1065 that YA Global filed for each of 2006, 2007, and 2008 reported no ordinary business income on line 22, each return reported income and deductions on Schedule K. Schedules K–1 issued to YA Global's partners identified the portion of those income and deduction items allocable to each partner. The

---

[59] In their Answering Brief, petitioners state their agreement with respondent "that if YA Global is liable for any section 1446 withholding tax, it is also liable for section 6655 additions to tax for failure to pay estimated tax because section 6655 does not excuse imposition of the additions based on reasonable cause and lack of willful neglect."

Schedules K–1 issued to the partnership's foreign partners did not identify any of the income allocable to them as effectively connected with a U.S. business conducted by the partnership. None of the partnership's Forms 1065 state whether the partnership made any payments of section 1446 withholding tax during the taxable year covered by the return. The copies of YA Global's 2006, 2007, and 2008 returns included in the record are not signed on the partnership's behalf.

### 2. *Applicable Law*

Section 6651(a)(1) provides for an addition to tax for the "failure . . . to file any return required under the authority" of specified Code provisions. Among the returns to which the section 6651(a)(1) addition to tax applies are those "required under the authority of subchapter A of chapter 61 (other than part II thereof)." Section 6011 is included in part II of subchapter A of chapter 61. By contrast, section 6031(a), which requires the filing of Form 1065, appears in part III of subchapter A of chapter 61. Therefore, a partnership's failure to file Form 1065 is not subject to the section 6651(a)(1) addition to tax. Section 6698 imposes a separate penalty on a partnership's failure to file a return under section 6031.

The addition to tax for failure to file imposed by section 6651(a)(1) is computed as a percentage of the tax required to be shown on the delinquent return. The applicable percentage is 5 percent for each month beyond its due date that the return remains unfiled, up to a maximum of 25 percent. § 6651(a)(1).

The adequacy of a return can be relevant both for the failure-to-file addition to tax and the period of limitation on assessment, which begins with the filing of the required return. The two issues are inextricably linked. In *Beard*, 82 T.C. at 777, we concluded that "a return that is sufficient to trigger the running of the statute of limitation must also be sufficient for the purpose of section 6651(a)(1)." As noted *supra* Part VI.C.2.b.v, *Beard* was a failure-to-file case. In the absence of precedent regarding the adequacy of a return for purposes of the failure-to-file addition to tax, however, we considered four Supreme Court precedents involving the period of limitations. Part VI.C.2.b, *supra*, describes three of those precedents: *Zellerbach Paper Co.*, *Germantown Trust Co.*, and *Lane-Wells Co.*

The fourth of the precedents relied on in *Beard* (and the earliest in chronological terms) was *Florsheim Brothers Drygoods Co.*, 280 U.S.

453. *Florsheim Brothers* involved a novel procedure implemented to address exigencies that had arisen when Congress enacted the Revenue Act of 1918 less than three weeks before the due date for corporate tax returns for calendar year 1918. Under that procedure, the Commissioner effectively allowed corporations an extension of time by (1) filing Form 1031T, Tentative Return and Estimate of Corporation Income and Profits Taxes and Request for Extension of Time for Filing Return, and (2) making the installment payment of tax that would have been required in the absence of an extension. The taxpayers in *Florsheim Brothers* argued that their filing of Forms 1031T had commenced the applicable periods of limitation and that, consequently, the assessments in issue were too late.

The Court rejected the taxpayers' argument, writing:

Form 1031T is not an instrument expressly provided for in the Act. It is not in the nature of a "list," "schedule," or "return," commonly required by tax statutes. It was an invention of the Commissioner designed to meet a peculiar exigency. Its purpose was to secure to the taxpayers a needed extension of time for filing the required return, without defeating the Government's right to prompt payment of the first installment.

*Id.* at 460. The Court observed that "§ 239 [of the 1918 Act] required all corporations to make returns 'stating specifically the items of . . . gross income and the deductions and credits.'" *Id.* "As Form 1031T made no reference to income, or to deductions or credits," the Court reasoned, "it could not have been intended as . . . the return required to satisfy the statute." *Id.*

The taxpayers conceded that the Form 1031T did not comply with the statutory filing requirement but argued, among other things, that "the sufficiency of a return for the purpose of starting the period of limitations does not depend upon a strict compliance with the requirements of § 239." *Id.* at 461. The Court responded:

These arguments ignore the differences in nature and purpose between Form 1031T and the return required by the Act. The mere fact that Form 1031T was a formal document prescribed by the Commissioner and termed a "return" does not identify it as the return required by the Act. . . . It may be true that the filing of a return which is

defective or incomplete under § 239 is sufficient to start the running of the period of limitation. . . . But the defective or incomplete return purports to be a specific statement of the items of income, deductions and credits in compliance with § 239. And, to have that effect, it must honestly and reasonably be intended as such.

*Id.* at 461–62 (footnote omitted).

In *Beard*, we concluded that a tax protester who had submitted a "tampered" variant of Form 1040 was liable for the section 6651(a)(1) addition to tax. Because the taxpayer had made prohibited alterations to the official form, we concluded that he had "not made a return according to the forms and regulations prescribed by the Secretary as required by section 6011(a)." *Beard*, 82 T.C. at 777. We accepted, however, that nonconforming documents could still be treated as returns.

As noted *supra* Part VI.C.2.b.v, in *Beard* we discerned from *Florsheim Brothers* and other Supreme Court precedents four "elements" of a "test to determine whether a document is sufficient for statute of limitations purposes." *Id.* "First, there must be sufficient data to calculate tax liability; second, the document must purport to be a return; third, there must be an honest and reasonable attempt to satisfy the requirements of the tax law; and fourth, the taxpayer must execute the return under penalties of perjury."[60] *Id.*

Applying the four elements of the applicable test to the facts before us, we acknowledged that the taxpayer's tampered form "was . . . sworn to." *Id.* at 778. We also accepted the possibility that the form purported to be a return. We questioned, however, "[w]hether . . . the

---

[60] Given their origins, the four enumerated "elements" perhaps ought not be viewed as comprising a rigid four-part test. The text from *Florsheim Brothers* from which we drew the second and third elements was dicta. In *Florsheim Brothers*, 280 U.S. at 462 (emphasis added), the Supreme Court allowed that "[i]t *may* be true that the filing of a return which is defective or incomplete under [the statutory filing requirement] is sufficient to start the running of the period of limitation" but only if "the defective or incomplete return purports to be a specific statement of the items of income, deductions and credits in compliance with [that requirement]" and only if it is "honestly and reasonably . . . intended as such." Therefore, it may be inappropriate to read *Beard* as having established that a document would *necessarily* be "sufficient for statute of limitations purposes" if it "purport[s] to be a return; . . . [represents] an honest and reasonable attempt to satisfy the requirements of the tax law;" and satisfies the other two elements.

form contain[ed] sufficient information to permit a tax to be calculated." *Id.* at 779. Most importantly, we concluded that the form did "not reflect an endeavor to satisfy the law." *Id.* at 778–79. Indeed, we found, the form "ma[de] a mockery of the requirements for a tax return, both as to form and content." *Id.* at 779. We characterized the form as "a conspicuous protest against the payment of tax, intended to deceive [the Commissioner's] return-processing personnel into refunding . . . withheld tax." *Id.* "The critical requirement that there must be an honest and reasonable attempt to satisfy the requirements of the Federal income tax law," we concluded, "clearly [was] not met." *Id.*

### 3. *The Parties' Arguments*

#### a. *Petitioners*

Petitioners focus most of their attention in regard to the section 6651(a)(1) addition to tax on their reasonable cause defense. As a threshold matter, however, petitioners argue that no failure to file occurred because "the Forms 1065 that YA Global filed meet the four-factor test under *Beard*."

Petitioners contend that "[a]ll four prongs of the *Beard* test were satisfied by YA Global's filing of the Forms 1065." Regarding the first *Beard* factor, petitioners insist that "the Forms 1065 filed by the Fund supplied all of the data necessary for Respondent to calculate the Fund's section 1446 withholding tax liability." Regarding the second factor, petitioners argue that "the Form 1065 purported to be the Fund's returns for reporting partnership items, and they were filed as such." Each of those forms, petitioners assert, quoting *Beard*, 82 T.C. at 778, "contained 'a specific statement of the items of income, deductions, and credits in compliance with the statutory duty to report information.'" Petitioners claim that YA Global "honestly and reasonably intended to comply satisfy [sic] its obligations by filing Forms 1065." Those forms, petitioners argue, should satisfy the third *Beard* requirement because "[t]he Fund, in good faith and based on its tax advisors' guidance, believed it was not engaged in a [U.S. trade or business], and it reported all of its income as portfolio income on the Forms 1065." Finally, petitioners observe that "[r]espondent does not dispute that the Forms 1065 were signed under penalties of perjury."

#### b. *Respondent*

Respondent calls petitioners' reliance on *Beard* "misplaced." "Unlike the taxpayer in *Beard*," respondent observes, "YA Global was

required to file two separate returns, each satisfying different filing obligations." Respondent interprets *Lane-Wells* as having "held in situations where two returns are required that a return being offered for both purposes must contain not only sufficient information to compute the tax at issue, but also sufficient facts on which the second liability would be predicated." Respondent argues that "YA Global's Form 1065 did not contain sufficient information from which to determine its withholding tax liabilities because the form does not set forth specific information about the amount of effectively connected income."

Respondent also contends that "YA Global's Forms 1065 do not purport to be returns of YA Global's section 1446 withholding tax liability." Those forms, he says, did not report the information required on Form 8804. Instead, in respondent's description, YA Global's Forms 1065 reported only "the bare minimum of general information."

Respondent accuses petitioners of "transplant[ing] . . . out of its proper context" the third element of the *Beard* test, 82 T.C. at 777, which asks whether the taxpayer's filing of a noncompliant return nonetheless represents an "honest and reasonable attempt" at compliance. The partnership's Forms 1065, respondent argues, "were never intended by YA Global to be a reporting of its section 1446 withholding tax liability because . . . YA Global did not think it was liable for the section 1446 withholding tax." The Forms 1065, respondent reasons, "cannot represent valid substitutes for returns YA Global did not believe it was obligated to file." Those forms "cannot be considered honest and reasonable attempts to satisfy the Form 8804 filing requirements."

4. *Analysis*

For each of the years in issue, YA Global was required to file both a Form 1065 and a Form 8804. During 2006 and part of 2007, YA Global was a U.S. partnership with income and deductions. For the remainder of 2007 and through 2008, YA Global was a foreign partnership that had gross income that petitioners concede was from sources within the United States. Therefore, YA Global was required to file a Form 1065 for each of 2006, 2007, and 2008. Although petitioners deny that YA Global was engaged in a U.S. trade or business, we have already concluded that it was and that all of its taxable income was ECTI. For each of 2006, 2007, and 2008, YA Global had at least one foreign partner. And petitioners do not deny that, if YA Global had ECTI for 2006, 2007, and 2008, at least some of the ECTI for each of those years was allocable

to a foreign partner. Therefore, in addition to filing a Form 1065, YA Global was required to file a Form 8804 for each year.

Petitioners argue that, if YA Global was required to file both a Form 1065 and a Form 8804, its filing of the first shields it from any addition to tax for its failure to file the second. For the reasons explained below, we find petitioners' argument untenable.

The requirements for filing Forms 1065 and 8804 are imposed by separate provisions of the Code. And the failures to satisfy those different requirements are subject to separate penalties. As noted above, the failure-to-file addition to tax imposed by section 6651(a)(1) applies to a failure to file, among other things, a return required by section 6011 (including a Form 8804). The section 6651(a)(1) addition to tax does not apply to returns required to be filed under the authority of part III of subchapter A of chapter 61. Because section 6031 is one of the provisions in part III, the section 6651(a)(1) addition to tax does not apply to a partnership's failure to file Form 1065. Instead, a separate penalty, provided in section 6698, would apply.

Moreover, the separate penalties are computed on different bases. The section 6651(a)(1) addition to tax is based on the amount of tax required to be shown on the return. The section 6698 penalty is computed by reference to the number of a partnership's partners. That penalty cannot be based on the amount of tax required to be shown on Form 1065 because that form is an information return that does not report any tax. In short, we are not convinced that a Form 1065 required to be filed by section 6031(a) can serve as a "return" whose filing can prevent the imposition of the failure-to-file addition to tax imposed by section 6651(a)(1).

Petitioners' argument, if accepted, would render superfluous the requirement that a partnership with ECTI allocable to foreign partners file a Form 8804 in addition to the Form 1065 that the partnership would otherwise be required to file. If the filing of Form 1065 protected a partnership against the section 6651(a)(1) addition to tax for its failure to file a Form 8804, that failure would be inconsequential. As a practical matter, the requirement to file Form 8804 provided in Treasury Regulation § 1.1446-3(d)(1)(iii) would be a nullity. If YA Global's filing of Forms 1065 satisfied the requirement of Treasury Regulation § 1.1446-3(d)(1)(iii), then any partnership's Forms 1065 would satisfy that requirement. Nothing about YA Global's Forms 1065 make them uniquely suitable substitutes for the required Forms 8804. Indeed, as

respondent observes, YA Global's Forms 1065 reported no business income at all.

Treasury Regulation § 1.1446-3(d)(1)(iii) reflects a determination that a partnership's Form 1065 does not provide sufficient information to allow for the effective administration of the section 1446 withholding tax. Section 6011 specifically allows the Secretary to make that determination. Petitioners do not challenge the substantive validity of Treasury Regulation § 1.1446-3(d)(1)(iii), nor, given the breadth of the delegation, do they have apparent grounds to do so. Therefore, we must respect the determination reflected in the regulation that Forms 1065 are inadequate to serve the purpose of administering section 1446. The Supreme Court's observations in *Commissioner v. Lane-Wells Co.*, 321 U.S. at 223–24, bear repeating:

> Congress has given discretion to the Commissioner to prescribe by regulation forms of returns and has made it the duty of the taxpayer to comply. It thus implements the system of self-assessment which is so largely the basis of our American scheme of income taxation. The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished. For such purposes the regulation requiring two separate returns for these taxes was a reasonable and valid one and the finding of the Board of Tax Appeals that the taxpayer is in default is correct.

It is unclear whether the *Beard* test has any relevance in determining whether YA Global's filing of Forms 1065 prevents the imposition of the section 6651(a)(1) additions to tax for its failures to have filed Forms 8804. (In other words, respondent may be right that petitioners' reliance on *Beard* may be "misplaced.")

When met, the *Beard* test allows the filing of a defective "return" to prevent the application of the failure-to-file addition to tax. A document not required to be filed under one of the provisions specified in section 6651(a)(1) arguably should not be treated as a return at all for purposes of the failure-to-file addition to tax.

In whatever respects YA Global's Forms 1065 might have been inaccurate, those inaccuracies did not prevent the documents from

qualifying as the returns required by section 6031(a) and Treasury Regulation § 1.6031(a)-1. Respondent has not asserted the section 6698 penalty by reason of a failure to comply with the information reporting requirements. Instead, YA Global's Forms 1065 were simply not "returns" within the meaning of section 6651(a)(1). *Cf. Florsheim Bros.*, 280 U.S. at 462. They were not "required under authority of" any of the provisions listed in that section.

Even if it were appropriate to evaluate YA Global's Forms 1065 under the *Beard* test as substitutes for Forms 8804, the forms the partnership filed would not pass muster. YA Global's Forms 1065, if considered as defective Forms 8804, would fail at least three of the four elements of the *Beard* test.[61]

The first factor listed in *Beard*, 82 T.C. at 777, requires a return to provide "sufficient data to calculate tax liability." That factor traces its roots back to *Germantown Trust Co.*, the case in which the Supreme Court concluded that a fiduciary return filed on behalf of an entity that the Commissioner determined to have been an association taxable as a corporation commenced the period of limitation on the assessment of the entity's corporate income tax liability. In reaching that conclusion, the Court observed that the fiduciary return "contained all of the data from which a tax could be computed and assessed." *Germantown Tr.*, 309 U.S. at 308.

The Court's linking in *Germantown Trust* of "data" and "comput[ation]" could be read to mean that a return is adequate if it provides all dollar amounts needed to calculate the relevant tax. But that view, which petitioners seem to espouse, ignores the important gloss added by *Lane-Wells*.

In *Commissioner v. Lane-Wells*, 321 U.S. at 223, the Forms 1120 that the corporation filed were inadequate substitutes for the Forms 1120H that it should have filed because the Forms 1120 "did not show the facts on which [personal holding company tax] liability would be predicated." And in *Paschall v. Commissioner*, 137 T.C. at 16 (quoting *Springfield*, 88 F.3d at 752), this Court endorsed the Ninth Circuit's interpretation of *Lane-Wells* as having established that "a taxpayer does

_____

[61] Respondent apparently accepts that the returns the partnership actually filed for 2006, 2007, and 2008, in contrast to the copies included in the record, were signed under penalties of perjury. In addressing *Beard*, respondent asserts that "YA Global's Forms 1065 do not meet the first three parts of the . . . test" set forth in that case.

not start the statute of limitations running by filing one return when a different return is required if the return filed is insufficient to advise the Commissioner that any liability exists for the tax that should have been disclosed on the other return."

Because *Beard*'s "sufficient data to calculate the tax" factor is grounded in both *Germantown Trust* and *Lane-Wells*, we interpret it to require that a return disclose not only the dollar amounts relevant to the calculation of the taxpayer's tax liability but also those facts necessary to establish that the taxpayer owes the tax in question. Even if all the dollar amounts respondent used to compute YA Global's liability for section 1446 withholding tax could be found on the Forms 1065 that the partnership filed, those returns did not disclose facts that were essential to the partnership's liability. In particular, they did not disclose the facts relevant to the determination that the partnership was engaged in a U.S. trade or business. Indeed, similar to the Forms 1120 at issue in *Lane-Wells*, YA Global's Forms 1065 denied that the partnership was engaged in a U.S. trade or business. Therefore, the partnership's returns do not satisfy the first *Beard* factor.

The second factor listed in *Beard*, 82 T.C. at 777, requires that "the document [in question] must purport to be a return." YA Global's Forms 1065 undoubtedly "purported to be . . . return[s]." But they purported to be—and were—the returns the partnership was required to file under section 6031(a) and Treasury Regulation § 1.6031(a)-1(a). Does a document satisfy the second *Beard* factor simply because it purports to be a return of *some* type, even if not the type of return required by one of the provisions referred to in section 6651(a)(1)?

Tracing the second *Beard* factor back to its origins demonstrates that simply purporting to be some type of return is not good enough. That factor originated in *Florsheim Brothers*, which dealt with what were in effect requests for extension necessitated by Congress's enactment of the Revenue Act of 1918 shortly before the due date for corporate tax returns for calendar year 1918. The taxpayers in *Florsheim Brothers*, 280 U.S. at 461, emphasized that the tentative return filed on Form 1031T "was a formal document prescribed by the Commissioner, called a 'return' and so termed on its face." To quote again the Court's response:

> These arguments ignore the differences in nature
> and purpose between Form 1031T and the return required
> by the Act. The mere fact that Form 1031T was a formal

document prescribed by the Commissioner and termed a "return" does not identify it as the return required by the Act. The word "return" is not a technical word of art. It may be true that the filing of a return which is defective or incomplete under § 239 [the provision of the Revenue Act of 1918 that required the filing of corporate returns] is sufficient to start the running of the period of limitation; and that the filing of an amended return does not toll the period. But the defective or incomplete return purports to be a specific statement of the items of income, deductions and credits in compliance with § 239.

*Id.* at 461–62 (footnote omitted).

Because a document's purporting to be a return of some type was insufficient to satisfy the test articulated in *Florsheim Brothers*, it is also insufficient to satisfy the second prong of the *Beard* test. Instead, the document must purport to be a return of the type, as applicable, (1) required to commence the period of limitation or (2) whose filing would avoid the failure-to-file addition to tax.

Again, YA Global's Forms 1065 purported to be returns, but they did not purport to be Forms 8804. Petitioners may be correct that Form 1065 is generally the form by which a partnership reports partnership items. And YA Global's Forms 1065 may have reported all the items required to be reported on that form. Again, however, Treasury Regulation § 1.1446-3(d)(1)(iii) reflects a determination that the information a partnership reports on Form 1065 is insufficient to facilitate effective administration of the section 1446 withholding tax. YA Global's Forms 1065 did not provide "a specific statement of the items" required to be reported under Treasury Regulation § 1.1446-3(d)(1)(iii). The Forms 8804 for the years in issue required a partnership to report, among other things, the partnership's ECTI allocable to foreign partners and the withholding tax payments made by the partnership. YA Global did not provide that information on its Forms 1065. Those forms did not purport to be returns of the type covered by section 6651(a)(1).

To satisfy the third factor enumerated in *Beard*, 82 T.C. at 777, a return must reflect the taxpayer's "honest and reasonable attempt to satisfy the requirements of the tax law." Petitioners argue that, by filing its Forms 1065, YA Global "honestly and reasonably intended" to satisfy its filing requirements. But respondent does not seek to penalize the

partnership for failing to file Forms 1065. Instead, respondent asserts the failure-to-file addition to tax because of the partnership's failure to file Forms 8804. Petitioners do not argue that the partnership honestly and reasonably believed that its filing of Forms 1065 would satisfy its obligations to file Forms 8804. Instead, they contend that, "based on its tax advisors' guidance," the partnership "believed it was not engaged" in a U.S. trade or business and thus was not subject to the section 1446 withholding tax and did not have to file Forms 8804.

Petitioners' argument goes to whether YA Global's failure to file the required Forms 8804 was due to reasonable cause and not willful neglect—not to whether a failure to file occurred in the first instance. The third *Beard* factor also traces its roots back to *Florsheim Brothers*. As explained above, in *Florsheim Brothers*, 280 U.S. at 462, the Supreme Court acknowledged the possibility that a "defective or incomplete" return could be "sufficient to start the running of the period of limitation" if it "purports to be a specific statement of the items of income, deductions and credits in compliance with" the applicable filing requirement. But the Court added: "[T]o have that effect, [the return] must honestly and reasonably be intended as" a statement of the items required to be reported. *Id.* A taxpayer cannot honestly and reasonably intend a filed return to comply with a requirement to which it does not believe itself subject. Petitioners make no argument that YA Global reasonably and honestly intended that the Forms 1065 comply with its obligation to file the withholding tax returns required by Treasury Regulation § 1.1446-3(d)(1)(iii). Instead, petitioners argue that YA Global was reasonable in its belief that it was not required to file withholding tax returns. Again, that argument goes to whether a failure to file can be excused—not to whether a failure to file occurred in the first instance.

In short, YA Global's filing of Forms 1065 did not satisfy, and could not have satisfied, the filing requirement imposed by section 6011 and Treasury Regulation § 1.1446-3(d)(1)(iii)—that is, the requirement to file Forms 8804. It is for failing to meet that requirement that respondent determined the additions to tax under section 6651(a)(1). To the extent that *Beard* is relevant, it simply confirms that the partnership's filing of Forms 1065 did not satisfy the requirement to file Forms 8804. YA Global is thus subject to the failure-to-file addition to tax unless its failure to have filed the required returns was due to reasonable cause and not willful neglect.

C.      *Reasonable Cause*

1.      *Findings of Fact*

a.      *Engagement Letters*

Jeffrey Yager, a managing director of RSM McGladrey, Inc. (RSM),[62] sent Edward Schinik an engagement letter dated December 29, 2006, to confirm the parties' understanding of the tax return preparation services that RSM would perform for YA Global for the taxable year ended December 31, 2006. Mr. Schinik signed the letter to indicate his agreement and acceptance of the proposed terms. Among other things, the letter states: "We will prepare your Federal and any resident state tax returns."

The 2006 engagement letter also states: "If you [YA Global] have engaged Goldstein Golub Kessler, LLP ('GGK') to provide you with attest services, we [RSM] may . . . rely on information that we receive from GGK in preparing your tax returns." YA Global *did* engage GGK to audit its 2006 financial statements, as indicated by an engagement letter also dated December 29, 2006, and also signed by Messrs. Yager and Schinik.[63]

Eric Sandler, also a managing director of RSM, sent Mr. Schinik a letter, dated November 12, 2009, similar to the 2006 tax engagement letter but concerning YA Global's 2009 taxable year. The 2009 tax engagement letter states:

> We will prepare your Federal income tax and any state income tax return(s) we prepared for you last year. If additional state tax returns or other returns need to be filed, please complete the "Schedule of Additional Tax Returns to be Prepared" below and mail a copy of this letter back to us. If you choose to add jurisdictions or other types of returns, this will increase the amount of our fees and expenses . . . .
>
> We will advise you if we believe, based on the information that you provide us, that a tax return should be filed in any

---

[62] RSM was an indirect, wholly owned subsidiary of H&R Block, Inc.

[63] GGK's parent company was acquired by McGladrey & Pullen, LLP in 2005.

other jurisdiction, but we will not prepare any such tax return without your approval.

The letter also states: "If you have engaged McGladrey & Pullen, LLP (M&P) to provide you with attest services, we may . . . rely on information that we receive from M&P in preparing your tax returns."[64] As with the 2006 tax engagement letter, Mr. Schinik signed the 2009 letter indicating his acceptance and approval of the proposed terms. A letter dated November 23, 2009, confirmed YA Global's engagement of M&P to audit its 2009 financial statements.

Mr. Yager sent Mr. Schinik a tax engagement letter for YA Global's 2007 taxable year that includes both of their signatures. Although the text of the key paragraph of the copy of the 2007 letter included in the record is not entirely legible, it appears to be the same as that of the 2009 tax engagement letter, quoted above.[65]

The record includes an unsigned draft of a tax engagement letter between YA Global and RSM for 2008. The key text of the 2008 letter is the same as that of the signed 2009 letter.[66]

The "Schedule of Additional Tax Returns to be Prepared" in the copies of the 2007, 2008, and 2009 tax engagement letters included in the record are all blank.

### b. *Testimony Concerning Advice*

According to Mr. Angelo, RSM advised YA Global that it was "not doing anything close to the line of what constitutes a [trade or] business that would trigger ECI." "[N]o one, then or now," he said "ever thought that [YA Global's] type of investment would qualify as ECI." Not only did RSM and the law firm of Schulte Roth & Zabel (SRZ) advise YA Global that it was not engaged in a trade or business, according to Mr. Angelo; the prospect that it was so engaged "never occurred" to them. And, in Mr. Angelo's description, those two firms were not outliers. "No tax professional in that moment or now," he opined, "would

---

[64] M&P's partners were "co-employed" by RSM.

[65] A letter dated January 22, 2008, confirmed YA Global's engagement of M&P to audit its 2007 financial statements.

[66] A letter dated December 15, 2008, confirmed YA Global's engagement of M&P to audit its 2008 financial statements.

have ever thought that [YA Offshore] needed to file protective returns for this."[67]

The testimony of representatives of RSM and SRZ was more circumspect. Mr. Yager testified that RSM discussed with YA Global at various times whether the partnership was engaged in a U.S. trade or business. When asked by petitioners' counsel whether RSM provided any advice, Mr. Yager responded that the firm "did not provide . . . formal written advice." When asked if RSM provided unwritten advice, Mr. Yager declined to characterize the discussions as having involved the provision of advice. He went on to say: "We . . . looked at various, you know, authoritative literature and rulings and things of that nature to provide them with our, I would say, conclusion and whether they were properly—you know, taking the proper position with respect to effectively connected income in the United States." Petitioners' counsel then asked: "What was the conclusion that you provided to YA Global?" Mr. Yager responded: "That their activities—based upon the activities they were conducting, the types of investments they were making, their objectives and strategy, that they were not engaged in a U.S. trade or business."

Later (though still on direct examination), Mr. Yager seemed to disavow his own testimony. Petitioners' counsel referred to Mr. Yager's prior testimony that "YA Global didn't have a U.S. trade or business." He asked Mr. Yager whether that was a conclusion that RSM had communicated to Mr. Schinik. Mr. Yager responded: "That was a conclusion that had already been reached by Yorkville. That was not a conclusion originated by RSM. That was a position that Yorkville had been taking for a number of years." But Mr. Yager added that his firm "concurred with" Yorkville's position.

When asked by respondent's counsel whether RSM's discussions with YA Global included an assessment of the hazards of litigation in the position that the partnership was not engaged in a U.S. trade or business, Mr. Yager responded that "there was a lack of guidance that was issued by U.S. Treasury over . . . [YA Global's] particular activities."

Laurence Karst, an RSM tax partner who specialized in international tax, testified that he had advised YA Global that it

---

[67] Mr. Angelo's assertion is contrary to the complaint YA Global filed against RSM in May 2015, which contends that the firm was negligent in not recommending the filing of protective returns.

qualified for the safe harbor for trading in stocks and securities. When petitioners' counsel asked Mr. Karst whether he had "provide[d] tax advice to YA Global," Mr. Karst responded that he had. And Mr. Karst acknowledged that his advice related to "the U.S. trade or business issue, or ECI issue." He said he provided that advice in response to the specific question of whether YA Global "could qualify under the Safe Harbor Provision Section 864." And his advice was that "they did" qualify for the safe harbor.[68] Mr. Karst also testified that, under either generally applicable standards or RSM's internal policies, the firm's preparation of Forms 1065 that reflected the partnership's position that it was not engaged in a U.S. trade or business indicated that "RSM believed it was more likely than not that YA Global would prevail, if examined."

Several of the PPMs of YA Global included in the record state that the partnership's "[i]nvestments in securities include convertible debentures, preferred stock and promissory notes."

Mr. Karst also acknowledged that, upon his request, he had received a sample PPM of YA Global. When asked by respondent's counsel whether he was "aware that YA Global . . . engaged in transactions involving promissory notes during tax years 2006 through 2011," however, Mr. Karst responded: "I'm not aware of that, no."

Respondent's counsel asked Mr. Karst, as well as Mr. Yager, about the prospect of RSM's discussions with YA Global including an assessment of the risk in the partnership's position. Mr. Karst's response was similar to that of Mr. Yager. "[T]here was a lot of uncertainty, frankly, . . . because, if I may say—that we weren't getting a lot of guidance from Treasury or the IRS."

David Griffel of SRZ testified that, in accordance with his firm's policy, it did not provide YA Global with a formal opinion that the partnership was not engaged in a U.S. trade or business. In fact, not only did SRZ not provide such an opinion; it specifically declined to do so upon YA Global's request. When asked why SRZ's internal guidelines prevented it from providing YA Global with the opinion the partnership requested, Mr. Griffel responded: "I think that there's uncertainty in the area." But he did say that, if SRZ had been of the view that YA

---

[68] Mr. Karst's explanation of the basis for his belief that YA Global qualified for the safe harbor made it clear that he had in mind the safe harbor for securities trading.

Global *had* been engaged in a U.S. trade or business, the PPM that the firm prepared for the partnership would have read differently. Instead of identifying the resultant adverse tax consequences as merely risks, the PPM would have advised potential investors that those consequences should be expected.[69]

Mr. Yager acknowledged that, at the time of trial in October 2020, RSM was "currently in litigation with" YA Global. He was unable to describe the basis of that suit but said that it "involve[ed] the preparation of the tax returns and . . . the assessment that the IRS has made against Yorkville [sic] for . . . certain years related to ECI." Nothing in the record provides further detail about the nature of the litigation between RSM and YA Global. The complaint in the case, however, filed in May 2015, describes the action as being "for professional malpractice and negligence."[70]

### 2. *Applicable Law*

By their terms, the section 6651(a)(1) and (2) additions to tax do not apply if "it is shown that [the taxpayer's] failure is due to reasonable cause and not due to willful neglect." Treasury Regulation § 301.6651-1(c)(1) provides:

> [A] taxpayer who wishes to avoid the addition to the tax for failure to file a tax return or pay tax must make an affirmative showing of all facts alleged as a reasonable cause for his failure to file such return or pay such tax on time in the form of a written statement containing a declaration that it is made under penalties of perjury. Such statement should be filed with the district director or the director of the service center with whom the return is required to be filed . . . . If the district director, [or] the director of the service center . . . determines that the delinquency was due to a reasonable cause and not to

---

[69] Mr. Griffel offered his view that a PPM does not provide a legal opinion. He described a PPM as "a legal offering document with our name on it, so we would have signed off on the content." And he acknowledged that SRZ "would not have provided th[e] offering memo if we thought [YA Global was] wrong" in believing that it was not engaged in a U.S. trade or business.

[70] Petitioners agree that we can take judicial notice of the complaint filed by YA Global against RSM and other defendants. We take notice only of the nature of YA Global's claims. We do not rely on the complaint for the truth of any factual allegations.

willful neglect, the addition to the tax will not be assessed. If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the due date.

In *Kuretski v. Commissioner*, 755 F.3d 929, 936 (D.C. Cir. 2014), *aff'g* T.C. Memo. 2012-262, the Court of Appeals for the District of Columbia Circuit held that a taxpayer's failure to have filed the statement required by Treasury Regulation § 301.6651-1(c) "afford[ed] a sufficient basis for upholding the imposition of late-payment penalties under § 6651(a)(2)" and thus obviated consideration of the various arguments the taxpayers made in contesting the addition to tax.

A number of early cases addressed situations in which a corporation ultimately determined to be a personal holding company filed only a regular corporate income tax return and not the additional form required from personal holding companies. *See, e.g.*, *Orient Inv. & Fin. Co. v. Commissioner*, 166 F.2d 601 (D.C. Cir. 1948); *Hatfried, Inc. v. Commissioner*, 162 F.2d 628 (3d Cir. 1947). In each case, the corporation relied on an accountant to prepare its returns. The cases considered whether the corporation could reasonably rely on its accountant to prepare any necessary return or whether, instead, reasonable cause required explicit advice by the accountant that the corporation was not a personal holding company.

This Court faced that situation in *Haywood Lumber & Mining Co. v. Commissioner*, 12 T.C. 735 (1949), *modified by* 178 F.2d 769 (2d Cir. 1950). In that case, the corporation's secretary-treasurer hired an accountant to prepare its tax returns and provided the accountant with all requested information. The accountant prepared regular corporate tax returns but not the personal holding company returns that the corporation should also have filed. In a reviewed opinion with only one judge dissenting, we found that the corporation "neither sought nor received advice as to whether it was a personal holding company." *Id.* at 739. It "made no effort to advise itself as to the requirement to file a personal holding company return." *Id.* Instead, "[i]t merely awaited

passively for such tax advice as Wolcott [the accountant] might volunteer to give." *Id*.

We emphasized that Mr. Sprague, the secretary-treasurer, knew the facts that resulted in the corporation's classification as a personal holding company. His claim to have been unaware of the requirement to file a personal holding company return was, in our view, "merely a confession of ignorance of the law." *Id*. at 740. "The exercise of ordinary business care and prudence," we wrote, "dictated that Sprague investigate on his own account, or, at least, specially inquire of a qualified tax adviser concerning the [corporation's] personal holding company status." *Id*. On the facts before us, we concluded that the "mere submission of the corporate records to an accountant experienced in tax affairs plus passive reliance on his volunteering appropriate tax advice does not equal the proper standard of care on Sprague's part to avert a delinquency penalty." *Id*.

The Court of Appeals for the Second Circuit "modified" our decision in *Haywood Lumber & Mining Co.* by "strik[ing] out the penalties in personal holding company surtax for the years 1941 and 1942."[71] *Haywood Lumber & Mining Co. v. Commissioner*, 178 F.2d at 772. "When a corporate taxpayer selects a competent tax expert, supplies him with all necessary information, and requests him to prepare proper tax returns," the appellate court opined, "we think the taxpayer has done all that ordinary business care and prudence can reasonably demand." *Id*. at 771. The Second Circuit rejected our characterization of Mr. Sprague as having "'awaited passively for such tax advice' as Wolcott 'might volunteer to give'." *Id*. Instead, he "affirmatively requested the preparation by his consultant of proper returns." *Id*. "To require Mr. Sprague to inquire specifically about the personal holding company act," the court reasoned, "nullifies the very purpose of consulting an expert." *Id*.

In *United States v. Boyle*, 469 U.S. 241 (1985), the Supreme Court distinguished between a taxpayer's reliance on qualified advisers in regard to questions of tax law and reliance on an attorney or accountant to carry out the ministerial act of timely filing a required return. The Court acknowledged those cases, such as *Haywood Lumber*, that had

---

[71] After the corporation conceded all other issues, its liability for the 25% delinquency penalty had been the only issue remaining before this Court. But our decision presumably upheld the deficiencies the Commissioner determined as well as the penalty. If so, that would explain why the Second Circuit "modified" our decision instead of reversing it.

held "that 'reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken." *Boyle*, 469 U.S. at 250. Indeed, the Court recognized that it had, itself, implied in *Lane-Wells Co.* that "reliance on the opinion of a tax adviser may constitute reasonable cause for failure to file a return."[72] *Id.* By contrast, the Court wrote, "one does not have to be a tax expert to know that tax returns have fixed filing dates and that taxes must be paid when they are due." *Id*. at 251. On the premise that "[i]t requires no special training or effort to ascertain a deadline and make sure that it is met," the Court concluded that "[t]he failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing under § 6651(a)(1)." *Id.* at 252.

The Court's analysis in *Boyle* provides no obvious means of distinguishing between advice provided by an attorney and that of an accountant. And this Court drew no distinction between attorneys and accountants when, in *Autin v. Commissioner*, 102 T.C. 760, 777 (1994), *rev'd on other grounds*, 109 F.3d 231 (5th Cir. 1997), we cited *Boyle* for the proposition that "a taxpayer may establish reasonable cause for failure to file a return if he shows that he reasonably relied on the advice of a competent professional even if the advice turns out to be erroneous."

*Whitsett v. Commissioner*, T.C. Memo. 2017-100, shows that, at least in the context of accuracy-related penalties, the evaluation of a taxpayer's good faith in relying on advice can take into account the resultant economic impact on the taxpayer. *Whitsett* involved a taxpayer who tendered stock for purchase in a corporate acquisition. The information she had received did not make clear whether the gain she recognized from the sale of her stock should have been reported for 2011 or 2012. She relied on her accountant to answer that question. The accountant advised her that the gain was reportable for 2011 and told her—incorrectly—that he had electronically filed a 2011 return

---

[72] As noted *supra* note 53, in two of the three years before the Court in *Lane-Wells*, the failure-to-file penalty had been automatic. For those years, the Court upheld the Commissioner's determination of failure-to-file penalties. But the then newly enacted reasonable cause exception was in effect for the third of the three years in issues. Therefore, the Court remanded the case to the Board of Tax Appeals for the limited purpose of determining whether that exception excused the taxpayer's failure to have filed a personal holding company return for the third year. If reliance on a tax adviser could not have constituted reasonable cause, the Court apparently reasoned in *Boyle*, remand in *Lane-Wells* would have been unnecessary.

reporting the gain. The Commissioner determined that the gain should have been reported for 2012 and issued a notice of deficiency to that effect that included accuracy-related penalties. The taxpayer ultimately agreed to the deficiency but claimed a reasonable cause defense to the accuracy-related penalty.

The Commissioner argued that a person exercising "ordinary business care and prudence" would have understood from the documents the taxpayer received that the gain in issue was reportable for 2012. We responded that, because the taxpayer was "a lay person unfamiliar with tax law," it was "understandabl[e]" that she "found th[e] documentation confusing" and "reasonably referred" to "her longtime tax return preparer" the question of the proper year for reporting her gain. *Whitsett*, T.C. Memo. 2017-100, at *13–14. We added that, "[g]iven the time value of money, it would obviously have been in [the taxpayer's] economic interest to report her million-dollar gain on a 2012 return rather than a 2011 return." *Id.* at *14. That she had accepted her accountant's advice, "rather than deciding unilaterally what would be best for her pocketbook," we reasoned, "displayed admirable 'business care and prudence.'" *Id.*

We went on to apply a three-factor test drawn from *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002), for determining when a taxpayer's reliance on advice negates the imposition of an accuracy-related penalty. We found that the taxpayer had demonstrated satisfaction of each of the three conditions listed in *Neonatology Associates*, including that she had "actually relied in good faith on [the accountant's] judgment." *See id.* at 99. In applying the actual good faith reliance factor, we again took into account the taxpayer's economic interest. "This is not a case," we opined, "where the adviser's judgment about the recommended tax treatment was 'too good to be true.'" *Whitsett*, T.C. Memo. 2017-100, at *18. We repeated that the accountant's advice "was contrary to [the taxpayer's] economic interest, but she nevertheless accepted it." *Id.* "In our view," we concluded, "this constitutes proof positive of her good faith." *Id.*

This Court and others have declined to impose accuracy-related penalties when taxpayers, without seeking advice from tax professionals, make reasonable efforts on their own to address issues on which guidance was lacking. In *Van Camp & Bennion v. United States*, 251 F.3d 862 (9th Cir. 2001), the Ninth Circuit upheld negligence penalties that the Commissioner had determined in respect of a corporation's failure to have withheld tax from wages paid to an officer

whom the corporation had judged to be an independent contractor. The court accepted, however, that, "[w]here a case is 'one of first impression with no clear authority to guide the decision makers as to the major and complex issues,' a negligence penalty is inappropriate." *Id.* at 868 (quoting *Foster v. Commissioner*, 756 F.2d 1430, 1439 (9th Cir. 1985), *aff'g in part, vacating in part* 80 T.C. 34 (1983)). But, the court opined, "[t]he legal standards to determine whether an officer is an employee were clear." *Id.* at 869. As the court saw the case, "the only question was whether [the officer] met the standard." *Id.* The corporation's argument that he did not, the court reasoned, "does not implicate an unsettled legal issue or a question of first impression." *Id.*

By contrast, *Williams v. Commissioner*, 123 T.C. 144, 153 (2004), involved "complex and overlapping issues of tax and bankruptcy law." We viewed the case as one of "first impression," accepting that "there was no clear authority to guide" the taxpayer. *Id.* The Commissioner had been unable to refer us to any previous cases that had addressed the relevant question, and we had found no such cases on our own. Under the circumstances, we concluded that the taxpayer had "made a reasonable attempt to comply with the Internal Revenue Code," taking a position that was "reasonably debatable." *Id.* at 153–54. Although we rejected the taxpayer's position, we found that it reflected "an honest misunderstanding of the law." *Id.* at 153. We therefore concluded that the accuracy-related penalty did not apply to the taxpayer's underpayment.

*Petersen v. Commissioner*, 148 T.C. 463, 481 (2017), *aff'd and remanded*, 924 F.3d 1111 (10th Cir. 2019), also raised what we viewed as "a question of first impression," one that involved "[t]he application of section 267(a) to employers and ESOP participants." We "discovered no prior case addressing th[e] question, and [the Commissioner] ha[d] pointed us to none." *Id.* We thus concluded that the taxpayers had "acted reasonably and in good faith with respect to the understatements for the years at issue" and were thus "not liable for penalties under section 6662(a)." *Id.*

### 3.   *The Parties' Arguments*

#### a.   *Petitioners*

Petitioners advance three arguments why YA Global's failure to file Forms 8804 for 2006, 2007, and 2008 was "due to reasonable cause and not due to willful neglect." First, they claim the partnership relied

on advice provided by its attorneys and accountants. They allege that the partnership's advisers "communicated . . . several times in different ways" their conclusion that YA Global was not engaged in a U.S. trade or business.

Petitioners insist that the malpractice claim that YA Global filed against RSM in 2015 "has no bearing at all on [their] claim that the Fund relied on professional advice in failing to file Forms 8804." They acknowledge that "a taxpayer's reliance on professional advice would not be reasonable if the taxpayer had some reason to believe that the advice was erroneous at the time it was provided." But they argue that YA Global's claim against RSM "is not an indication that the Fund had any reason to believe in 2007–2010 that it might be receiving negligent—or even erroneous advice." "[T]he record in *this* case," they allege, "shows [that] Yorkville and the Fund had no reason to believe that the advice it [sic] received from its [sic] advisors, including RSM, was inaccurate at the time it was rendered." Therefore, petitioners conclude, Yorkville and YA Global's "reliance on th[e] advice [provided by RSM and other advisers] was entirely reasonable."

Petitioners posit that "if the Fund had withheld tax from foreign investors, it would have had no financial impact on the Fund's management or any of its U.S. investors." From that premise, petitioners conclude that "if Yorkville and the Fund had any reason to believe that they should have withheld tax from foreign investors, they would have done so." Petitioners cite our opinion in *Whitsett* for the proposition that, when a taxpayer relies on advice that is contrary to the taxpayer's economic interest, that reliance is necessarily in good faith.

Second, citing the Second Circuit's opinion in *Haywood Lumber*, petitioners claim that YA Global could rely on RSM's failure to prepare Forms 8804 along with Forms 1065. And third, petitioners argue that the validity of YA Global's reasonable cause defense does not depend on any explicit or implicit advice provided by RSM. "[T]he lack of guidance over the issue means that no penalties should be imposed in these cases even without considering the Fund's reliance on counsel claim." Citing *Petersen*, *Williams*, and *Van Camp & Bennion*, petitioners argue that "[t]his Court routinely declines to impose penalties when there is no clear authority to guide taxpayers."[73]

---

[73] In *Van Camp & Bennion*, the Ninth Circuit considered an appeal from the Federal District Court for the Eastern District of Washington.

At a posttrial hearing in September 2022, petitioners' counsel suggested that the requirement of Treasury Regulation § 301.6651-1(c)(1) of a sworn statement of facts underlying a taxpayer's reasonable cause defense should not be read to establish a jurisdictional bar to a court's consideration of such a defense. As noted above, the D.C. Circuit declined to consider the reasonable cause defense of the taxpayers in *Kuretski* because of their failure to provide the required written statement. As petitioners' counsel observed, however, those taxpayers had apparently conceded not only the validity of the regulatory requirement but also its application to them. *Kuretski v. Commissioner*, 755 F.3d at 936 ("We see no basis for excusing [the taxpayers'] failure to comply with a regulation they concede to be applicable."). In addition, petitioners' counsel argued that, if the regulation were applicable to YA Global, the facts provided in YA Offshore's request for a waiver of the timely filing requirement of Treasury Regulation § 1.882-4(a)(3)(i) and in materials provided throughout the examination of the YA Global's returns should be sufficient to satisfy the written statement requirement.

b.    *Respondent*

Respondent acknowledges that a taxpayer's "reasonable reliance on the advice of an accountant or attorney that the filing of return [sic] was unnecessary, even if mistaken, may establish reasonable cause." But respondent contends that none of YA Global's accountants or attorneys advised the partnership that it was not engaged in a U.S. trade or business. He accepts that "YA Global had multiple discussions with its outside advisors about whether [it] was engaged in a U.S. trade or business and potentially liable for section 1446 withholding tax." But "[w]itnesses from RSM and Schulte," he says, "were quite clear, and, in fact, emphasized that they did not provide advice to YA Global as to whether it was engaged in the conduct of a U.S. trade or business."

Respondent also asserts that YA Global did not apprise its advisers of all the facts relevant to the question of its conduct of a U.S. trade or business. Respondent points to Mr. Karst's admission that he "was unaware that YA Global loaned money to borrowers in exchange for promissory notes." And on the premise that SRZ "was not engaged to provide advice to YA Global," respondent reasons that the law firm "was unlikely to have a full understanding of YA Global's business."

Regarding petitioners' second argument, respondent suggests that the result in *Haywood Lumber* rested in significant degree on the

taxpayer's lack of awareness "that it may be a personal holding company." Therefore, the taxpayer in *Haywood Lumber* "had no reason to concern itself with filings that may be implicated by being so characterized." By contrast, YA Global was "on full alert that it may be engaged in a U.S. trade or business." Moreover, respondent reads *Haywood Lumber* to mean that a taxpayer's reliance on an adviser can be reasonable only if the taxpayer chose competent advisers and supplied them with all necessary information.

In addressing petitioners' third argument, respondent rejects the notion that "[w]hether a foreign person is engaged in a trade or business" is "a 'novel' legal issue of first impression." He acknowledges that "YA Global's facts may be intensive and complex" but suggests that the law applicable to those facts is clear.

At the September 2022 posttrial hearing, respondent's counsel accepted that a taxpayer's failure to have provided the written statement of relevant facts required by Treasury Regulation 301.6651-1(c)(1) does not preclude the taxpayer from making a reasonable cause argument in a deficiency case. In the written Report he submitted following the hearing, respondent confirmed that position, stating he "does not believe that petitioners should be precluded from making a reasonable cause argument if they didn't submit a written statement to the Service." Respondent suggests that *Kuretski* may be distinguishable because it involved review of a determination by the Commissioner to collect taxes by levy, the scope of which may have been "limited to the administrative record."[74]

### 4. *Analysis*

We begin with the procedural question of the applicability of, and the extent of petitioners' compliance with, the written statement requirement provided in Treasury Regulation § 301.6651-1(c)(1). We are not prepared to say that a taxpayer's failure to have provided the required written statement can never be a procedural bar to consideration of a reasonable cause defense offered by the taxpayer in a deficiency proceeding. Given respondent's position, however, we accept that Treasury Regulation § 301.6651-1(c)(1) does not preclude us from considering petitioners' defense in the cases before us. On the merits, however, for the reasons explained below, we conclude that petitioners

---

[74] In fact, our review of the additions to tax at issue in *Kuretski*, T.C. Memo. 2012-262, at *12–13, was de novo.

have not met their burden of proving that YA Global's failure to file Forms 8804 and pay section 1446 withholding tax was "due to reasonable cause and not due to willful neglect." § 6651(a)(1) and (2).

Petitioners' primary argument in support of their reasonable cause defense is that the partnership relied on the advice of qualified advisers. We agree with respondent that the record does not establish that SRZ provided YA Global with reliable advice that the partnership was not engaged in a U.S. trade or business. Mr. Griffel made clear that his firm did not provide YA Global with an opinion on the trade or business issue and, indeed, could not have provided an opinion to that effect under the firm's established guidelines. Mr. Griffel did acknowledge that the disclosure his firm prepared for a PPM would have read differently had his colleagues affirmatively believed that YA Global was engaged in a U.S. trade or business. But his acknowledgement does not allow us to construe the PPM as advice that YA Global was not engaged in a U.S. trade or business. An inability to conclude that a proposition is true does not require a conclusion that its antithesis is true. One can simply be unable to reach a conclusion either way.

By contrast, we accept that RSM McGladrey *did* provide advice to YA Global that the partnership was not engaged in a U.S. trade or business. In support of his argument to the contrary, respondent cites that portion of Mr. Yager's testimony in which he tried to characterize RSM as having "discussed the issue" with YA Global without providing advice, whether formally in writing or otherwise. Again, Mr. Yager sought to distinguish between providing "advice" and providing a "conclusion."

Even if a distinction might be drawn for other purposes between providing "advice" and providing a "conclusion" in regard to a legal question, we are not convinced that the distinction is relevant in evaluating a taxpayer's reasonable cause defense to section 6651(a) additions to tax. For that purpose, we see no reason not to treat as "advice" an adviser's communication to a taxpayer of the adviser's conclusion regarding the taxpayer's legal obligation to file a return and pay tax. In any event, Mr. Yager's colleague, Mr. Karst, testified that he had advised YA Global that it qualified for the statutory safe harbor under which trading in stocks and securities is not treated as a U.S. trade or business.

Mr. Yager sought to downplay the importance of his firm's "conclusion" by claiming that it had not been "originated by RSM." YA

Global had apparently been reporting on the basis that its activities did not constitute a U.S. trade or business before RSM assumed responsibility for preparing the partnership's returns. Therefore, it might be argued that YA Global's position was not attributable to any advice provided by RSM.

If YA Global had been inclined simply to adhere to a previously established position, however, the discussions that Mr. Yager acknowledged would have been unnecessary. YA Global would have had no reason to raise with Mr. Karst the "specific[]" question of the partnership's qualification for the securities trading safe harbor. And the partnership would not have sought SRZ's advice on whether YA Global was engaged in a U.S. trade or business. Although, as Mr. Griffel explained, his firm declined to give the advice YA Global sought, the partnership's request of that advice shows that it was interested in its advisers' views as to whether it should maintain its position that it was not engaged in a U.S. trade or business. And, while SRZ declined to provide the requested advice, YA Global *did* get advice from RSM. That advice included Mr. Karst's conclusion that the partnership qualified for the securities trading safe harbor. Under the circumstances—especially the partnership's persistent requests for advice from its advisers—it cannot be said that the partnership viewed RSM's advice as redundant or unnecessary.

Mr. Karst's profession that he did not know about YA Global's provision of capital in return for promissory notes does not preclude the partnership from relying on that advice. The relevant question is not whether an adviser could recall relevant facts years later. Nor does it matter which facts the adviser was consciously aware of when providing the advice. Instead, the question is whether "the taxpayer provided [the adviser with] necessary and accurate information." *Ellwest Stereo Theatres of Memphis, Inc. v. Commissioner*, T.C. Memo. 1995-610, 1995 WL 760499, at \*5. M&P and its predecessor, GGK, obviously knew of YA Global's purchase of promissory notes from portfolio companies: those firms audited the financial statements that listed those notes among the partnership's assets. And RSM had access to information available to M&P and GGK under the information-sharing agreements evidenced by the engagement letters. Moreover, Mr. Karst might himself have had access to the information that YA Global purchased promissory notes from portfolio companies in addition to purchasing convertible debentures and entering into SEDAs. The sample PPM that Mr. Karst acknowledged having received could well have included that

information. In any event, it is clear that YA Global provided that information to GGK and M&P and, thus, at least indirectly, to RSM.

The record thus establishes that RSM advised YA Global that it was not engaged in a U.S. trade or business, advice that, if accurate, would have meant that the partnership was not required to file Forms 8804 or pay section 1446 withholding tax. Our inquiry, however, does not end with that conclusion. We still face questions of when RSM provided its advice to YA Global and whether, at that time, the partnership had reason to believe that its advisers might have been negligent in providing their advice.

The record does not establish *when* RSM provided the conclusion to which Mr. Yager referred or when Mr. Karst provided his advice. YA Global cannot have relied on that conclusion or advice for its failure to have filed a Form 8804 due before the partnership received that advice or conclusion. Mr. Karst's testimony about the level of confidence indicated in RSM's preparation of YA Global's Forms 1065, however, establishes that RSM reached its conclusion before the due date of YA Global's returns for 2006, the first of the years in issue and the first year for which YA Global hired RSM to prepare its returns. The testimony of Messrs. Yager and Karst establishes that, at some point, the "conclusion" of which Mr. Yager spoke and Mr. Karst's "advice" were provided to YA Global. Accepting that RSM reached its conclusion regarding YA Global's conduct of a U.S. trade or business before the due date of the partnership's 2006 returns, we are willing to infer that that conclusion was communicated to YA Global before the returns' due date.

That brings us to the question of the reasonableness of YA Global's reliance on RSM's advice. Petitioners do not dispute that the complaint YA Global filed against RSM and other defendants in May 2015 indicates that, by that point, the partnership had become aware of facts that gave it reason to believe that RSM had been negligent in advising the partnership that it was not engaged in a U.S. trade or business. If the partnership knew or had reason to know of those facts before the due date of any of the Forms 8804 that it should have filed but did not, RSM's advice could not serve as the basis for a reasonable cause defense. Petitioners accept that "a taxpayer may not claim reasonable cause based on a reliance on professional advice if the *taxpayer* was negligent in relying on that advice." They therefore accept that the question of "*when* the Fund became aware of the possibility that RSM might be negligent" is "critical." They insist, however, that "[t]here is not a scintilla of evidence . . . that the Fund had any reason to believe

that RSM's advice was questionable when it was provided or when the Fund filed (or failed to file) returns during the years at issue."

Petitioners have effectively conceded that they have not met their burden of establishing that YA Global reasonably relied on McGladrey's advice. They acknowledge that the record is silent in regard to a critical question on which they bear the burden of proof. Pointing to the silence of a record is of no avail. Petitioners' blanket claim that "the record demonstrates" that YA Global was not "negligent in relying on RSM's . . . advice" does not meet their burden.

Petitioners argue that the filing of YA Global's claim against RSM in 2015 "is not an indication that the Fund had any reason to believe in 2007–2010 that it might be receiving negligent . . . advice." We disagree. The negligence claim *does* indicate that, *at some point*, YA Global came to believe that it had received negligent advice. When did that point arrive? Was it before the due date of one or more of the partnership's unfiled Forms 8804? Again, petitioners accept the importance of those questions but point to no evidence in the record that answers them. Instead, they resort to blanket assertions unsupported by the record. They claim that "the record in this case shows [that] Yorkville and the Fund had no reason to believe that the advice it received from its advisors, including RSM, was inaccurate at the time it was rendered, and their reliance on that advice was entirely reasonable." But petitioners offer no citations. How and where does the record show that YA Global had no reason to believe, as of the due dates of the relevant returns, that RSM had been negligent in advising the partnership that it was not engaged in a U.S. trade or business? Absence of evidence is not evidence of absence. The only way the record could show that YA Global did not learn the relevant facts until after the due date of its 2008 Form 8804 would be with affirmative evidence that YA Global first learned of those facts only after that date. Petitioners point to no such evidence.

Petitioners invite us to infer from YA Global's failure to pay withholding tax that it did not learn until after the years in issue whatever facts underlie its negligence claim against RSM. We decline to draw that inference. As respondent observes, YA Global's payment of withholding tax would have reduced the partnership's assets, thereby reducing its income and the fees that Yorkville Advisors would have earned from the management of those assets. Foreign partners might have been induced to withdraw, further reducing the partnership's assets and Yorkville Advisors' fees.

YA Global's business model apparently presupposed that the intended activities would not give rise to a U.S. trade or business. The partnership could not have expected to attract as much foreign investment if potential investors understood that their investments would be fully subject to U.S. tax.

For several reasons, *Whitsett* does not support an inference that, because YA Global paid no withholding tax for the years in issue, it must have learned of whatever facts underlie its negligence claim against RSM only after its withholding tax returns were due. To begin with, as explained above, petitioners have not demonstrated that YA Global's failure to pay withholding tax and file withholding tax returns was contrary to its economic interest.

*Whitsett* is also readily distinguishable. We found in *Whitsett*, T.C. Memo. 2017-100, at *16, that the taxpayer was "completely unaware of the adviser's errors." Petitioners have not demonstrated that YA Global was unaware, during the years in issue, of whatever facts later served as the basis for its negligence claim against RSM.

Moreover, *Whitsett* suggests that the standards for a reasonable cause defense to accuracy-related penalties are not necessarily the same as those for a reasonable cause defense to additions to tax under section 6651(a). The Commissioner argued in *Whitsett* that, under the Supreme Court's analysis in *Boyle*, the taxpayer's reliance on her accountant could not serve as the basis for a reasonable cause defense. For two reasons, we viewed *Boyle* as inapplicable to the case before us in *Whitsett*. We noted that the taxpayer's accountant had affirmatively advised the taxpayer on a question of law. And we observed that, "in this case the IRS determined an accuracy-related penalty, not a late-filing addition to tax." *Whitsett*, T.C. Memo. 2017-100, at *14 n.6. If authorities under section 6651(a)(1) (such as *Boyle*) are not necessarily pertinent for purposes of the accuracy-related penalty, it follows that authorities involving the accuracy-related penalty (such as *Whitsett*) are not necessarily pertinent for purposes of the additions to tax under section 6651(a).

In sum, RSM advised YA Global that it was not engaged in a U.S. trade or business. And YA Global "provided [RSM with] necessary and accurate information." *Ellwest Stereo Theatres of Memphis, Inc. v. Commissioner*, 1995 WL 760499, at *5. We accept that RSM's advice was timely, in that it was provided before the omissions for which respondent seeks to impose additions to tax under section 6651(a)(1) and

(2). But petitioners have not established that, at the relevant times, YA Global had not yet learned of whatever facts later led it to file suit against RSM for professional malpractice and negligence. In other words, petitioners have not established that YA Global's reliance on RSM's advice was reasonable and not negligent. And the record does not establish that SRZ provided YA Global with reliable advice that the partnership was not engaged in a U.S. trade or business. We therefore reject petitioners' argument that YA Global's failures to file Forms 8804 and pay section 1446 withholding tax were due to reasonable cause and not willful neglect by reason of the partnership's reliance on the advice of competent and informed tax advisers.

We now turn to the second of petitioners' three arguments. Again, petitioners argue that, even if YA Global could not have reasonably relied on the explicit advice provided by RSM, it nonetheless reasonably relied on the implicit advice its accountants provided in not having prepared Forms 8804 along with Forms 1065.

Petitioners ground their argument in the Second Circuit's opinion in *Haywood Lumber & Mining Co. v. Commissioner*, 178 F.2d at 771, in which the appellate court concluded: "When a . . . taxpayer selects a competent tax expert, supplies him with all necessary information, and requests him to prepare proper tax returns . . . the taxpayer has done all that ordinary business care and prudence can reasonably demand." Leaving aside that the Second Circuit effectively reversed an opinion of this Court,[75] neither our opinion in *Haywood Lumber* nor that of the Second Circuit gives any indication that the taxpayer in that case had reason to know of the accountant's error in not having prepared one of the returns the taxpayer was required to file. By contrast, as explained above, YA Global came to believe, at some point before May 2015, that RSM had been negligent in advising YA Global that it was not engaged in a U.S. trade or business. And petitioners have not demonstrated that YA Global did not have reason for that belief before the due date of its 2008 Form 8804. Just as YA Global has not demonstrated reasonable reliance on RSM's explicit advice, it has not demonstrated reasonable reliance on the advice implicit in the firm's failure to prepare Forms 8804.

---

[75] Although we have never explicitly overruled our opinion in *Haywood Lumber*, we seem to have accepted the view expressed by the Second Circuit in that case. *See W. Coast Ice Co. v. Commissioner*, 49 T.C. 345 (1968); *Estate of Mayer v. Commissioner*, 43 T.C. 403 (1964), *aff'd per curiam*, 351 F.2d 617 (2d Cir. 1965); *Reliance Factoring Corp. v. Commissioner*, 15 T.C. 604 (1950).

That leaves us with petitioners' third argument, regarding what they allege to be a lack of relevant guidance. Petitioners characterize as "highly technical" the question of whether activities such as those conducted by Yorkville Advisors on YA Global's behalf give rise to a U.S. trade or business. According to petitioners, the partnership faced a "lack of guidance" on that question. That lack of guidance, they argue, "means that no penalties should be imposed in these cases even without considering the Fund's reliance on counsel claim."

As noted above, petitioners rely on three cases in support of their lack-of-guidance argument: two from this Court and one from the Ninth Circuit, considering an appeal from a federal district court. Again, each of the three cases involved accuracy-related penalties rather than additions to tax under section 6651. The threshold question we face in considering petitioners' argument is the relevance of section 6662 authorities in applying the section 6651 additions to tax. As we have already noted, our opinion in *Whitsett* suggests that authorities in one area may not be pertinent to the other. But we had no need to resolve that question in *Whitsett*. We had other grounds in that accuracy-related penalty case for distinguishing the Supreme Court's interpretation of section 6651(a) in *Boyle*.

The text of the two relevant statutes does not definitively answer the question, either. Their terms are similar but not identical. Under section 6651(a)(1), the failure-to-file addition to tax does not apply if the taxpayer shows that its failure to file was "due to reasonable cause and not due to willful neglect." Section 6651(a)(2) uses identical wording in providing an exception from the failure-to-pay addition to tax. Under section 6664(c)(1), the accuracy-related penalty does not apply "to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

All three statutes use the phrase "reasonable cause." But section 6664(c)(1) refers to a taxpayer's "good faith," while section 6651(a)(1) and (2) refer to an absence of "willful neglect." Those differences in statutory text support our observation in *Whitsett* that the scope of the different exceptions are not necessarily the same.

That said, the regulations interpreting the different provisions indicate a similar focus: Each requires assessing the reasonableness of the taxpayer's efforts to comply with the law. To review, Treasury Regulation § 301.6651-1(c)(1) provides:

If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the due date.

(Presumably, a finding of reasonable cause rules out willful neglect.[76])

Treasury Regulation § 1.6664-4(b)(1), interpreting the reasonable cause exception to the accuracy-related penalty, provides:

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. . . . Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all facts and circumstances, including the experience, knowledge, and education of the taxpayer.

Although the regulations are similar in their general thrust, they differ in one potentially important detail. Treasury Regulation § 301.6651-1(c)(1) includes no analogue to the "honest misunderstanding" phrase in Treasury Regulation § 1.6664-4(b)(1). And our quoting that language in *Williams*, 123 T.C. at 153, suggests that the lack-of-guidance basis for reasonable cause within the meaning of section 6664 may be grounded in specific wording unique to the regulation interpreting that provision.

Nonetheless, we accept that the authorities petitioners cite are at least analogous precedent. As we observed in *Grecian Magnesite*, 149 T.C. at 93, "where a taxpayer asserts reasonable cause as a defense from liability for [accuracy-related penalties and additions to tax under

---

[76] The converse, however, is not true. A taxpayer who simply forgets to file a return or pay the tax may not be guilty of *willful* neglect, but neither has the taxpayer demonstrated ordinary business care and prudence.

section 6651(a)(1) and (2)] because he relied on the advice of a competent adviser, the defenses overlap significantly."

Therefore, we face the task of locating petitioners' cases within the categories drawn by the precedents petitioners cite. Are the cases before us ones of first impression, like *Williams* or *Petersen*? Or do they instead, like *Van Camp & Bennion*, simply involve the application of an established standard to specific facts?

On that point, respondent has inadvertently supported petitioners' argument. He refers to "the widely held understanding of the industry at the time that whether a U.S.-based hedge fund engaged in financing activities was a U.S. trade or business was fraught with uncertainty." Messrs. Yager, Karst, and Griffel all testified to that effect.

Respondent emphasizes the uncertainty and lack of guidance to support the proposition that RSM was negligent in providing its advice and YA Global was negligent in relying on it. Respondent relies on Mr. Angelo's characterization of the advice Yorkville and YA Global received.

If YA Global's advisers were as bullish as Mr. Angelo described, the advisers might well have been negligent. And if YA Global knew, or had reason to know, of the lack of guidance in the area, the partnership might well have been negligent in relying on that overly bullish advice. Given Mr. Angelo's apparent tendency toward hyperbole, however, we judge it more likely that he overstated the degree of confidence in the advice that YA Global received.

As noted *supra* Part II.B, the line separating business activities from the management of investments is not always clear. And no prior authority of which we are aware applies that distinction to a hedge fund conducting activities similar to those of YA Global. Were we, therefore, to accept that YA Global's cases are ones of first impression, it might follow that, had the partnership not sought and received advice from tax advisers but instead done its best, on its own, to determine its filing and withholding tax obligations, its failure to file withholding tax returns and pay withholding tax might have been excusable on the basis of reasonable cause. But it does *not* follow that we should treat YA Global as being in the same position when, having sought and received such advice, it then came to believe that its adviser had been negligent in

providing that advice. Having taken the step of consulting advisers, the partnership could not unring that bell.

Petitioners would have us accept that a taxpayer, upon learning of possible negligence by an adviser who addressed an uncertain area of law, could simply shrug off the discovery on the theory that the taxpayer had no need of the adviser's advice to begin with. That level of indifference would not demonstrate ordinary business care and prudence. A prudent taxpayer in that circumstance would conduct further inquiry. If, for example, the adviser had overlooked potentially relevant facts or authorities, the taxpayer could ask the adviser whether consideration of those facts or authorities would change its view. The record, however, provides no indication that YA Global had further discussions with RSM after learning of whatever grounds led it to file its negligence and malpractice claim against the accountants.

Therefore, we conclude that petitioners have not established that YA Global's failures to file Forms 8804 and pay section 1446 withholding tax were "due to reasonable cause and not due to willful neglect." § 6651(a)(1) and (2). The record does not establish that SRZ provided YA Global with reliable advice that the partnership was not engaged in a U.S. trade or business. By contrast, we accept that RSM *did* provide YA Global with advice to that effect. But we cannot ignore the implications of the negligence and malpractice claim that YA Global filed against RSM in May 2015. Its filing of that claim indicates that, at some point, YA Global came to believe that RSM had been negligent in providing the advice on which it purported to have relied. And petitioners have not established that that point did not arrive until after the omissions for which respondent has asserted additions to tax under section 6651(a)(1) and (2). Just as YA Global has not demonstrated reasonable reliance on RSM's explicit advice, it has not demonstrated reasonable reliance on the advice implicit in the firm's failure to prepare Forms 8804. And the degree of uncertainty in the relevant area of law is not, under the circumstances, sufficient by itself to provide YA Global with a reasonable cause defense. A taxpayer might exercise ordinary business care and prudence in making its best effort, on its own, to interpret an uncertain area of law. It does not follow, however, that a taxpayer also exercises ordinary business care and prudence when it

takes the additional step of consulting an adviser and then disregards evidence of the adviser's negligence.

*Decisions will be entered for respondent for the taxable years 2006 and 2007 and under Rule 155 for the taxable year 2008; additional issues for the taxable year 2009 will be addressed in a subsequent opinion.*